382 F.3d 91
 Marcella LANDELL, Plaintiff-Appellee,
Donald R. Brunelle, Vermont Right to Life Committee, Inc., Political Committee, Neil Randall, George Kuusela, Steve Howard, Jeffrey A. Nelson, John Patch, Vermont Libertarian Party, Vermont Republican State Committee and Vermont Right to Life Committee-Fund for Independent Political Expenditures, Plaintiffs-Appellees-Cross-Appellants,
v.
William H. SORRELL, John T. Quinn, William Wright, Dale O. Gray, Lauren Bowerman, Vincent Illuzzi, James Hughes, George E. Rice, Joel W. Page, James D. McNight, Keith W. Flynn, James P. Mongeon, Terry Trono, Dan Davis, Robert L. Sand and Deborah L. Markowitz, Defendants-Appellants-Cross-Appellees,
Vermont Public Interest Research Group, League of Women Voters of Vermont, Rural Vermont, Vermont Older Women's League, Vermont Alliance of Conservation Voters, Mike Fiorillo, Marion Grey, Phil Hoff, Frank Huard, Karen Kitzmiller, Marion Milne, Daryl Pillsbury, Elizabeth Ready, Nancy Rice, Cheryl Rivers and Maria Thompson, Intervenors-Defendants-Appellants-Cross-Appellees,
 Docket No. 00-9159(L).
 Docket No. 00-9180(CON).
 Docket No. 00-9231(XAP).
 Docket No. 00-9139(XAP).
 Docket No. 00-9240(XAP).
 United States Court of Appeals, Second Circuit.
 Argued: May 7, 2001.
 Decided: August 7, 2002.
 Withdrawn: October 3, 2002.
 Amended Opinion Issued: August 18, 2004.
 
 Appeal from the United States District Court for the District of Vermont, William K. Sessions, III, Chief Judge. COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Timothy B. Tomasi, Assistant Attorney General, Montpelier, VT (Richard A. Johnson, Jr., Christopher G. Jernigan, Assistant Attorneys General, Office of the Attorney General, William H. Sorrell, Attorney General, Montpelier, VT, of counsel), for Defendants-Appellants-Cross-Appellees William H. Sorrell, John T. Quinn, William Wright, Dale O. Gray, Lauren Bowerman, Vincent Illuzzi, James Hughes, George E. Rice, Joel W. Page, James D. McNight, Keith W. Flynn, James P. Mongeon, Terry Trono, Dan Davis, Robert L. Sand, and Deborah Markowitz.
 Brenda Wright, National Voting Rights Institute, Boston, MA (Bonita Tenneriello, John C. Bonifaz, Gregory G. Luke, National Voting Rights Institute, Boston, MA; Peter F. Welch, Welch, Graham & Mamby, Burlington, VT; of counsel), for Intervenors-Defendants-Appellants-Cross-Appellees Vermont Public Interest Research Group, the League of Women Voters of Vermont, Rural Vermont, Vermont Older Women's League, Vermont Alliance of Conservation Voters, Mike Fiorillo, Marion Grey, Phil Hoff, Frank Huard, Karen Kitzmiller, Marion Milne, Daryl Pillsbury, Elizabeth Ready, Nancy Rice, Cheryl Rivers, and Maria Thompson.
 Mitchell L. Pearl, Langrock Sperry & Wool, LLP, Middlebury, VT (Peter F. Langrock, Langrock Sperry & Wool, LLP, Middlebury, VT; Joshua R. Diamond, Diamond & Robinson, Montpelier, VT; David Putter, Montpelier, VT; Mark J. Lopez, American Civil Liberties Union, New York, NY; American Civil Liberties Foundation of Vermont; of counsel), for Plaintiffs-Appellees-Cross-Appellants Neil Randall, George Kuusela, Steve Howard, Jeffrey A. Nelson, John Patch, and Vermont Libertarian Party.
 James Bopp, Jr., Bopp, Coleson & Bostrom, Terre Haute, IN (James R. Mason, III, Eric R. Bohnet, Aaron Kirkpatrick, Bopp, Coleson & Bostrom, Terre Haute, IN, of counsel), for Plaintiffs-Appellees-Cross-Appellants Donald R. Brunelle, Vermont Right to Life Committee, Inc., Vermont Republican State Committee, Vermont Right to Life Committee-Fund for Independent Political Expenditures, and Marcella Landell.
 Jane R. Rosenberg, Assistant Attorney General, Hartford, CT (Eliot D. Prescott, Assistant Attorney General, Richard Blumenthal, Attorney General, Hartford, CT, of counsel), for Amici States of Colorado, Connecticut, Maryland, New York, and Oklahoma.
 Gillian E. Metzger, Brennan Center for Justice at New York University School of Law, New York, N.Y. (Nancy Northup, Brennan Center for Justice at New York University School of Law, New York, NY, of counsel), for Amicus Brennan Center for Justice at New York University School of Law.
 Before: WINTER, STRAUB, and POOLER, Circuit Judges.
 STRAUB, Circuit Judge.
 
 
 1
 During his 1997 inaugural address, Vermont's Governor offered the Vermont General Assembly a moment of telling candor: "As I've said before, money does buy access and we're kidding ourselves and Vermonters if we deny it. Let us do away with the current system." The General Assembly responded by promulgating Act 64, a comprehensive campaign finance reform package. The testimony and statements made during the General Assembly's debate demonstrated that Vermont lawmakers were concerned with more than just the quid pro quo corruption that pre-occupies much of campaign finance reform. Typically, this fear of corruption has involved the danger that politicians will sell their votes for campaign funds. The Vermont debate highlighted something else that public officials can, and apparently do, offer in exchange for funds: time and access. The General Assembly, together with the State's chief executive, concluded that Vermont needed limitations governing its campaigns for state office with respect to both expenditures and contributions.
 
 
 2
 This appeal arises from a consolidated suit which brings a First Amendment challenge to key sections of Act 64. The plaintiffs have argued that Vermont's reform violates the First Amendment guarantee of free speech and association in the political realm. At the conclusion of a bench trial, the District Court enjoined the enforcement of Act 64's limitations on expenditures, gifts by non-resident contributors, and contributions by political parties to candidates. The District Court upheld all of Act 64's other contribution limitations, including limits of between $200 and $400 on contributions to candidates by individuals and political action committees, limits of $2000 on contributions to political parties and political action committees, and regulations treating coordinated expenditures by third parties as contributions to a candidate.
 
 
 3
 All parties have appealed that decision. We are therefore asked to determine whether the First Amendment rights of free speech and political association forbid each of the challenged provisions, including (1) Vermont's campaign expenditure limitations; (2) the contribution limits applied to candidates; (3) the contribution limits applied to political parties and political associations; (4) the limit on contributions by non-residents; and (5) the regulation of coordinated expenditures by political parties.
 
 
 4
 After issuance of the original opinion in this case, see Landell v. Sorrell, Nos. 00-9159(L), 00-9180(CON), 00-9231(XAP), 00-9139(XAP), and 00-9240(XAP) (2d Cir. Aug. 7, 2002) (slip op.), in which we upheld in large part both Act 64's contribution limits and its expenditure limits, plaintiffs filed a petition for rehearing in banc. We withdrew our original opinion on October 3, 2002, pending further proceedings. Landell v. Sorrell, Nos. 00-9159(L), 00-9180(CON), 00-9231(XAP), 00-9139(XAP), and 00-9240(XAP), 2002 WL 31268493 (2d Cir. Oct. 3, 2002). Having reconsidered our holding and taking serious note of the views presented during the rehearing process, we now issue this amended opinion, modifying our holding only with regard to Act 64's expenditure limits. In both instances, our colleague, Judge Winter, has dissented.
 
 
 5
 As we did in our original opinion, we hold today that the Supreme Court, in Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), did not rule campaign expenditure limits to be per se unconstitutional, but left the door ajar for narrowly tailored spending limits that secure clearly identified and appropriately documented compelling governmental interests.[1] In applying the narrow tailoring test, we hold that the State has established that the challenged expenditure limits are supported by its compelling interests in safeguarding Vermont's democratic process from (1) the corruptive influence of excessive and unbridled fundraising[2] and (2) the effect that perpetual fundraising has on the time of candidates and elected officials. The evidence considered by the District Court and the Vermont legislature demonstrates that, absent expenditure limitations, the fundraising practices in Vermont will continue to impair the accessibility to elected officials which is essential to any democratic political system. The race for campaign funds has compelled public officials to give preferred access to contributors, essentially requiring candidates to sell their time in order to raise campaign funds. In addition, we affirm the District Court's finding that effective campaigns can be run under Act 64's limits.
 
 
 6
 Nevertheless, although we reaffirm these aspects of our original holding, we now conclude that a remand is necessary for further fact-finding on an aspect of the narrow tailoring inquiry that was not fully considered by the District Court: the crucial question of whether Act 64's expenditure limits provision was the "least restrictive means" of furthering the State's compelling anti-corruption and time-protection interests — or whether there are other less restrictive mechanisms available that might be as effective in satisfying the compelling interests established by Vermont. On remand, the District Court should also consider another question that it did not reach in its original examination of this case — whether treating related expenditures as candidate expenditures is constitutional. We therefore leave in place the District Court's injunction, while remanding for further proceedings.
 
 
 7
 As for the remaining issues regarding Act 64's contribution limitations, our decision remains the same in all material respects. We hold that all of Vermont's provisions limiting the size of contributions survive scrutiny, including the treatment of a third party's related expenditures as contributions and the application of contribution limitations to political party donations to candidates. We thus affirm the District Court's rulings on contribution limits in part, but vacate and remand for further proceedings insofar as the District Court's injunction prohibits enforcement of the political party limit. We also vacate the judgment and remand for further proceedings on (1) whether the provisions of Act 64 regulate wholly independent expenditures by political action committees ("PACs") and, if so, whether those provisions are constitutional; and (2) the constitutionality of the law's regulation of funds transferred from national political parties to state and local party entities.
 
 
 8
 Finally, we affirm the District Court's holding that the First Amendment forbids Vermont's attempt to limit campaign contributions by non-residents to no more than 25 percent of the total contributions received. Vermont has asserted no governmental interest sufficient to justify such a rule.
 
 
 9
 Due to the number of issues involved in this case, we set out the following table of contents:
 
 CONTENTS
 
 10
 BACKGROUND ....................................................................... 99
 A. Act 64 ................................................................... 99
 B. Procedural History ....................................................... 102
 C. The District Court's Decision ............................................ 103
DISCUSSION ....................................................................... 105

 I. Act 64's Expenditure Limitations ............................................ 106
 A. The Rule of Buckley ...................................................... 106
 B. The Requisite Level of Scrutiny .......................................... 110
 C. Compelling Interests ..................................................... 114
 1. Anti-Corruption ....................................................... 115
 2. Time Protection ....................................................... 119
 3. Conclusion: Two Compelling Interests .................................. 124
 D. Narrow Tailoring ......................................................... 125
 1. Are Vermont's time-protection and anti-corruption interests
 advanced by campaign spending caps? ................................. 126
 2. Do spending limits at these levels allow for "effective advocacy"? .... 128
 3. Are mandatory expenditure limits the least restrictive means of
 advancing the State's interests? ..................................... 131
 a. Type of Regulation ................................................. 132
 b. Basis for Spending Cap Limits ...................................... 133
 E. Conclusion: Remand for Further Findings .................................. 135

 II. Act 64's Contribution Limitations ........................................... 137
 A. Limitations on Contributions by Individuals to Candidates ................ 137
 B. Limitations on Contributions to and by PACs and Political Parties ........ 139
 C. The Related Expenditure Provision is Constitutional as to
 Contributions .......................................................... 145
 D. The 25 Percent Limit on Out-of-State Donations is Unconstitutional ....... 146
 
 
 11
 CONCLUSION ....................................................................... 148
 
 BACKGROUND
 A. Act 64
 
 12
 In 1997, Vermont passed a comprehensive campaign reform act known as Act 64. 1997 Vermont Campaign Finance Reform Act, codified at Vt. Stat. Ann. tit. 17, §§ 2801-2883 ("Act 64" or "the Act"). As enacted, Act 64 is a comprehensive campaign finance reform package, regulating contributions, expenditures, and disclosures related to candidates for state office in Vermont and political organizations that participate in Vermont elections. Section 2805a limits the expenditures that a candidate for office may make during a two-year election cycle. Candidates for state-wide office are restricted to varying amounts depending on the position sought, with a candidate for governor limited to $300,000, for lieutenant governor to $100,000, and other statewide offices to $45,000. See id. § 2805a(a)(1)-(3). Candidates for governor and lieutenant governor also have the option of receiving public financing for their campaigns, provided they receive a certain number and amount of "qualifying contributions." See id. §§ 2851-2856. Candidates for state senator and county office are limited to $4000 in expenditures, with state senators permitted an additional $2500 per seat in multi-seat districts. See id. § 2805a(a)(4). Candidates for state representative in single-member districts can spend no more than $2000, and those in two-member districts no more than $3000. See id. § 2805a(a)(5). Incumbent candidates may spend only 85 percent of the permitted amounts, except for incumbents of the General Assembly who may spend 90 percent. See id. § 2805a(c).
 
 
 13
 The Act also limits the size of contributions which candidates, political committees, and political parties may receive from a single source during a two-year election cycle. Candidates for state representative or local office may accept no more than $200 from a single source, political party, or political action committee. See id. § 2805(a). Slightly higher limits apply to candidates for state senate or county office ($300) and to candidates for statewide office ($400). See id. Political action committees and political parties may accept no contribution greater than $2000. See id. For the purpose of all of these contribution limits, a political party's state, county, and local branches (and national and regional affiliates of the party) count as a single unit. See id. § 2801(5).
 
 
 14
 The Act further imposes limits on the source of such contributions. Although candidates, political parties, and political action committees may accept contributions from out-of-state residents and political organizations, the sum of such amounts may not exceed 25 percent of the total contributions received. See id. § 2805(c).
 
 
 15
 Finally, the Act treats coordinated expenditures by third parties as both contributions to a candidate (subject to the applicable contribution limits) and expenditures by the candidate (counted against the candidate's permissible budget). See id. §§ 2809(a)-(b). The Act creates a rebuttable presumption that expenditures made by political parties or political action committees that recruit or endorse candidates are related expenditures if they primarily benefit six or fewer candidates. See id. § 2809(d).
 
 
 16
 The Vermont General Assembly promulgated Act 64 after extensive legislative consideration. Numerous committees considered the Act, holding over 65 hearings with more than 145 witnesses testifying. Moreover, Act 64 was the latest installment of Vermont's century-long effort to safeguard the accessibility and accountability of its elected officials.[3]
 
 
 17
 The General Assembly closely investigated the history of campaign financing for state races by examining campaign finance summaries for various Senate, House, and statewide races during the period 1978-1996, and reports of spending and contribution patterns in Vermont races. Members of the General Assembly analyzed the current status of Vermont's campaign finance law, including the disintegration of Vermont's voluntary expenditure limits. They also spoke with a range of experienced candidates and experts who provided testimony and data regarding the cost of campaigning, including the cost of travel, staff, materials, mailings, phone calls, and television and radio advertisements. Some of these witnesses described the widespread use of manipulative contribution devices, such as "bundling," which enable special interests to direct large quantities of money by way of individual contributions to particular candidates. Polls demonstrated that citizens held deep reservations and suspicions about the influence of money on the political system, particularly the influence of large contributions. Some witnesses provided testimony detailing the role that big donors have played in advocating or blocking particular pieces of legislation in Vermont.
 
 
 18
 The record considered by the General Assembly demonstrated how the Vermont system of unbridled expenditures has created a situation where public officials are functionally compelled to sell privileged access through the fundraising system. The Vermont legislature explained that this results in a number of related phenomena, including (1) candidates being forced to spend too much time fundraising; (2) fundraising requiring candidates to give preferred access to contributors over non-contributors; and (3) the system of increasing expenditures hindering the robust debate of issues, candidate interaction with the electorate, and public involvement and confidence in the electoral process.
 
 
 19
 The evidence adduced in those hearings also demonstrated broad and powerful support among the Vermont electorate for fundamental reform to the State's campaign financing scheme. These legislative hearings culminated in passage of the Act by an overwhelming majority and with strong bipartisan support.
 
 
 20
 Based on these hearings, reports and data, the General Assembly set forth specific findings which, in its view, indicated the need for comprehensive reform that includes contribution and expenditure limitations in Vermont electoral campaigns.
 
 The General Assembly finds that:
 
 21
 (1) Election campaigns for statewide and state legislative offices are becoming too expensive. As a result many Vermonters are financially unable to seek election to public office and candidates for statewide offices are spending inordinate amounts of time raising campaign funds.
 
 
 22
 (2) Some candidates and elected officials, particularly when time is limited, respond and give access to contributors who make large contributions in preference to those who make small or no contributions.
 
 
 23
 (3) In the context of Vermont, contributions larger than the amounts specified in this act are considered by the legislature, candidates and elected officials to be large contributions.
 
 
 24
 (4) Robust debate of issues, candidate interaction with the electorate, and public involvement and confidence in the electoral process have decreased as campaign expenditures have increased.
 
 
 25
 (5) Increasing campaign expenditures require candidates to seek and rely on a smaller number of larger contributors, often outside the state, rather than a large number of small contributors.
 
 
 26
 (6) In the context of Vermont, contributions scaled in proportion to the size of the electoral district of the office and up to the amounts specified in this act adequately allow contributors to express their opinions, level of support and their affiliations.
 
 
 27
 (7) In the context of Vermont, candidates can raise sufficient monies to fund effective campaigns from contributions no larger than the amounts specified in this act.
 
 
 28
 (8) Limiting large contributions, particularly from out-of-state political committees or corporations, and limiting campaign expenditures will encourage direct and small group contact between candidates and the electorate and will encourage the personal involvement of a large number of citizens in campaigns, both of which are crucial to public confidence and the robust debate of issues.
 
 
 29
 (9) Large contributions and large expenditures by persons or committees, other than the candidate and particularly from out-of-state political committees or corporations, reduce public confidence in the electoral process and increase the appearance that candidates and elected officials will not act in the best interests of Vermont citizens.
 
 
 30
 (10) Citizen interest, participation and confidence in the electoral process is lessened by excessively long and expensive campaigns.
 
 
 31
 (11) Public financing of campaigns, conditioned on an appropriate number of qualifying contributions, will increase citizen participation and will limit the time spent soliciting contributions, and will reduce the need of elected officials to respond to, and provide access to, contributors. As a result candidates will be freed to devote more time and energy to debate of the issues and elected officials will be able to spend more time responding to constituents and to performing their official duties.
 
 
 32
 (12) Public financing of campaigns, coupled with generally applicable contribution and expenditure limitations, will level the financial playing field among candidates and provide resources to independent candidates, both of which will increase the debate of issues and ideas.
 
 
 33
 (13) In Vermont, campaign expenditures by persons who are not candidates have been increasing and public confidence is eroded when substantial amounts of soft money are expended, particularly during the final days of a campaign.
 
 
 34
 (14) Identification of persons who publish political advertisements assists in enforcement of the contribution and expenditure limitations established by this act.
 
 
 35
 (15) Because it is essential for all candidates to have their names and positions on issues known to the electorate and because incumbents have a substantial advantage in these areas, public grants and campaign expenditures must be reduced for incumbents.
 
 
 36
 1997 Vt. Laws P.A. 64 (H. 28). On June 26, 1997, Vermont's Governor signed Act 64 into law.
 
 B. Procedural History
 
 37
 The current suit was consolidated from three separate civil actions. On May 18, 1999, Marcella Landell, Donald R. Brunelle, and the Vermont Right to Life Committee, Inc., sued Vermont's Attorney General, Secretary of State and fourteen state's attorneys ("Vermont"). On August 13, 1999, Neil Randall, George Kuusela, Steve Howard, Jeffrey A. Nelson, John Patch, and the Vermont Libertarian Party also brought suit, as did the Vermont Republican State Committee on February 15, 2000. The remaining defendants, including the Vermont Public Interest Research Group, the League of Women Voters of Vermont, and numerous members of Vermont's General Assembly (collectively "Defendant-Intervenors"), successfully intervened in the consolidated action.[4]
 
 
 38
 Plaintiffs argued that the challenged provisions unconstitutionally infringe their First Amendment rights to free speech and political association.[5] The District Court held a ten-day bench trial between May 8, 2000 and June 2, 2000. An array of former and current public office holders, private citizens, and electoral experts testified about Vermont's interest in campaign finance legislation, the history of elections and campaign finance reform in Vermont, the cost of campaigning in Vermont, and the likely effect of Act 64's challenged provisions on Vermont races, candidates and political actors. As we discuss in more detail below, the ten-day bench trial resulted in the District Court's upholding most of the challenged provisions, but striking down Act 64's expenditure limitations, its limitations on contributions by parties to candidates, and its restriction on contributions from out-of-state sources. Vermont and the other defendant-appellants timely appeal from the District Court's order holding those portions of Act 64 unconstitutional. Vermont is joined by amici, the Brennan Center for Justice at New York University School of Law and the States of Colorado, Connecticut, Maryland, New York, and Oklahoma. The plaintiffs have cross-appealed, contending that the District Court should have also enjoined the enforcement of the other disputed provisions of the Act.
 
 C. The District Court's Decision
 
 39
 After receiving post-trial submissions, the District Court issued an opinion containing its findings of fact and conclusions of law. See Landell v. Sorrell, 118 F.Supp.2d 459 (D.Vt.2000). First, the District Court held that the plaintiffs have standing to challenge the subject provisions of the Act. Id. at 475. As to the merits, although the District Court found that Vermont had generally demonstrated several compelling justifications for Act 64's comprehensive reform of the campaign finance system, the court concluded that some of Act 64's provisions violated the First Amendment. With the exception of the expenditure limitations, the District Court applied the standard of review of "exacting scrutiny," inquiring whether the provision is narrowly tailored to serve a sufficiently important governmental interest. With regard to the expenditure limits, the District Court interpreted Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), as forbidding such limitations per se and held that any contrary decision would violate the doctrine of stare decisis. 118 F.Supp.2d at 483. The District Court rejected the expenditure limitations despite its findings that Vermont had established several compelling interests in their favor, namely: (1) freeing office holders from the requirements of excessive fundraising so that they can perform their duties; (2) preserving faith in democracy; (3) protecting access to the political arena for those unable to access large sums of money; and (4) diminishing the importance of repetitive 30-second commercials. Id. at 482-83. Despite holding that the expenditure limitations are illegal under Buckley, the District Court did find that the expenditure limits would permit effective campaigning. Id. at 471-72.
 
 
 40
 The District Court upheld the provisions imposing limitations on amounts that individuals may contribute to political campaigns, Vt. Stat. Ann. tit. 17, §§ 2805(a)(b). The District Court found that the Vermont provision, like the statutory provision upheld in Buckley, served the governmental interest in preventing actual and perceived corruption in the political system. Id. at 476-79. As evidence of the existence of such an interest, the District Court relied on citizen polls, comments by public officials, and media accounts of citizen concern with the state of the political system, as well as direct testimony from citizens regarding their views of the political system. Id. at 465-70. The evidence indicated that the current financing scheme eroded public confidence in the democratic system and contributed to a waning public interest in elections. Id. Finally, the evidence supported the public's perception that large contributions won actual influence over the legislative process. Again, the District Court relied not only on trial testimony, but also on studies showing how the pressure to raise money made legislative initiatives less likely to succeed if contrary to the wishes of well-organized interest groups who frequently contribute to candidates. Id.
 
 
 41
 The District Court further analyzed the amounts of the contribution limitations, and held that they were narrowly tailored to serve this anti-corruption purpose. In support of the narrow-tailoring conclusion, the court relied upon the cost of previous elections in Vermont, the size of Vermont electoral districts and the corresponding cost-per-voter, the effect of the limitations on the Burlington mayoral election held after the passage of Act 64, the widely-held public view that donations in excess of the Act's limitations were suspicious, and the fact that the limitation did not inhibit "effective campaigning." Id. at 470-72, 476-80.
 
 
 42
 The District Court rejected the contention that PACs merit special treatment; it thus upheld the restrictions on contributions by and to PACs pursuant to Act 64. See Vt. Stat. Ann. tit. 17, §§ 2805(a)-(b). If contributions by individuals may be restricted, the court reasoned, then so too may gifts by individuals to associations that in turn give funds to candidates. The District Court reasoned that Vermont has the same anti-corruption interest in limiting PAC contributions as those by individuals. The contribution limit closes a loophole which individuals could exploit to evade individual contribution limitations. Id. at 488-89.
 
 
 43
 The District Court held, however, that political parties deserve greater freedom in their ability to make contributions to political candidates. Although the District Court upheld the $2000 limitation on contributions to political parties pursuant to Vt. Stat. Ann. tit. 17, § 2805(a), it struck down the provision limiting contributions to candidates insofar as it applies to those candidate's own political parties pursuant to Vt. Stat. Ann. tit. 17, § 2805(b). Id. at 486-87. Regarding contributions to political parties, the court relied on Vermont's anti-corruption interest, noting that unrestrained contributions to parties provided a loophole to individuals wishing to evade restrictions on direct contributions. Quoting Nixon v. Shrink Mo. Gov't PAC, 528 U.S. 377, 397, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000)(Shrink), the District Court found that the limit imposed by the statute is not "so radical in effect as to render political association ineffective, drive the sound of [a political party's] voice below the level of notice, and render contributions pointless." 118 F.Supp.2d at 485. Moreover, the District Court found that, given Vermont's electoral situation, the $2000 limit did not inhibit the strength of political parties. The court relied on the evidence specifically concerning Vermont campaigns and politics, a comparison of limits on contributions to candidates in other jurisdictions, and the ability of the Republican Party to raise substantial sums while subject to Act 64's limitations. Id. at 484-86. The District Court, however, did not address the constitutionality of transfers of money to state and local parties from the national affiliated party, which are apparently subject to the $2000 limitation.
 
 
 44
 The District Court held that Vermont's limits on how much a political party could give to its own candidates for various state offices ($400, $300, and $200, respectively) were unconstitutionally low. Id. at 487. The court recognized that the anti-corruption interest may justify some limitations, given that corruption may "filter[] through the party machine." Id. at 486. But according to the District Court, those limitations must be balanced against the special role political parties play in the American electoral system. Without much factual discussion, the court concluded that the limits would reduce the party's voice to a whisper — since political parties speak through their candidates and the restrictions were too stringent even for the small scale of Vermont's electoral races. Id. at 487.
 
 
 45
 The District Court also upheld the treatment of state and local parties as a single entity for the purpose of calculating the contribution limitations pursuant to Vt. Stat. Ann. tit. 17, §§ 2801(5) & 2301-20. The court relied on a number of factors, including the fact that notwithstanding its adamant assertions, the defendant Vermont Republican State Committee had never acted as a loose confederation of entities in the conduct of the litigation. Id. at 487-88.
 
 
 46
 The District Court upheld the provision of Act 64 that treats third party expenditures "intentionally facilitated by, solicited by or approved by the candidate or the candidate's political committee" as contributions to the candidate pursuant to the Act. See Vt. Stat. Ann. tit. 17, § 2809(a) & (c). The purpose of the provision is to close a loophole which would otherwise permit evasion of the legitimate contribution limitations by engaging in coordinated expenditures. The District Court further upheld the provision establishing a rebuttable presumption that any third party expenditure benefiting six or fewer candidates is a related expenditure. See id. § 2809(d). The court explained that the presumption is a guideline to assist in compliance, and that since Vermont's Secretary of State has determined that the presumption is rebuttable, it does not unduly chill otherwise protected speech activity. Id. at 492. Although the District Court upheld the provision treating related expenditures as contributions to candidates, it struck down the provision treating related expenditures as expenditures by candidates. Vt. Stat. Ann. tit. 17 § 2809(a) & (b).
 
 
 47
 The District Court found unconstitutional the provision that caps out-of-state funds at 25 percent of total contributions received by a candidate, political party, or PAC pursuant to Vt. Stat. Ann. tit. 17, § 2805(c). The court found that the factual record did not establish any legitimate governmental interest in limiting such contributions. Id. at 483-84. Instead, the record only supported an inference that such contributions raise the risk of corruption when they are large — a problem solved by the contribution limits. The fact that a donor is a resident of another state is not an important factor in either increasing the risk of corruption or the public's perception of corruption. Moreover, the mechanics of the ban indicated a lack of proper tailoring because it acts as a complete bar to contributions by some would-be contributors.
 
 
 48
 Finally, the court held that, under Vermont law, the unconstitutional provisions may be severed from the rest of Act 64. Id. at 492-93.
 
 DISCUSSION
 
 49
 As a threshold matter, the defendants have challenged the plaintiffs' standing to assert this facial challenge to Act 64's expenditure and contribution limitations. In order to present a "case or controversy" within the meaning of Article III of the Constitution, the plaintiffs seeking relief must have a sufficient "personal stake in the outcome of the controversy." Buckley v. Valeo, 424 U.S. 1, 11, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (internal quotation marks omitted). The District Court provided careful analysis demonstrating that each of the challenged provisions arguably affects the First Amendment rights of one or more of the plaintiffs. See Landell v. Sorrell, 118 F.Supp.2d 459, 474-76 (D.Vt. 2000). For the reasons set forth by the District Court, we uphold its determination that the plaintiffs have standing to assert their challenge to Act 64's expenditure and contribution limits.
 
 
 50
 Although we review the District Court's factual findings for clear error pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, see Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 498, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), the District Court's legal conclusions regarding the campaign finance reform legislation are subject to de novo review. Indeed, the breadth of review of factual issues is greater in cases raising First Amendment issues: "an appellate court has an obligation to `make an independent examination of the whole record' in order to make sure that `the judgment does not constitute a forbidden intrusion on the field of free expression.'" Id. at 499, 104 S.Ct. 1949 (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 284-286, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). The appellate court must also be vigilant for errors of law that "may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law." Bose Corp., 466 U.S. at 501, 466 U.S. 485.
 
 
 51
 In reviewing campaign finance regulations, "the level of scrutiny is based on the importance of the political activity at issue to effective speech or political association." Federal Election Comm'n v. Beaumont, 539 U.S. 146, 161, 123 S.Ct. 2200, 156 L.Ed.2d 179 (2003) (internal quotation marks omitted). Campaign contributions advance political association by allowing one to affiliate with a political candidate, and "enabl[ing] like-minded persons to pool their resources in furtherance of common political goals." Buckley, 424 U.S. at 22, 96 S.Ct. 612. However, restrictions on contributions have been treated as merely "marginal" speech restrictions because contributions "lie closer to the edges than to the core of political expression." Beaumont, 539 U.S. at 161, 123 S.Ct. 2200. As a result, contribution limits pass muster if they are "closely drawn to match a sufficiently important interest." Id. at 162, 123 S.Ct. 2200 (citations and internal quotation marks omitted). And, as the Supreme Court recently observed, its cases "have made clear that the prevention of corruption or its appearance constitutes a sufficiently important interest to justify political contribution limits." McConnell, 540 U.S. at ___, 124 S.Ct. at 660; see also id. at ___, 124 S.Ct. at 657 n. 40 (explaining that since Buckley, the Court has "consistently applied less rigorous scrutiny to contribution restrictions aimed at the prevention of corruption and the appearance of corruption") (collecting cases).
 
 
 52
 However, "limits on political expenditures deserve closer scrutiny than restrictions on political contributions." Federal Election Comm'n v. Colorado Republican Federal Campaign Comm., 533 U.S. 431, 440, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001) (Colorado Republican II); see also McConnell, 540 U.S. at ___, 124 S.Ct. at 655. The Supreme Court has treated limits on campaign spending as a direct restraint on speech, and thus, expenditure limits must be narrowly tailored to serve a compelling state interest. See Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 657, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990) (addressing corporate expenditures).
 
 
 53
 With these standards in mind, we review each of the challenged provisions in turn.
 
 I. Act 64's Expenditure Limitations
 A. The Rule of Buckley
 
 54
 Buckley v. Valeo remains the seminal case governing the constitutional review of campaign finance reform efforts, including expenditure limitations. 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). The Buckley Court considered and rejected a variety of expenditure limitations, including a ceiling on independent, campaign-related expenditures, a ceiling on a candidate's use of personal or family resources, and a ceiling on a candidate's campaign expenditures. Like the federal statute reviewed in Buckley, Act 64 limits the total amount of campaign funds that a candidate may spend.
 
 
 55
 Although the clear language of Buckley requires that courts should review expenditure limits with exacting scrutiny, the District Court in this case (and it is by no means alone) apparently felt that Buckley categorically prohibits expenditure limitations. See, e.g., Homans v. City of Albuquerque, 366 F.3d 900, 914-21 (10th Cir.2004); Kruse v. City of Cincinnati, 142 F.3d 907, 918-19 (6th Cir.), cert. denied 525 U.S. 1001, 119 S.Ct. 511, 142 L.Ed.2d 424 (1998); see also post at 151, 152, 159, 172, 185 (Winter, dissenting). We disagree. The Buckley Court's rejection of particular federal campaign expenditure limitations was rooted in Congress' purported reasons for such legislation and the failures of those interests to demonstrate any need for expenditure limits. 424 U.S. at 55-58, 96 S.Ct. 612. Ultimately, the Court concluded that the federal government had failed to assert any sufficiently important interest that its expenditure limitations served. See id. at 55, 96 S.Ct. 612.
 
 
 56
 Examining the federal government's interest in eliminating corruption from federal elections, the Buckley Court concluded that the government's asserted rationale only applied to large contributions — that is, eliminating large contributions fully satisfied the government's anti-corruption interest. See id. at 56-57, 96 S.Ct. 612. The federal government claimed that expenditure limitations were necessary to make contribution limitations easier to enforce, arguing that when candidates cannot spend large quantities of money, they have a weaker incentive to accept illegally large contributions. But the Court concluded that the contribution limitations promised to be sufficiently effective on their own. See id. Based on the Court's review of the record, "[t]here [was] no indication that the substantial criminal penalties" attached to violations of contribution limits, as well as the "political repercussion of such violations," would not suffice to realize this anti-corruption interest. Id.
 
 
 57
 Nor was the Court persuaded that the federal government had a sufficient interest in utilizing expenditure limitations to equalize the financial resources of candidates competing for office. See id. at 56-57, 96 S.Ct. 612. The contribution limits would assure that any difference in resources "var[ies] with the size and intensity of the candidate's support." Id. at 56, 96 S.Ct. 612. Finally, the Court addressed the argument that expenditure limitations served the federal government's interest "in reducing the allegedly skyrocketing costs of political campaigns." Id. at 57, 96 S.Ct. 612. The Court rejected the idea that the state had a sufficient interest in setting the appropriate scope of the "quantity and range of debate on public issues in a political campaign." Id. In other words, Buckley held that large campaign expenditures, in and of themselves, are not inherently suspect.
 
 
 58
 We conclude, then, that Vermont cannot sustain Act 64 by asserting a need to control excessive campaign spending per se. But critically, the Buckley Court did not conclude that the Constitution would always prohibit expenditure limits, regardless of the reasons asserted and the record supporting the limitations. It simply held that based on the record before it, "[n]o governmental interest that has been suggested is sufficient to justify" the federal expenditure limits. Id. at 55, 96 S.Ct. 612. Accordingly, after Buckley, there remains the possibility that a legislature could identify a sufficiently strong interest, and develop a supporting record, such that some expenditure limits could survive constitutional review.
 
 
 59
 We are not alone in concluding that Buckley does not permanently foreclose any consideration of campaign expenditure limitations. In Shrink, Justices Breyer, Ginsburg and Stevens all recognized that our post-Buckley experiences with campaign finance have demonstrated that we need a flexible approach to the constitutional review of campaign finance rules. Justice Breyer, who was joined by Justice Ginsburg, concluded that courts must resist a static reading of Buckley's mandate, which may require reinterpretation in light of subsequent experience, including a legislature's "political judgment that unlimited spending threatens the integrity of the electoral process." 528 U.S. at 403-04, 120 S.Ct. 897 (Breyer, J., concurring). Legislatures may protect the electoral process not only from quid pro quo corruption, but also from the threat that campaign funding may pose to the "integrity of the electoral process." Id. at 401, 120 S.Ct. 897. Justice Stevens also articulated the need for "a fresh reexamination" of Buckley, and concluded that "Money is property; it is not speech." Id. at 398, 120 S.Ct. 897 (Stevens, J., concurring). And although Justice Kennedy argued from a different perspective that the post-Buckley experience requires a wholesale abandonment of the approach adopted in Buckley, he too left open the possibility that "Congress, or a state legislature, might devise a system in which there are some limits on both expenditures and contributions thus permitting officeholders to concentrate their time and effort on official duties rather than on fundraising." Shrink, 528 U.S. at 409, 120 S.Ct. 897 (Kennedy, J., dissenting); see also McConnell, 540 U.S. at ___, 124 S.Ct. at 745 (Kennedy, J., concurring in part and dissenting in part) (indicating by implication that Buckley did not make expenditure limits per se invalid).[6]
 
 
 60
 Indeed, some judges have noted that reconsideration might be required were a court faced with compelling evidence that unlimited expenditures posed great dangers to the very political process that Buckley sought to safeguard. Justices Stevens and Ginsburg have supported the constitutionality of spending limits on political parties for, among other reasons, the likelihood that such limits would improve, rather than inhibit, a flourishing political system:
 
 
 61
 It is quite wrong to assume that the net effect of limits on contributions and expenditures — which tend to protect equal access to the political arena, to free candidates and their staffs from the interminable burden of fundraising, and to diminish the importance of repetitive 30-second commercials — will be adverse to the interest in informed debate protected by the First Amendment.
 
 
 62
 Colorado Republican Federal Campaign Comm. v. Federal Election Comm'n, 518 U.S. 604, 649-50, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) (Colorado Republican I) (Stevens, J., dissenting). In part, they reached this conclusion because of the comparative competency of the different branches of government: "Congress surely has both wisdom and experience in these matters that is far superior to ours." Id. at 650, 116 S.Ct. 2309. Moreover, one judge sitting on the Sixth Circuit has pointed out that Buckley was "decided on a slender factual record" and that a fuller record might satisfy the constitutional requirement that expenditure limits be narrowly tailored to a compelling interest. Kruse, 142 F.3d at 919 (Cohn, J., concurring); cf. LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 13-27, at 1133 n.1 (2d ed. 1988) ("One consequence of th[e] expedited review [in Buckley] was that the Supreme Court, working in a factual vacuum, was forced to indulge in more than a little empirical speculation about such issues as the circumvention of expenditure limits and the impact of those limits on campaign speech."); Burt Neuborne, One Dollar-One Vote: A Preface to Debating Campaign Finance Reform, 37 WASHBURN L.J. 1, 30 (1997) ("Since the Buckley Court's judgment was made without the benefit of a factual record, critics have argued that it is time for a factually based study of the potential for corruption inherent in large, independent expenditures."); David R. Lagasse, Note, Undue Influence: Corporate Political Speech, Power and the Initiative Process, 61 BROOK. L. REV. 1347, 1357 (1995) ("The Supreme Court granted certiorari in Buckley v. Valeo without either party to the action having the opportunity to develop a strong factual record on which the Court could base its ultimate decision. Thus, the Court faced the issue of Congress's power to regulate campaign expenditures purely on theoretical grounds, without the benefit of developing an adequate factual record.") (citing BOB WOODWARD & SCOTT ARMSTRONG, THE BRETHREN 469-70 (1979)).
 
 
 63
 The academic literature also contains persuasive analyses that our post-Buckley understanding of campaign finance requires a careful evaluation of the evidence in support of expenditure limits. See, e.g., Richard Briffault, Nixon v. Shrink Missouri Government PAC: The Beginning of the End of the Buckley Era?, 85 MINN. L. REV. 1729, 1765-69 (2001) (arguing that fair and competitive elections may require some form of expenditure limitations); Vincent Blasi, Free Speech and the Widening Gyre of Fund-Raising: Why Campaign Spending Limits May Not Violate the First Amendment After All, 94 COLUM. L. REV. 1281, 1288-89 (1994) (noting that changed circumstances and never-before considered governmental interests, including the protection of candidates' time, might be sufficiently compelling to support expenditure limits).
 
 
 64
 Although we recognize that there is considerable dissatisfaction with Buckley's approach, we still premise our conclusions on the assumption that Buckley continues to govern the constitutional review of campaign finance laws. However, we do not accept an unyielding interpretation of Buckley that expenditure limits are per se unconstitutional, because such a static approach to Buckley's import would require us to ignore not only Buckley's own language, but also over three decades of experience as to how the campaign funds race has affected public confidence and representative democracy.[7] In sum, like the federal expenditure limitations considered in Buckley, Act 64's expenditure limitations rise or fall on whether they have been narrowly tailored to a compelling governmental interest. It is to that question that we now turn.
 
 B. The Requisite Level of Scrutiny
 
 65
 As a regulation of the amount that a candidate can spend on speech made "for the purpose of influencing an election," Vermont's expenditure limits are a content-based restriction on speech. See Burson v. Freeman, 504 U.S. 191, 197, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) (treating election provision as content-based because "whether individuals may exercise their free speech rights ... depends entirely on whether their speech is related to a political campaign").[8] "Content-based regulations are presumptively invalid," R.A.V. v. St. Paul, 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), and the government bears the burden of rebutting that presumption. United States v. Playboy Entertainment Group, Inc., 529 U.S. 803, 817, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). To uphold a content-based restriction on speech, the government must prove the existence of a compelling state interest to support the restriction, and that the restriction is narrowly tailored to advance that interest.
 
 
 66
 In the context of expenditure limits, then, the level of scrutiny applied is akin to the "strict scrutiny" standard frequently employed in the equal protection context, in terms of the required degree of "fit" between means and ends. Cf. Guido Calabresi, Antidiscrimination and Constitutional Accountability (What the Bork-Brennan Debate Ignores), 105 HARV. L. Rev. 80, 112-13 n.94 (citing cases) (noting that, traditionally, judicial review has been at its strongest in protecting against infringement on First Amendment rights). Our application of this standard is informed both by the particular First Amendment right implicated by the challenged restrictions, as well as by the degree of deference owed to the supporting legislative findings.
 
 
 67
 Turning to the first of these factors, there is no doubt that "[p]olitical speech is the primary object of First Amendment protection." Shrink, 528 U.S. at 410-11, 120 S.Ct. 897 (Thomas, J., dissenting). Moreover, in our representative democracy, the free exchange of political information "should receive the most protection when it matters the most — during campaigns for elective office." Id. at 411, 120 S.Ct. 897. However, the precise object of First Amendment protection in this case, for most plaintiffs, is the ability to spend money on political speech — not the speech itself. See Shrink, 528 U.S. at 400, 120 S.Ct. 897 (Breyer, J., concurring) (money is not speech; it "enables speech"). To be sure, the Supreme Court has consistently held that the expenditure of money is so critical in enabling political speech in today's mass society, that it should receive the same First Amendment protection as the speech itself. We do not question this proposition — and indeed apply it in this case — but, particularly in light of at least one Supreme Court Justice's willingness to rethink the money equals speech equation (J. Stevens concurring in Shrink, 528 U.S. at 398, 120 S.Ct. 897), think it important to define the protected interest as precisely as possible.
 
 
 68
 Although most of the plaintiffs are persons or organizations that want to spend money on speech, plaintiff Marcella Landell is a voter who wants to receive political speech. Her First Amendment right to receive such speech is the equivalent of the right of the speakers. See Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 756, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (the First Amendment protection afforded is to "the communication, to its source and to its recipients both"). As Landell describes her interest in her brief, she "does not wish her ability to cast a wise and informed vote to be restricted by the State of Vermont imposing a direct barrier on the amount of candidate speech she may receive." Restrictions of political speech that "hamstring[ ] voters seeking to inform themselves about the candidates and the campaign issues" are unconstitutional. Eu v. San Francisco County Democratic Central Comm., 489 U.S. 214, 223, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989). Plaintiffs argue that this high level of protection, as applied in Buckley, dictates that the expenditure limit provision must automatically be struck down.
 
 
 69
 On the other hand, Vermont appears to argue that deference to the legislature — on whether the interests asserted in favor of expenditure limits are compelling, and whether expenditure limits are necessary to achieve these goals — is warranted. Vermont cites several Supreme Court cases in support of its view of legislative deference, including Federal Election Comm'n v. National Right to Work Comm., 459 U.S. 197, 210, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982) (it is improper to "second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared"); Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 665, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (Turner I) ("courts must accord substantial deference to the predictive judgments" of the legislature); Turner Broadcasting System, Inc. v. FCC, 520 U.S. 180, 196, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (Turner II) ("We owe Congress' findings an additional measure of deference out of respect for its authority to exercise the legislative power."); and Walters v. National Association of Radiation Survivors, 473 U.S. 305, 330-31 n. 12, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985) (Congress' factual findings are entitled to "a great deal of deference, inasmuch as Congress is an institution better equipped to amass and evaluate the vast amounts of data bearing on" an issue). Indeed, the District Court concluded that "[a]lthough legislative findings are not entirely isolated from review," it was "required to exercise considerable deference to such findings." 118 F.Supp.2d at 476 (citing Turner II). Accordingly, the court adopted the fifteen official findings excerpted supra and in the District Court opinion, but made clear that it was also considering the other evidence presented at trial. Id. at 468-74.
 
 
 70
 As to plaintiffs' position, we disagree that the high level of protection accorded political speech or the money enabling it dictates that the provision must automatically be struck down. Cf. McConnell, 540 U.S. at ___, 124 S.Ct. at 706 ("Many years ago we observed that `[t]o say that Congress is without power to pass appropriate legislation to safeguard ... an election from the improper use of money to influence the result is to deny to the nation in a vital particular the power of self protection.'") (quoting Burroughs v. United States, 290 U.S. 534, 545, 54 S.Ct. 287, 78 L.Ed. 484 (1934)); Storer v. Brown, 415 U.S. 724, 729-30, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974) (compelling interest in the integrity and stability of the election process means that "every substantial restriction on the right to vote or to associate" should not automatically be invalidated). In our view, this level of protection is the starting point, not the endpoint, for scrutiny of Vermont's expenditure limits.
 
 
 71
 Indeed, the Supreme Court has been clear in its rejection of the view that "strict scrutiny is `strict in theory, but fatal in fact.'" Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 237, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (quoting Fullilove v. Klutznick, 448 U.S. 448, 519, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (Marshall, J., concurring)) (explaining that "[w]hen race-based action is necessary to further a compelling interest, such action is within constitutional constraints if it satisfies the `narrow tailoring' test this Court has set out in previous cases"). This observation has proven true in the First Amendment context, as the Supreme Court has validated a number of electoral regulations against First Amendment challenge even while applying strict scrutiny. See, e.g., Burson v. Freeman, 504 U.S. 191, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) (plurality opinion) (upholding state ban on electioneering activity near polling places); Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990) (upholding statute restricting independent expenditures by corporations on campaigns). Careful analysis is particularly important in applying strict scrutiny, where, as Justice Breyer has put it, "a law significantly implicates competing constitutionally protected interests in complex ways." Shrink, 528 U.S. at 402, 120 S.Ct. 897 (Breyer, J., concurring). As we will explain, this is a case where "constitutionally protected interests lie on both sides of the legal equation," preventing a simple equation of strict scrutiny with constitutional infirmity. Id. at 400, 120 S.Ct. 897; see also, e.g., Burson, 504 U.S. at 199, 112 S.Ct. 1846 (plurality opinion) (recognizing compelling interest in preserving integrity of electoral process); id. at 213, 112 S.Ct. 1846 (Kennedy, J., concurring) ("[T]here is a narrow area in which the First Amendment permits freedom of expression to yield to the extent necessary for the accommodation of another constitutional right."); Storer, 415 U.S. at 736, 94 S.Ct. 1274 (allowing some restrictions on ballot access in order to further the "State's interest in the stability of its political system").
 
 
 72
 Nor should we adopt total legislative deference as the appropriate level of scrutiny. Deference to legislative findings may well be warranted on certain issues relating to the constitutionality of election-related laws, such as the precise level of contribution limits, as in Buckley, 424 U.S. at 30, 96 S.Ct. 612, or whether 100 feet, as opposed to 50 or 75 feet, is an adequate radius surrounding a polling place to ban electioneering, as in Burson, 504 U.S. at 209-10, 112 S.Ct. 1846. Some degree of deference on the issue of whether there are state interests that justify legislative changes to the State's electoral system may also be appropriate. See, e.g., Federal Election Comm'n v. Beaumont, 539 U.S. 146, 155, 123 S.Ct. 2200, 156 L.Ed.2d 179 (2003) ("[D]eference to legislative choice is warranted particularly when Congress regulates campaign contributions, carrying as they do a plain threat to political integrity and a plain warrant to counter the appearance and reality of corruption and the misuse of corporate advantages."). But total deference is not warranted on the core questions of whether those interests are truly compelling enough, in a constitutional sense, to justify the expenditure limits, and whether this regulation places an undue burden on the First Amendment rights of those who bring this challenge. See, e.g., Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 519, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (plurality opinion) ("[I]t has been this Court's consistent position that democracy stands on a stronger footing when courts protect First Amendment interests against legislative intrusion, rather than deferring to merely rational legislative judgment in this area."); Schneider v. State, 308 U.S. 147, 161, 60 S.Ct. 146, 84 L.Ed. 155 (1939) ("This court has characterized the freedom of speech and that of the press as fundamental personal rights and liberties.... [T]he delicate and difficult task falls upon the courts ... to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of the rights.").
 
 
 73
 We read the District Court opinion as consistent with this view. It gives "considerable deference" to the legislative findings on the need for the law only, but not to the legislature's assessment of whether its solution is narrowly tailored. Cf. Regents of University of California v. Bakke, 438 U.S. 265, 299, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (Powell, J.) ("Political judgments regarding the necessity for the particular classification may be weighed in the constitutional balance, but the standard of justification will remain constant"), quoted in Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 224-25, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). This approach is consistent with Justice Breyer's concurrence in Shrink, where he indicated that the Court should "defer to [the Missouri legislature's] political judgment that unlimited spending threatens the integrity of the electoral process," but not with respect to whether "its solution, by imposing too low a contribution limit, significantly increases the reputation-related or media-related advantages of incumbency and thereby insulates legislators from effective electoral challenge." 528 U.S. at 403-04, 120 S.Ct. 897.
 
 
 74
 Although we bear in mind Justice Breyer's observations in Shrink, we cannot adopt his conclusion, in light of the extensive Supreme Court precedent to the contrary, that the interests must be balanced here, and that there is therefore "no place" for a "strong presumption against constitutionality of the sort often thought to accompany the words `strict scrutiny.'" Id. at 400, 120 S.Ct. 897. Such a presumption is proper, at least until the Supreme Court tells us otherwise, and it means that the burden of persuasion at trial was on the State to defend Act 64 — i.e., to establish that there was a compelling state interest to support the expenditure limit provision and that the provision was narrowly tailored to advance that interest. See Burson, 504 U.S. at 226, 112 S.Ct. 1846 (Stevens, J., dissenting, joined by O'Connor and Souter) (noting that "a core premise of strict scrutiny" is that "the heavy burden of justification is on the State"). But this burden does not excuse the courts from actually applying the scrutiny that the First Amendment demands, and the State of Vermont deserves.
 
 
 75
 Therefore, although we do not question the validity of the factual findings developed by the legislature in support of Act 64,[9] our system of judicial review provides plaintiffs the opportunity to present competing evidence, assigns to the District Court the responsibility for making findings of fact and conclusions of law after weighing the evidence, and leaves to the Court of Appeals the independent responsibility to assess the legal significance of these factual findings. This responsibility is particularly important here, where, as plaintiffs claim, complete deference to the legislature could "risk such constitutional evils as permitting incumbents to insulate themselves from effective electoral challenge." Shrink, 528 U.S. at 402, 120 S.Ct. 897 (Breyer, J., concurring).
 
 
 76
 Put differently, this level of scrutiny is a serious barrier for expenditure limits, but it is not impenetrable. Rather, an independent court must be convinced that the legislature was serving the people's interest and not its own. See, e.g., Burson, 504 U.S. at 213, 112 S.Ct. 1846 (Kennedy, J., concurring) (discussing the use of the compelling-interest test as "one analytical device to detect, in an objective way, whether the asserted justification is in fact an accurate description of the purpose and effect of the law"), quoted in R.A.V. v. City of St. Paul, 505 U.S. 377, 395, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992); Cf. Croson, 488 U.S. at 493, 109 S.Ct. 706 (noting in the equal protection context that "the purpose of strict scrutiny is to `smoke out' illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool," with the narrow tailoring analysis helping to ensure that there is "little or no possibility that the motive for the classification was illegitimate").
 
 C. Compelling Interests
 
 77
 In Shrink, the Court indicated that "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." 528 U.S. at 391, 120 S.Ct. 897. For example, the Court in Shrink accepted a relatively minimal evidentiary showing of Missouri's interest in preventing corruption or the appearance thereof, because in its view, there was "little reason to doubt that sometimes large contributions will work actual corruption of our political system, and no reason to question the existence of a corresponding suspicion among voters." Id. at 395, 120 S.Ct. 897; see also McConnell, 540 U.S. at ___, 124 S.Ct. at 661 ("The idea that large contributions to a national party can corrupt or, at the very least, create the appearance of corruption of federal candidates and officeholders is neither novel nor implausible."). Similarly, the Shrink Court relied in large part on Buckley's conclusion on the fit between contribution limits and the anti-corruption interest, to decide that the contribution limits in Missouri were sufficiently tailored and not "so different in kind as to raise essentially a new issue about the adequacy of the Missouri statute's tailoring to serve its purposes." 528 U.S. at 395, 120 S.Ct. 897.
 
 
 78
 With Shrink's guidance on "the quantum of empirical evidence needed" in mind, we turn then to the interests asserted by Vermont in support of Act 64's expenditure limits to assess whether any of the interests might be sufficiently compelling to support this regulation of political speech. Vermont offers five interests that it argues are sufficiently compelling to support the spending limits on candidates: (1) "avoiding the reality and appearance of corruption in elective politics and government"; (2) "assur[ing] that candidates and officeholders will spend less time fund-raising and more time interacting with voters and performing official duties"; (3) promoting "electoral competition and in protecting equal access to political participation"; (4) "bolster[ing] voter interest and engagement in elective politics"; and (5) "enhanc[ing] the quality of political debate and voters' understanding of the issues."
 
 
 79
 Defendants-intervenors appear to rely primarily on the first two of these interests to support the spending limits — describing those interests as (1) deterring corruption and the appearance of corruption; and (2) permitting candidates and officeholders to spend less time fund-raising and more time interacting with voters and performing duties. Defendants-intervenors also argue that the third interest asserted by the State — "protecting political equality" — should be recognized as an "additional basis" to support the spending limits on candidates.[10]
 
 
 80
 We now consider the interests asserted by the defendants.
 
 1. Anti-Corruption
 
 81
 The Supreme Court has recently clarified that the anti-corruption interest, in the campaign finance context, is "not confined to bribery of public officials, but extend[s] to the broader threat from politicians too compliant with the wishes of large contributors." Shrink, 528 U.S. at 389, 120 S.Ct. 897; see also McConnell, 540 U.S. at ___, 124 S.Ct. at 660. Moreover, the Shrink Court reiterated that, in addition to the actual influence of campaign contributions on politicians' behavior, the perception of corruption was an important part of this compelling state interest because it "could jeopardize the willingness of voters to take part in democratic governance." Shrink, 528 U.S. at 390, 120 S.Ct. 897 (citing United States v. Mississippi Valley Generating Co., 364 U.S. 520, 562, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961) (democracy works "only if the people have faith in those who govern")).
 
 
 82
 In terms of "the quantum of empirical evidence needed," we note that although the interest in avoiding corruption and the appearance thereof is well-established as sufficiently important in the context of contribution limits, the rejection in Buckley of the anti-corruption interest as a constitutional justification for spending limits dictates the need for considerable evidence to demonstrate that unlimited spending is part of the corruption problem, and that spending limits are a necessary and plausible solution.
 
 
 83
 In this case, the District Court found that Vermont had proven that the reality and perception of corruption in its political system was a legitimate concern. Specifically, it found that "[e]vidence at trial overwhelmingly demonstrated that the Vermont public is suspicious about the effect of big-money influence over politics," and "it appears they have reason to feel that way," 118 F.Supp.2d at 468, concluding that "[t]he record suggested that large contributors often have an undue influence over the legislative agenda." Id. In light of Shrink, this "undue influence" over the legislative agenda is properly considered part of the anti-corruption interest. See 528 U.S. at 389, 120 S.Ct. 897.[11] For the reasons that follow, our independent review of the evidence supports these findings by the District Court.
 
 
 84
 First, citizens in Vermont have consistently demonstrated a belief that the attention of their public representatives may be available for a price. As a result, public faith in the democratic system has declined. The General Assembly described the effects of a need to raise ever growing amounts of funds: "Robust debate of issues, candidate interaction with the electorate, and public involvement and confidence in the electoral process have decreased as campaign expenditures have increased." 1997 Vt. Laws P.A. 64 (H. 28) (finding No. 4). "Large contributions and large expenditures by persons or committees, other than the candidate and particularly from out-of-state political committees or corporations, reduce public confidence in the electoral process and increase the appearance that candidates and elected officials will not act in the best interests of Vermont citizens." Id. (finding No. 9). At trial, one expert witness, Celinda C. Lake, concluded that "[v]oters are extremely concerned about the influence of special interests in the political process." In fact, according to polling data, nearly 75 percent of Vermont voters say that ordinary voters do not have enough influence over Vermont politics and government, and more than two thirds believe that "large corporations and wealthy individuals have too much influence." (expert report of Celinda C. Lake).
 
 
 85
 Testimony by Vermont's elected officials revealed that this disenchantment and loss of public faith played a critical role in their belief that expenditure limits are necessary. One sponsor of Act 64, Representative Karen Kitzmiller, presented the Vermont House of Representatives with evidence showing that 94 percent of Vermonters believe that too much money is spent in politics, and 76 percent believe that ending private contributions would "reduce the power of special interest groups." Another state legislator, Gordon Bristol, testified at trial about his concern "about the regular guy on the street, and I think if they feel that candidates are spending a modest amount of money, that they are going to get candidates in there who are representing issues and not a special interest. . . ." According to another legislator, citizens have reported that they do not vote because "`[a]ll the big money controls everybody in Montpelier anyways.' . . . They think it's all wrapped up and that the special interests control it and, quite frankly, they aren't that wrong." (testimony of Elizabeth Ready). Another legislator said: "[I]t's the monied interests that control the process, and that cynicism ... it keeps people from participating, from engaging. . . ." (testimony of Donald Hooper).
 
 
 86
 Second, because of the limited number of campaign contributors and the constant concern of being outspent, candidates and elected officials are significantly influenced in deciding positions on issues by a belief that they are unable to oppose too many special interests, no matter how unpopular, because they will be cut off from funds. The General Assembly described the effects of a need to raise ever growing amounts of funds: "Increasing campaign expenditures require candidates to seek and rely on a smaller number of larger contributors, often outside the state, rather than a large number of small contributors." 1997 Vt. Laws P.A. 64 (H.28) (finding No. 5). If legislation alienates one major special interest group, officials are reluctant to alienate others because the number of entities and people making political contributions is finite and small. One state legislator admitted that, when considering a piece of legislation, "You have to initially consider it as whether or not you want to risk losing the financial support or, in the worst case, having that financial support go to a primary opponent or to a person who opposes you in a general election." (testimony of Peter Smith). One candidate recalled being told by another lawmaker: "We've already lost the drug money [because of the pharmacy bill], and I don't need to lose the food manufacture money too. So I'm not going to sign the bill." (testimony of Cheryl Rivers).
 
 
 87
 Third, and perhaps most perniciously, the demands of fundraising also affect the behavior of elected officials in the context of agenda-setting, since officials pay attention to which contributor "wants what to happen in terms of language of the bill, in terms of calendaring the bill, in terms of writing the rules." (testimony of Peter Smith). That same witness also noted that a crucial part of any deliberation on a bill involves speculation about the reaction of contributors because they control the money: politicians are forever asking "what's the industry position, what's the union position, what's — you know, and what they're talking about is where [is] the money behind the issue, what does the money want, where is the conflict between and among the power brokers." Senator Rivers testified that campaign contributors, by virtue of their role as contributors, can dominate the attention of party leadership or a committee chair, and thereby influence the legislature's agenda. In her words, "there is kind of an atmosphere that is created that there is [an] assumption that phone calls [of contributors] will get taken and [their] policy issues will be considered." Another senator, Elizabeth Ready, recognized that "there is an agenda out there that is pretty much set by folks that are not elected."[12] Candidates, often with great reluctance, accept the bargain with contributors so that they do not lose large sources of potential fundraising for the "arms race" in which they feel compelled to participate.
 
 
 88
 The evidence at trial established that candidates for public office rely on special interests for financial support, produced directly or by way of "bundling" smaller contributions from a particular company or industry.[13] The Buckley Court seemed to assume that many small contributions could not raise the specter of corruption. "If a senatorial candidate can raise $1 from each voter, what evil is exacerbated by allowing that candidate to use all that money for political communication?" 424 U.S. at 56 n. 64, 96 S.Ct. 612 (internal quotation marks omitted). But the reality of campaign financing in Vermont is a far cry from this idyllic vision of political fundraising, in large part because not every voter has the financial ability to participate by giving campaign contributions. "[T]he average Vermonter has been, to some degree, disenfranchised because the average Vermonter cannot afford the price of admission." Senate J. of the State of Vt., at 1338 (Biennial Session, 1997) (statement of William T. Doyle).
 
 
 89
 Vermont has a compelling interest in safeguarding its political process from such contributor dominance, because it corrupts the process for achieving accessibility and accountability of state officials and candidates. The evidence at trial demonstrated that money — and the special interests that wield it — has a great influence on candidate behavior in Vermont, at the expense of the electorate as a whole, since candidates depend on it in order to run for office. Where access and influence can be bought, citizens are less willing to believe that the political system represents the electorate, exacerbating cynicism and weakening the legitimacy of government power. See Jacobus v. Alaska, 338 F.3d 1095, 1113 (9th Cir.2003) (describing the phenomenon of "access-peddling" and explaining that it "creates a danger of corruption and the appearance of corruption"). The accessibility and accountability of public officials — and the public's faith that Vermont's government is accessible and accountable — are fundamental to any democratic system.
 
 
 90
 In our view, such influence of campaign contributors is pernicious because it is bought. Certain private citizens and organizations should not be given greater access to public office holders — and thus greater influence — on account of those citizens' ability and willingness to pay for candidates' campaigns. Even with contribution limits, the arms race mentality has made candidates beholden to financial constituencies that contribute to them, and candidates must give them special attention because the contributors will pay for their campaigns. Quid pro quo corruption is troubling not because certain citizens are victorious in the legislative process, but because they achieve the victory by paying public officials for it.
 
 
 91
 In short, we believe, based on the District Court's findings and our own independent review of the record, that Vermont has proven the strength of this interest, and its relationship to unlimited campaign spending. And we believe that the factual record developed by Vermont in support of the anti-corruption interest, through the legislative process and at trial, may be sufficient to distinguish Buckley. Cf. Colorado Republican I, 518 U.S. at 617-18, 116 S.Ct. 2309 (plurality opinion) (indicating that "the lack of coordination between the candidate and the source of the expenditure... prevents us from assuming, absent convincing evidence to the contrary, that a limitation on political parties' independent expenditures is necessary to combat a substantial danger of corruption of the electoral system.") (emphasis added); Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 863-64, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (citing West Coast Hotel and Brown v. Board of Education as examples of "applications of constitutional principle to facts as they had not been seen by the Court before"). Nonetheless, given Buckley's holding rejecting the anti-corruption interest as inadequate to support the expenditure limits at issue in that case, we are reluctant to conclude that the same general interest, standing alone, is sufficiently compelling to support Act 64's expenditure limits. See Buckley, 424 U.S. at 46-48, 96 S.Ct. 612; see also McConnell, 540 U.S. at ___, 124 S.Ct. at 647. We turn then to the second interest asserted by defendants.
 
 2. Time Protection
 
 92
 Vermont also submits that it has a compelling interest in "assur[ing] that candidates and officeholders will spend less time fundraising and more time interacting with voters and performing official duties." Indeed, the District Court found that "the need to solicit money from large donors at times turns legislators away from their official duties." 118 F.Supp.2d at 468. The District Court also indicated that the State proved that this concern exists, and that Vermont's expenditure limits addressed this interest, among others. Id. at 482-83.
 
 
 93
 Again, we are mindful of Shrink's guidance that "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised."[14] 528 U.S. at 391, 120 S.Ct. 897. On this score, the "time protection" rationale has been recognized as compelling, although not in the context of candidate spending limits. Indeed, the Buckley Court considered this interest in assessing, and deemed it sufficiently important to support, the public financing scheme for Presidential election campaigns — a provision it upheld. See 424 U.S. at 96, 96 S.Ct. 612 ("Congress properly regarded public financing as an appropriate means of relieving major-party Presidential candidates from the rigors of soliciting private contributions") (citing Senate Rep. No. 93-689); 424 U.S. at 91, 96 S.Ct. 612 ("Congress was legislating for the `general welfare' . . . to free candidates from the rigors of fundraising."). See also Republican Nat'l Committee v. Federal Election Comm'n, 487 F.Supp. 280, 284-86 (S.D.N.Y.) (three-judge District Court) (upholding constitutionality of expenditure limits as condition of accepting presidential public financing in part on ground that it would "give candidates the opportunity to lessen the `great drain on (their) time and energies' required by fundraising `at the expense of providing competitive debate of the issues for the electorate'") (quoting Senate Rep. No. 93-689), aff'd mem., 445 U.S. 955, 100 S.Ct. 1639, 64 L.Ed.2d 231 (1980).
 
 
 94
 Moreover, other circuits have more recently recognized the compelling nature of the time-protection interest in similar contexts. See Rosenstiel v. Rodriguez, 101 F.3d 1544, 1553 (8th Cir.1996), cert denied, 520 U.S. 1229, 117 S.Ct. 1820, 137 L.Ed.2d 1028 (1997) (upholding Minnesota's voluntary public financing scheme because the government has a compelling interest in reducing "the time candidates spend raising campaign contributions, thereby increasing the time available for discussion of the issues and campaigning"); Vote Choice, Inc. v. DiStefano, 4 F.3d 26, 39 (1st Cir.1993) (holding that statute survives exacting scrutiny because Rhode Island has "a valid interest in having candidates accept public financing because such programs `facilitate communication by candidates with the electorate' [and] free candidates from the pressures of fundraising.") (quoting Buckley, 424 U.S. at 91, 96 S.Ct. 612). Indeed, the Rosenstiel court determined that it is "well settled" that this interest is compelling. 101 F.3d at 1553 (collecting cases).
 
 
 95
 The Buckley Court, in determining that the expenditure limits in that case were unconstitutional, alluded to this time-protection interest only in passing. 424 U.S. at 91, 96, 96 S.Ct. 612 (mentioning generally Congress' desire to relieve political candidates from the "rigors" of soliciting and fundraising); see also Blasi, supra, at 1285-86 & n. 15 ("[D]uring the public and legislative debates that led to the passage in 1974 of mandatory spending limits for congressional races, and during the Buckley litigation which resulted in the invalidation of those limits, candidate time protection was almost wholly ignored as a justification for campaign spending limits."). Only Justice White, concurring in part and dissenting in part, observed that imposing "expenditure ceilings" would "ease the candidate's understandable obsession with fundraising, and so free him and his staff to communicate in more places and ways unconnected with the fundraising function." Buckley, 424 U.S. at 264-65, 96 S.Ct. 612 ("There is nothing objectionable — indeed it seems to me to be a weighty interest in favor of the provision — in the attempt to insulate the political expression of federal candidates from the influence inevitably exerted by the endless job of raising increasingly large sums of money."). One commentator explains that "candidate time protection was not at the center of either the reform agenda or the constitutional analysis" because Buckley was decided "[b]efore the advent of pervasive war chests and candidate-PAC merchandizing bazaars."[15] Blasi, supra, at 1287.
 
 
 96
 Plaintiffs argue that this interest is no different than the goal of reducing the "skyrocketing costs of political campaigns," rejected by Buckley as an insufficiently compelling interest to support expenditure limits. 424 U.S. at 57, 96 S.Ct. 612. The Sixth Circuit agreed in Kruse, reasoning that "[t]he need to spend a large amount of time fundraising is a direct outgrowth of high costs of campaigns. However, because the government cannot constitutionally limit the cost of campaigns, the need to spend time raising money, which admittedly detracts an officeholder from doing her job, cannot serve as a basis for limiting campaign spending." 142 F.3d at 916-17. We are unpersuaded by this reasoning.
 
 
 97
 Indeed, we think the language of Buckley, as well as an examination of the Buckley briefs, oral argument, and subsequent commentary from judges and scholars, precludes such an interpretation. In its discussion of the federal campaign expenditure ceilings at issue in Buckley, the Buckley Court explained that the limits "appear to be designed primarily to serve the governmental interests in reducing the allegedly skyrocketing costs of political campaigns," and cited the statistics put forward by appellees and appellants on how the percentage increase in campaign spending in recent years compared to the rise in the consumer price index, gross national product, and total expenditures for commercial advertising over the same time period. 424 U.S. at 57, 96 S.Ct. 612. The Court concluded that, regardless of the import of such statistics, "the mere growth in the cost of federal election campaigns in and of itself provides no basis for governmental restrictions on the quantity of campaign spending and the resulting limitation on the scope of federal campaigns." Id. (emphasis added). Particularly in light of the recent statements of three Justices indicating that this "time protection" rationale may be a compelling interest, see supra at 108 (quoting Shrink, 528 U.S. at 409, 120 S.Ct. 897 (Kennedy, J., dissenting)); and Colorado Republican I, 518 U.S. at 649-50, 116 S.Ct. 2309 (Stevens, J., joined by Ginsburg, J., dissenting), we see no reason to read Buckley more broadly than its language indicates.
 
 
 98
 At trial, Vermont presented powerful evidence concerning the time pressures which the prospect of unlimited expenditures places on candidates for office. In particular, there is strong evidence that unlimited expenditures have compelled candidates to engage in lengthy fundraising in order to preempt the possibility that their political opponents may develop substantially larger campaign war chests. The Vermont General Assembly found that such fundraising by candidates requires an "inordinate[] amount of time." 1997 Vt. Laws P.A. 64 (H. 28) (finding No. 1). The large, and growing, campaign war chests in Vermont have created strong pressures on elected officials to ensure that they can raise funds comparable to any opponent. One witness, former State Senator and Lieutenant Governor Peter Smith, described the "stampede or nuclear arms race mentality that we currently have, which is just keep building the bank because you never know what's going to happen." Under the current system, Vermont candidates feel like "you had two races you were running. The first was for the money. . . ." (testimony of Donald Hooper).
 
 
 99
 Although there may be no inherent problem with candidates competing to raise large quantities of funds, the evidence in Vermont is clear that the pressure to raise large sums of money greatly affects the way candidates and elected officials spend their time. Special interests, well placed to take advantage of candidates' fear of losing this fundraising war, dominate candidates' time and thereby have been able to exercise substantial control over the information that passes to candidates. They do this by increasingly consuming the opportunities candidates have for meeting with constituent groups and forcing candidates to choose contributors over private citizens who make small or no contributions. This command of available time, inherent in endless fundraising, drastically reduces opportunities that candidates have to meet with non-contributing citizens.[16]
 
 
 100
 Legislators explained at trial that officials are more likely to return donors' phone calls. "If I have only got an hour at night when I get home to return calls, I am much more likely to return [a donor's] call then I would [a non-donor's] .... [W]hen you only have a few minutes to talk, there are certain people that get access." (testimony of Elizabeth Ready). A former candidate for Congress and current lobbyist in Vermont, Anthony Pollina, described the process:
 
 
 101
 [C]andidates and policymakers ... can only talk to so many people in a day. They can only respond to so many phone calls. The governor can only have so many meetings in a day. And if in fact large contributors are using their contributions to buy access to the governor or other policymakers ... then that means that the policymaker, the governor and others are not spending their time talking to other people who have not provided other large contributions....
 
 
 102
 Nor is this just a theoretical concern. One widely reported case involved the differing access that state officials granted to interested groups as the state government considered whether to label milk produced using genetically engineered hormones. Major dairy companies, who in the past had been contributors, were able to arrange meetings with critical state leaders, whereas local farmer organizations that lacked importance as contributors could not arrange similar meetings.
 
 
 103
 By giving money, contributors "haven't bought the person, but they have certainly bought a piece of that time there where they have that person's attention." (testimony of Elizabeth Ready). Even if candidates receive valuable information during every hour spent fundraising, their time is being controlled by those with campaign cash, and this effect is corrosive. The Vermont legislature considered one article in the Burlington Free Press stating that "[m]oney not only threatens to corrupt the process, it sabotages the political dialogue as well. Candidates spend too much time begging for dollars and too little time talking issues...." See Democratic Process Relies on Reform, Burlington Free Press, Oct. 6, 1997 at 6A.
 
 
 104
 Public officials testified at trial that the financial necessity imposed by fundraising, and bred by the "arms race" mentality in campaigns with unlimited spending, requires that elected officials spend time with donors rather than on their official duties. One state Senator testified that legislators have to spend time at party fundraising events to give donors access to elected officials. (testimony of Cheryl Rivers). Another Senator explained how spending limits would affect her time:
 
 
 105
 If I can go out and raise what I have to raise and know that those limits are in place, I can spend the whole rest of my campaign, once I have raised that money, out with the public, okay. I can go door-to-door. I can go around to local events. I can go to the county fairs. I can have a little booth, you know, and be talking to people. I am not going to be locked away, you know, in the Democratic Party somewhere or in my own office somewhere making fundraising calls. (testimony of Elizabeth Ready).
 
 
 106
 Simply put, every hour spent drumming up financial contributions is an hour that cannot be spent independently studying legislative proposals or meeting with constituents who may not be likely donors. And the public understands this reality: at trial, Vermont presented survey data that 85% of Vermonters are concerned that "political fundraising took away time from important government business." (testimony of Celinda C. Lake).
 
 
 107
 Indeed, although we do not balance interests, the fact that this time-protection interest is itself fundamental to our representative democracy, and related to First Amendment values, cannot be ignored. As one First Amendment scholar put it, the quality of democratic representation suffers "when legislators continually concerned about re-election are not able to spend the greater part of their workday on matters of constituent service, information gathering, political and policy analysis, debating and compromising with fellow representatives, and the public dissemination of views." Blasi, supra, at 1282-83.
 
 
 108
 Unfortunately, without spending limits, the contribution limits would exacerbate the time problem. A lobbyist who supports Act 64 noted that contribution limits coupled with unlimited expenditures would require that candidates "continue to spend more time and energy raising those smaller contributions to see who could raise the most money and outspend their opponent and therefore win the race. So the spending limits, tied to the contribution limits, create a situation where the candidates simply don't have to spend as much time and energy raising money.... [The limits] change the way campaigns are run, in a sense, and make them more people oriented or voter oriented as opposed to fundraising oriented...." (testimony of Anthony Pollina). Cf. McConnell, 540 U.S. at ___, 124 S.Ct. at 656 ("The `overall effect' of dollar limits on contributions is `merely to require candidates and political committees to raise funds from a greater number of persons.'") (quoting Buckley, 424 U.S. at 21-22, 96 S.Ct. 612). That same lobbyist also explained that with contribution limits alone, "the unfortunate thing is that candidates would feel compelled to look for those other sources because they would still be trying to outspend... their opponents, and that would cause them to then spend more time and more energy into looking for those other sources of funding. It might then encourage the bundling practices that were referred to earlier, and ... it would not address the problem that we are hoping to address." (testimony of Anthony Pollina).[17]
 
 
 109
 In sum, our independent review of the evidence adduced at trial supports the District Court findings that "the Vermont public perceives, legitimately, that candidates frequently spend an excessive amount of time fundraising and not enough time interacting with voters," and that "the need to solicit money from large donors at times turns legislators away from their official duties." 118 F.Supp.2d at 468, 470. So long as the danger remains that a political opponent might severely outstrip a candidate's financial resources, candidates have continued to feel it necessary to raise ever larger sums of money. For elected officials, this will mean giving more time to contributors over non-contributors, and expending more effort on relatively generous contributors over less important ones.
 
 3. Conclusion: Two Compelling Interests
 
 110
 Faced with this evidence and the resulting findings of the District Court, we conclude that Vermont has established at least two interests in maintaining campaign expenditure limits: preventing the reality and appearance of corruption, and protecting the time of candidates and elected officials. In this case, Vermont's well-documented interest in time-protection is particularly compelling when considered in tandem with the State's firmly-rooted interest in preventing corruption (or the appearance thereof). Cf. Miller v. Johnson, 515 U.S. 900, 921, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) (leaving open question whether "compliance with the [Voting Rights] Act, standing alone, can provide a compelling interest independent of any interest in remedying past discrimination").[18] Regardless of whether one finds Vermont's justifications novel, the quantum of evidence demonstrating the depth of the problem in Vermont campaigns is great. The drive for campaign funds has created a situation where candidate time is effectively for sale. As a democracy, Vermont has a compelling interest in ensuring that its representatives' time is not available only — or mostly — to the people who are willing and able to pay for it. Fundamentally, Vermont has shown that, without expenditure limits, its elected officials have been forced to provide privileged access to contributors in exchange for campaign money. Vermont's interest in ending this state of affairs is compelling: the basic democratic requirements of accessibility, and thus accountability, are imperiled when the time of public officials is dominated by those who pay for such access with campaign contributions.
 
 
 111
 Because we conclude that Vermont has established two interests that, taken together, are sufficiently compelling to support its expenditure limits, we need not consider the other interests asserted by the State. Specifically, we need not consider whether the interest in encouraging electoral competition and protecting the ability of non-wealthy Vermonters to run for state office in Vermont is sufficiently compelling. And we do not need to reach the question of whether Vermont has sufficiently compelling, independent interests in (1) bolstering voter interest and engagement in elective politics; and (2) encouraging public debates and other forms of meaningful constituent contact in place of the growing reliance on 30-second commercials. We do note that the first of these interests is properly considered part of the anti-corruption interest, and the second relates to the time-protection rationale.
 
 D. Narrow Tailoring
 
 112
 Our analysis next requires a determination as to whether the particular limits are narrowly tailored to serve the compelling interests offered. Because mandatory expenditure limits are so rare, and the Supreme Court and federal courts of appeals that have considered the constitutionality of expenditure limits have found no compelling interests sufficient to support them, no court has reached the narrow tailoring question in this context. Thus, we are in largely uncharted waters.
 
 
 113
 Plaintiffs argue that even if there is a compelling interest to support Act 64's spending limits, the spending limits are not narrowly tailored. They argue that the spending limits are too serious an impingement on First Amendment rights, without significantly advancing the interests asserted by the State. Because the District Court held that mandatory spending limits are per se unconstitutional under Buckley, it never fully reached the narrow tailoring inquiry, although it did address the subsidiary question of whether candidates could run effective campaigns under the rubric of "narrow tailoring." 118 F.Supp.2d at 470-72.
 
 
 114
 The parties present the narrow tailoring issue as whether the expenditure limits are sufficiently high to allow candidates to run effective campaigns. Indeed, in our initial consideration of this case, we assumed that the parties were correct in focusing the narrow tailoring question on the ability of a candidate to run an "effective campaign." We now believe, however, that the narrow tailoring inquiry is broader, and that answering the question requires remand to the District Court. We write further to explain the nature of the narrow tailoring inquiry required.
 
 
 115
 The narrow tailoring inquiry examines the "fit" between means and ends. Here, the question is whether mandatory spending limits will significantly advance the State's time-protection and anti-corruption interests, without severely burdening the First Amendment rights of the plaintiffs. "Where at all possible, government must curtail speech only to the degree necessary to meet the particular problem at hand, and must avoid infringing on speech that does not pose the danger that has prompted regulation." Federal Election Comm'n v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 265, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986).
 
 
 116
 In order to satisfy the "narrow tailoring" standard, the government must also prove that the mechanism chosen is the least restrictive means of advancing that interest. See, e.g., Playboy Entertainment Group, Inc., 529 U.S. at 816, 120 S.Ct. 1878 ("When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals."); Universal City Studios, Inc. v. Corley, 273 F.3d 429, 450 (2d Cir.2001) ("Content-based restrictions are permissible only if they serve compelling state interests and do so by the least restrictive means available.").[19] When the First Amendment demands strict scrutiny, "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." Playboy Entertainment Group, 529 U.S. at 813, 120 S.Ct. 1878; Sable Communications of Cal., Inc., v. FCC, 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989) ("The Government may ... regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest."); see also Boos v. Barry, 485 U.S. 312, 329, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (concluding that government regulation at issue was not narrowly tailored because "a less restrictive alternative is readily available"); California Democratic Party v. Jones, 530 U.S. 567, 585-86, 120 S.Ct. 2402, 147 L.Ed.2d 502 (2000) (observing, in dicta, that California's "blanket" partisan primary system was not a narrowly tailored means of furthering asserted state interests because "a nonpartisan blanket primary" would advance the same interests "without severely burdening a political party's First Amendment right of association").
 
 
 117
 Accordingly, answering the narrow tailoring question requires addressing three different issues: (1) the extent to which the State's interests are advanced by the regulation; (2) the extent to which candidates can conduct "effective advocacy" under the limits; and (3) whether the government has proven the absence of less restrictive alternatives that are as effective in advancing its compelling interests, while impinging less on First Amendment rights.
 
 
 118
 1. Are Vermont's time-protection and anti-corruption interests advanced by campaign spending caps?
 
 
 119
 Plaintiffs argue that the spending limits do not actually advance the interests asserted by the State because the limits are set at the equivalent of current levels of spending, and when considered in combination with the contribution limits, actually force candidates and elected officials to spend more time and attention on fundraising, not less. For the reasons that follow, we disagree and conclude that the spending limits are likely to advance both the time-protection and anti-corruption interests asserted by the State.
 
 
 120
 First, we do note the apparent tension between seeking to reform the political process by imposing expenditure limits, yet setting limits based on current candidate expenditure patterns in an effort to approximate the spending needs of such candidates. We believe, however, that this tension is more apparent than real. Indeed, plaintiffs' argument misunderstands the driving force behind the spending limits. The evidence at trial, including the evidence from legislative hearings, indicated the widespread presence of an "arms race" mentality. The record in Vermont demonstrates that often it is this potential of being vastly outspent that creates powerful and deleterious pressures to raise funds. The significance of the spending cap lies not in reducing the amount of money spent on campaigns, but rather in eliminating this potential of being vastly outspent that leads to the "arms race" mentality among candidates and elected officials.
 
 
 121
 Limiting the arms race promises to have a direct impact on the time of candidates and elected officials. Indeed, the witnesses' testimony at trial supported the idea that reducing the arms race mentality, spending limits would allow candidates and elected officials to focus more time on issues. One elected official shared her sense of how spending limits will liberate public officials: "[The spending limit] lessens the pressure.... I am not going to be locked away ... in the Democratic Party somewhere or in my own office somewhere making fundraising calls." (testimony of Elizabeth Ready). Another State Senator, and a sponsor of Act 64, testified that "I would hope that it's going to give folks running for office more of an opportunity to go out and engage the voters on the issues." (testimony of Cheryl Rivers). And William T. Doyle, another senator, testified that without the need to raise such large sums of money "there will be increased time for real debate ... candidates will be able to concentrate more on issues rather than raising public money."
 
 
 122
 The "arms race" mentality—and its effect on the behavior of candidates and elected officials—is also quite relevant to the anti-corruption interest, and helps explain why the spending caps also address this "threat from politicians too compliant with the wishes of large contributors." Shrink, 528 U.S. at 389, 120 S.Ct. 897. The evidence presented at trial indicated that the agenda of candidates and elected officials is affected by the perceived need to raise increasing amounts of funds. Because the sources of campaign money are necessarily limited, candidates are reluctant to alienate potential fundraising constituencies. This affects what issues are put on the agenda, what issues are taken off, and how certain issues are addressed. With spending caps, this calculus changes to a certain extent. For example, with a limit on how much money can be spent, elected officials testified that they would be more willing to take a position which a particular industry opposed. (testimony of State Sen. Cheryl Rivers; testimony of former Congressman and Lt. Governor Peter Smith).
 
 
 123
 Plaintiffs also argue that Act 64's expenditure limits do not advance the interest in reducing the time dedicated to fundraising because Act 64, as a whole, actually forces candidates to devote more time to fundraising, not less. Defendants essentially do not dispute that lower contribution limits increase the amount of time that candidates must spend on fundraising. Instead they argue that this makes the interest in time-protection more compelling, not less, with respect to expenditure limits. In essence, plaintiffs argue that rather than address both the anti-corruption interest with contribution limits, and the anti-corruption and time-protection interests with expenditure limits, the State of Vermont must address just one interest, or else resign itself to the state of affairs post-Buckley. After Buckley, when the Court upheld the contribution limits but not spending limits, Congress' regulatory scheme fell prey to precisely this problem: candidates have been forced to spend increasing amounts of time fundraising under a regime with contribution limits but no spending limits. We reject the notion that Vermont cannot try to address both interests—anti-corruption and time-protection —at once.
 
 
 124
 Finally, plaintiffs argue, as the Buckley plaintiffs did for contribution limits, that the "limitations work such an invidious discrimination between incumbents and challengers that the statutory provisions must be declared unconstitutional on their face." 424 U.S. at 30-31, 96 S.Ct. 612. We agree with plaintiffs—and with our dissenting colleague, see post—that election laws, written by legislators who are, at least in part, necessarily self-interested, must be scrutinized for indications that the limits unduly benefit incumbents or otherwise create dangerous distortions of the electoral system. See Shrink, 528 U.S. at 402, 120 S.Ct. 897 (Breyer, J., concurring) (noting the need for courts to scrutinize legislative judgments that "risk such constitutional evils as, say, permitting incumbents to insulate themselves from effective electoral challenge."). It should be recognized, however, that a legislature's inaction may maintain such barriers more easily than reforms create them, and review of legislation should not amount to a presumption against the fairness of spending limits simply because elected officials have an interest in the reforms they are enacting. See Frank I. Michelman, The Constitutional Question, 24 HARV. J. L. & PUB. POL'Y 17, 22 (2000).
 
 
 125
 Indeed, there is considerable evidence in Act 64 itself that incumbent protection was not the legislature's motive. Act 64 permits challengers to outspend incumbents, partially neutralizing the advantages that incumbents often enjoy from free media exposure. Specifically, incumbent candidates for statewide office may only spend 85 percent of the amount permitted challengers. See Vt. Stat. Ann. tit. 17, § 2805a(c). Incumbents in the General Assembly may spend 90 percent. See id. These are rare types of provisions in state campaign finance laws; if the legislature wanted to achieve incumbent protection, it seems unlikely that they would have inserted such provisions. Moreover, defendants presented evidence at trial that the disparity between challenger and incumbent spending is what most frequently disadvantages challengers, and reduces electoral competition—a disparity that spending limits would inevitably reduce. (testimony of Donald Gross). In short, plaintiffs have not demonstrated that challengers will be disproportionately harmed by the spending limits. Like the Buckley court, we see no evidence in the record sufficient to overcome the presumption that "a court should generally be hesitant to invalidate legislation which on its face imposes evenhanded restrictions." 424 U.S. at 31, 96 S.Ct. 612.
 
 
 126
 In sum, because Vermont has demonstrated that the time-protection and anti-corruption interests are advanced, and plaintiffs have not succeeded in demonstrating impermissible legislative motives, we conclude that the State has met its burden on this aspect of narrow tailoring— that the spending limits actually advance these asserted interests.
 
 
 127
 2. Do spending limits at these levels allow for "effective advocacy"?
 
 
 128
 We must then turn to the question of whether the spending limits prevent "effective advocacy" by limiting the ability of candidates to communicate adequately with voters, and the ability of voters to receive the information they need to make a choice on election day. This "effective advocacy" requirement is drawn from the caselaw on whether contribution limits are sufficiently high. See McConnell, 540 U.S. at ___, 124 S.Ct. at 655-56 ("Because the communicative value of large contributions inheres mainly in their ability to facilitate the speech of their recipients, we have said that contribution limits impose serious burdens on free speech only if they are so low as to `preven[t] candidates and political committees from amassing the resources necessary for effective advocacy.'") (quoting Buckley, 424 U.S. at 21, 96 S.Ct. 612); Shrink, 528 U.S. at 395-96, 120 S.Ct. 897 (same). Although the concept of "effective advocacy" originated with regard to the freedom of association rights rooted in the First Amendment, see NAACP v. Alabama, 357 U.S. 449, 459-60, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), the Supreme Court has also used this concept in assessing candidates' claims that campaign finance regulations place too great a burden on their First Amendment speech rights. In Shrink, for example, one of the plaintiffs was a candidate for statewide office who argued that Missouri's contribution limits prevented him from "amassing the resources necessary for effective advocacy." 528 U.S. at 396, 120 S.Ct. 897 (quoting Buckley). We believe that the use of this "effective advocacy" standard is appropriate here as a threshold consideration in assessing whether the expenditure limits are "narrowly tailored," as the parties have argued.[20]
 
 
 129
 Discussing the nature of this "effective advocacy" analysis in the context of contribution limitations, the Court asked in part whether the limitation was "so radical in effect" as to "drive the sound of a candidate's voice below the level of notice." Shrink, 528 U.S. at 397, 120 S.Ct. 897; see also McConnell, 540 U.S. at ___, 124 S.Ct. at 677. The nature of the "effective advocacy" requirement, then, is that of a constitutional minimum; as long as the regulation does not "drive the sound of a candidate's voice below the level of notice," based on evidence from past campaigns, then the First Amendment is not violated on this ground.
 
 
 130
 Although the District Court never reached the legal issue of narrow tailoring, it did make findings as to whether "effective campaigns" could be run under the limits. The District Court found that Vermont's expenditure limitations reflect the actual cost of running for office in Vermont, would not cause a revolutionary change in campaign spending, and would leave candidates fully capable of conducting effective campaigns. 118 F.Supp.2d at 472. These conclusions are subject to a mixed standard of review, consistent with Rule 52(a) of the Federal Rules of Civil Procedure but also bearing in mind the obligation in First Amendment cases for appellate courts to make an independent examination of the record as a whole. See Bose Corp. v. Consumers Union of the United States, Inc., 466 U.S. 485, 499, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 688, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989); Ezekwo v. New York City Health & Hospitals Corp., 940 F.2d 775, 780 (2d Cir.), cert. denied, 502 U.S. 1013, 112 S.Ct. 657, 116 L.Ed.2d 749 (1991).
 
 
 131
 Based on the data presented at trial through expert witnesses, the District Court found that the average spending in Vermont House district races during the three election cycles preceding the District Court's opinion was almost uniformly below the limits set pursuant to Act 64. 118 F.Supp.2d at 471. Similarly, multi-member Senate districts all involved average spending below that permitted pursuant to Act 64, with average spending exceeding the Act's expenditure limits only in single-member Senate districts. Id. In addition to reflecting the actual expenditures in Vermont elections, the District Court found that Act 64's expenditure limits are also appropriate given the costs of running for office in Vermont. The District Court credited the testimony of a number of fact witnesses who testified to the details of previous campaigns they had run, including a Senate challenger in Chittenden County and a former Senate candidate in Rutland County, "confirm[ing] that fully effective campaigns for the Vermont Senate can be run under the limits established by Act 64." Id. at 472. The court noted that Vermont candidates for legislative office frequently use low-cost campaigning methods, such as community debates, door-to-door campaigning, town barbecues and suppers, advertising placards and the issuance of press releases. Id. Legislative candidates rarely hire campaign staff or purchase expensive mass media. Id. Indeed, the evidence at trial indicated that most Vermont House and Senate candidates do not use television advertising primarily because the lack of congruence between media markets and district boundaries render such advertising an inefficient and ineffective way to communicate with voters. (Ex. AA, Landell Admission # 49; Ex. BB, Randall Admission # 84, # 85; testimony of Neil Randall; testimony of Toby Young; Ex. U-1, Expert Report of Anthony Gierzynski, at 8.) Nonetheless, candidates are able to spend the money needed to ensure that their voice is well above "the level of notice" necessary for "effective advocacy." Shrink, 528 U.S. at 397, 120 S.Ct. 897.
 
 
 132
 Although candidates for statewide office utilize more expensive media and techniques, they are permitted to spend larger amounts and can thus also engage in "effective advocacy." In part, this reflects the particular qualities of Vermont, especially the relatively inexpensive cost of television advertising in the State. 118 F.Supp.2d at 472. In reaching this conclusion, the District Court rejected testimony of plaintiffs' witnesses that much larger amounts of money—amounts so large that no Vermont candidate has ever spent them—are required to wage an effective campaign for governor or other statewide offices. See id. ("The Court rejects [the witness's] testimony that it is necessary to spend between $800,000 and $1 million to run an effective campaign for Governor of Vermont ... Nor does the Court accept that candidates must spend approximately $500,000 in order to run effective campaigns for Lieutenant Governor and the other lower statewide offices of Secretary of State, Treasurer, Auditor, and Attorney General.").
 
 
 133
 And though conflicting evidence was presented at trial, there was ample evidence aside from the specific statistics and campaigns cited in the District Court opinion to support the District Court's effective campaign findings. For example, plaintiffs' evidence emphasized what they described as the problems under the limits for candidates running for Senate in Chittenden County, a county that includes the city of Burlington, as well as very rural areas. But defendants presented evidence that the average spending in this district was consistently far less than the $16,500 allowed under Act 64. More specifically, defendants presented evidence that in 1994, all six of the victorious candidates in Chittenden County spent at or near the Act 64 spending limits, including two successful challengers. In 1996, all six winners spent at or below the limits, including three successful challengers. And in 1998, three of the six candidates spent below the limits. As to statewide races, one candidate for State Auditor in 2000, Elizabeth Ready, indicated that under the $45,000 limit for her race, she had been able to purchase newspaper and radio ads, and considered using television advertising later in the race.
 
 
 134
 Plaintiffs may not simply rely on the highest-spending races in order to declare the entire statute unconstitutional on its face. In Shrink, the Supreme Court went as far as to assume the truth of plaintiff's claim that the contribution limits affected his ability "to wage a competitive campaign," and concluded that nonetheless, "a showing of one affected individual does not point up a system of suppressed political advocacy that would be unconstitutional under Buckley." 528 U.S. at 396, 120 S.Ct. 897. Indeed, certain plaintiffs have a particularly difficult time arguing that the spending limits will burden their First Amendment rights. Plaintiff Donald Brunelle's maximum expenditure in any of his past House campaigns was $1,007, and plaintiff George Kuusela has never spent more than $1,550. The new limits allow each of them, as challengers, to spend $3,000 in their House campaigns, significantly more than they have spent in the past.
 
 
 135
 In Shrink, the Supreme Court relied on and quoted the District Court's conclusions, made on cross-motions for summary judgment, that "candidates for state elected office [have been] quite able to raise funds sufficient to run effective campaigns," and that "candidates for political office in the State are still able to amass impressive campaign war chests." 528 U.S. at 396, 120 S.Ct. 897 (citations omitted). Like the Shrink Court, we affirm the District Court's conclusion, here made after a 10-day bench trial, that candidates can meet the threshold level of "effective advocacy" when running for office in the State of Vermont. 118 F.Supp.2d at 471-72. After independent review, we agree with the District Court that these expenditure limits are not "so radical in effect" as to "drive the sound of a candidate's voice below the level of notice," Shrink, 528 U.S. at 397, 120 S.Ct. 897, and therefore the limits do not prevent candidates from "amassing the resources necessary for effective advocacy." Buckley, 424 U.S. at 21, 96 S.Ct. 612. However, as we address in the next section, the inquiry into how much the spending limits impinge First Amendment rights is broader than it was in the Shrink contribution limits context, and therefore must go beyond merely "effective advocacy."
 
 
 136
 3. Are mandatory expenditure limits the least restrictive means of advancing the State's interests?
 
 
 137
 The greater level of scrutiny accorded spending limits, as compared to contribution limits, requires that Vermont must also prove that Act 64's mandatory expenditure limit system is the least restrictive alternative for achieving the State's compelling time-protection and anti-corruption interests. This inquiry is essentially twofold. First, the State must prove that the type of regulation chosen was the least restrictive—that is, that no other type of regulation could have advanced the interests asserted while impinging less on First Amendment rights. Second, the least restrictive alternative inquiry requires scrutiny of the basis for the particular spending limits chosen—an inquiry not undertaken with respect to contribution limits. In evaluating the constitutionality of contribution limits, the Supreme Court has indicated that "[i]f it is satisfied that some limit ... is necessary, a court has no scalpel to probe, whether, say, a $2,000 ceiling might not serve as well as $1,000," noting that "[s]uch distinctions in degree become significant only when they can be said to amount to differences in kind." Buckley, 424 U.S. at 30, 96 S.Ct. 612. In the context of expenditure limits, and in light of the legislative history of Act 64, there may well be "differences in kind" as to the choice of specific spending limits that demand scrutiny.
 
 a. Type of Regulation
 
 138
 Vermont argues that it "had already explored less restrictive alternatives and found them to be ineffective." Specifically, in 1993, the State instituted a system of voluntary expenditure limits. Former Vt. Stat. Ann. tit. 17, §§ 2841-42 (1991) (repealed 1997). Under this system, candidates had the option of signing an affidavit indicating that they would comply with the spending limits and, in exchange, received any favorable or unfavorable publicity from that decision. At trial, Vermont presented evidence that the voluntary spending limits in place from 1993 to 1997 were not working. Participation in the voluntary system fell dramatically each year, with 90 percent of candidates participating in the first year but less than 20 percent in the second year. Witnesses testified that Vermont's voluntary limits did not work because candidates attempted to gain an advantage in the fundraising "arms race" by ignoring the limits. Most tellingly, by 1998, not a single candidate for statewide office chose to abide by the voluntary expenditure limits.
 
 
 139
 Vermont's voluntary limits were quite different, however, than many of the voluntary spending limits in other states.[21] In Vermont, the only "carrot" exchanged for the voluntary agreement to the limits was the ability to publicize one's compliance. Most other states (and New York City) offer additional incentives such as public matching funds, a higher contribution limit, or other inducements. See, e.g., WRITING REFORM: A GUIDE TO DRAFTING STATE AND LOCAL CAMPAIGN FINANCE LAWS, V-8-19 (Deborah Goldberg ed., Brennan Center 2001) (describing variety of mechanisms used by states to encourage compliance with voluntary limits). And many of these types of provisions have been upheld by the federal courts of appeals in the face of a First Amendment challenge. See e.g. Rosenstiel v. Rodriguez, 101 F.3d 1544, 1552-53 (8th Cir.1996) (upholding Minnesota's voluntary public financing scheme), cert. denied, 520 U.S. 1229, 117 S.Ct. 1820, 137 L.Ed.2d 1028 (1997); see also Vote Choice, Inc. v. DiStefano, 4 F.3d 26, 39 (1st Cir.1993) (holding that Rhode Island's voluntary public financing statute survives exacting scrutiny).
 
 
 140
 Indeed, this type of spending limit— voluntary, but with public funding as an inducement to comply—was in Act 64 as originally introduced in the House, but the provision appears to have been changed to mandatory in one of the House committees. (Ex. A, at E-0001, 0031.) It is unclear from the current record why this change occurred, and the District Court made no findings on this point. Similarly, it is possible that the Vermont legislature could have employed a public financing option for all offices, in addition to the option that was provided for Governor and Lieutenant Governor candidates. See, e.g., GENERAL ACCOUNTING OFFICE, CAMPAIGN FINANCE REFORM: EARLY EXPERIENCES OF TWO STATES THAT OFFER FULL PUBLIC FUNDING FOR POLITICAL CANDIDATES (May 9, 2003) (GAO-03-453) (assessing initial results of public funding of legislative candidates in Maine and Arizona). Notably, early versions of the bill appear to have contained such funding for a broader range of offices. (testimony of Karen Kitzmiller; Ex. 70, at E-2828.) On the other hand, after the voluntary affidavit system broke down, the legislature may have concluded that only mandatory expenditure limitations, together with contribution limitations, would adequately advance the State's interests. Indeed, there may have been still other reasons—not yet made part of the record—for the legislature's decision not to adopt, for all offices, voluntary expenditure limits with public funding incentives.
 
 
 141
 If Vermont could have utilized some of the same voluntary mechanisms employed by other states, offering either financial or other incentives for compliance with expenditure limits, then Vermont may not be able to prove that it employed the least restrictive alternative. Cf. Denver Area Educational Telecommunications Consortium v. FCC, 518 U.S. 727, 758, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996) ("[W]e can take Congress' different, and significantly less restrictive, treatment of a highly similar problem at least as some indication that more restrictive means are not `essential' (or will not prove very helpful).") (emphasis in original). On remand, the District Court should make findings as to whether there were less restrictive alternatives available that could have been as effective in advancing the asserted interests. See Wygant v. Jackson Bd. of Ed., 476 U.S. 267, 280 n. 6, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) (alternatives should serve the interest "`about as well'"). Should there be proven another type of regulation that would have similarly advanced the interests asserted, while impinging less on First Amendment rights, the District Court will have a basis to find that the provision is not narrowly tailored.
 
 b. Basis for Spending Cap Limits
 
 142
 If the District Court finds, however, that mandatory spending limits were the only type of regulation that could sufficiently advance Vermont's time-protection and anti-corruption interests, then the court must also inquire into the basis for the particular amount of the spending limits chosen. There was evidence presented at trial that Act 64's spending limits were intended to map onto existing spending levels from past campaigns. In defendants' proposed findings of fact after trial, defendants indicated that the legislature "considered factors such as population, historical information on past spending levels and campaigns, Vermont's previous voluntary spending limits, and the testimony of numerous witnesses concerning the appropriate level for the limits, with the legislature balancing different viewpoints as is necessary with most pieces of legislation." This is consistent with the District Court's findings that the average spending on past races was consistently under the limits imposed by Act 64. 118 F.Supp.2d at 471-472. See also Richard Briffault, Nixon v. Shrink Missouri Government PAC: The Beginning of the End of the Buckley Era?, 85 MINN. L. REV. 1729, 1769 (2001) (suggesting that median spending levels of candidates in recent races could be an appropriate basis for spending limits).
 
 
 143
 Nonetheless, the specific basis for the final limits is not entirely clear from the existing record. Defendants noted that for the Governor's race, the Senate bill would have set a $250,000 limit, while the House bill originally set a $400,000 limit. In the final bill as adopted, the limit was set at $300,000. Similarly, the limits for one-seat Senate races varied in the various committee bills, either $4,000, $5,000 or $6,000, with an additional $2-3,000 for each additional seat in the district. The final limits were those that emerged out of the Senate Finance Committee (the lowest in any of the committee bills)—$4,000 plus an additional $2,500 for each additional seat. Such decisions, of course, could be the product of typical legislative compromise— a process into which we will not intrude. However, plaintiffs also presented evidence that the ultimate decision as to the amount of certain statewide spending limits was motivated by a desire to preserve the public fisc, because of Act 64's public financing option for gubernatorial and Lieutenant Governor candidates.[22] Particularly in the context of expenditure limits, these choices demand greater scrutiny.
 
 
 144
 Thus, in undertaking its "least restrictive means" analysis on remand, the District Court should make additional findings on the impact of the legislative choices as to the appropriate spending limits on candidates' and voters' First Amendment rights. Even if Act 64's spending limits are sufficiently high to permit "effective advocacy" as defined in Shrink, as the District Court found and as we have affirmed, the precise level of the limits chosen can have a significant impact on how "restrictive" the provision is on First Amendment rights. Of course, a $2 million limit for State Senate races is quite unlikely to restrict First Amendment rights, but equally unlikely to impact the "arms race" mentality and thereby advance the interests asserted. Moreover, there will always be "distinctions in degree" that could be seen as less restrictive —$305,000 is "less restrictive" than $300,000; $310,000 "less restrictive" than $305,000, etc. And such an inquiry has no logical endpoint.
 
 
 145
 However, the specific choices made by the Vermont legislature among the different spending limits contained in various bills may be "differences in kind" with respect to the impact on the First Amendment rights of candidates and voters. Inquiries into the First Amendment impact of challenged regulations have been undertaken in analogous contexts by other courts, see, e.g., National Black Police Ass'n v. D.C. Board of Elections and Ethics, 924 F.Supp. 270, 277 (D.D.C.1996) (considering a variety of factors in assessing whether the reduction in campaign funds was "so substantial that it affected the candidates' ability to reach voters"), vacated as moot sub nom. National Black Police Ass'n v. District of Columbia, 108 F.3d 346 (D.C.Cir.1997), and, although necessarily speculative here, should be undertaken on remand. If the choice of the lower spending limit—for example, $4,000 for a Senate race as opposed to $6,000—is significantly "more restrictive," while no more effective in advancing the interest asserted, then the lower spending limit is not consistent with the First Amendment. Assessing the legislative alternatives, then, requires evaluating both (1) the extent to which the higher spending limit is "less restrictive" of the First Amendment rights of candidates and voters[23]; and (2) the extent to which the higher spending limit would be as effective in advancing the anti-corruption and time-protection interests. The answers to these questions will determine whether the spending limits chosen not only allow for "effective campaigns" but also are the "least restrictive alternative," and therefore narrowly tailored.
 
 E. Conclusion: Remand for Further Findings
 
 146
 Quite simply, the District Court found that effective campaigns can be waged under Act 64's stated limits, and we agree. But the District Court did not examine, because it found spending limits per se unconstitutional, whether the legislature might have chosen either another type of regulation besides mandatory spending limits, or higher limits, that would still achieve the goals we sanction and yet impinge less on the First Amendment rights of candidates and voters.[24] Cf. Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 668, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (remanding, after grant of summary judgment, "to permit the parties to develop a more thorough factual record, and to allow the District Court to resolve any factual disputes remaining, before passing upon the constitutional validity of the challenged provisions" in part because "the record fails to provide any judicial findings concerning the availability and efficacy of `constitutionally acceptable less restrictive means' of achieving the Government's asserted interests") (quoting Sable Communications of Cal., Inc., v. FCC, 492 U.S. 115, 129, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989)). As to the amount of the limits, there obviously comes a point where limits would be set so high as to have no impact on the interests sought to be protected. We need, however, to hear from the District Court on this fact-intensive question of whether that point is as set in Act 64 or appreciably higher.
 
 
 147
 On remand, the District Court ought consider, along with any other issues relating to narrow tailoring that it and the parties deem relevant: (1) what alternatives were considered by the legislature, including both alternative types of regulations and alternative amounts for the limits; (2) why these alternatives were rejected; (3) whether and how these alternatives would impinge less on First Amendment rights; and (4) whether the alternatives would be as effective as the mandatory spending limits in advancing the time-protection and anti-corruption interests.[25] Based on its fact-finding on these issues, the District Court will be able to draw a legal conclusion as to whether Vermont's legislature chose the "least restrictive alternative" for advancing its interests, and therefore whether the expenditure limits are narrowly tailored.[26]
 
 
 148
 With respect to treating related expenditures as candidate expenditures, see § 2809(b), the District Court did not analyze this question after deciding that candidate expenditure limits were unconstitutional per se. On remand, independent of the constitutionality of expenditure limits, the District Court should evaluate this issue.
 
 
 149
 Because a content-based regulation of speech such as this is presumptively invalid, and the District Court held it unconstitutional, we leave in place the injunction against enforcement of these provisions pending further proceedings consistent with this opinion.[27]
 
 II. Act 64's Contribution Limitations
 
 150
 Act 64 also imposes four basic types of contribution limitations. First, contributions by individuals to candidates are limited to $200 for state representative and other local offices, $300 for state senator and other county offices, and $400 for statewide office. See Vt. Stat. Ann. tit. 17, § 2805(a). Second, PACs and political parties may not accept contributions from a single source in excess of $2000 and are subject to the individual contribution limits when contributing to candidates. See id. Third, individuals, PACs or political parties that make "related expenditures" with candidates must count those expenditures toward the relevant expenditure and contribution limits. See id. § 2809(a)-(c). Finally, candidates, PACs, and political parties may not accept more than 25 percent of their total resources from out-of-state sources. See id. § 2805(c).
 
 
 151
 A. Limitations on Contributions by Individuals to Candidates
 
 
 152
 The contribution limits of $200 (state representative), $300 (state senator), and $400 (statewide office) are subject to a lesser degree of scrutiny than expenditure limits, as explained most recently by the Supreme Court in Shrink, 528 U.S. at 386, 120 S.Ct. 897. Contribution limits can survive "if the Government demonstrated that contribution regulation was closely drawn to match a sufficiently important interest, though the dollar amount of the limit need not be fine tuned." Id. at 387-88, 120 S.Ct. 897 (internal quotation marks omitted).
 
 
 153
 The governmental interest in eliminating actual and apparent corruption is sufficient to support Vermont's limits on contributions to candidates. The Buckley Court upheld limitations of $1000 on contributions to candidates for federal office on the strength of this interest alone. "It is unnecessary to look beyond the Act's primary purpose—to limit the actuality and appearance of corruption resulting from large individual financial contributions—in order to find a constitutionally sufficient justification. . . ." 424 U.S. at 26, 96 S.Ct. 612; see also McConnell, 540 U.S. at ___, 124 S.Ct. at 647 (explaining that in Buckley, the Court "determined that limiting contributions served an interest in protecting `the integrity of our system of representative democracy'") (quoting Buckley, 424 U.S. at 26-27, 96 S.Ct. 612); Jacobus v. Alaska, 338 F.3d 1095, 1107 (9th Cir.2003) ("[A] failure to regulate the arena of campaign finance allows the influence of wealthy individuals and corporations to drown out the voices of individual citizens, producing a political system unresponsive to the needs and desires of the public, and causing the public to become disillusioned with and mistrustful of the political system."). In this case, the District Court relied on trial testimony, citizen polls, comments by public officials and media coverage to demonstrate the real and perceived threat of corruption in Vermont. 118 F.Supp.2d at 469, 478. As the District Court concluded, "[t]he threat of corruption in Vermont is far from illusory." Id. at 478.
 
 
 154
 In addition, we conclude that the Vermont limits are "closely drawn" to this anti-corruption interest. The District Court's findings in this respect are reasonable and based on the evidence adduced at trial. Id. at 470, 478-80. The District Court relied in part on expert testimony indicating that over the last three election cycles, less than 10 percent of contributions exceeded the limits set by the Vermont legislature. Id. at 478. Based on testimony by both plaintiffs' and defendants' witnesses, the District Court also concluded that the limitations approximated amounts "considered suspiciously large by the Vermont public." Id. at 479-80. And finally, the court compared the Vermont law to similar limits upheld in Maine and Missouri. In Maine, a limit of $250 for House and Senate candidates was upheld. See Daggett v. Comm'n on Governmental Ethics & Election Practices, 205 F.3d 445, 459 (1st Cir.2000). In Missouri, limits of $1075, $525, and $275, depending on the size of the electoral district have been upheld. See Shrink, 528 U.S. at 396-98, 120 S.Ct. 897, remanded to Shrink Mo. Gov't PAC v. Adams, 204 F.3d 838, 840-42 (8th Cir.2000).[28]
 
 
 155
 The contribution ceilings are also sufficiently high to permit effective campaigning. Overly restrictive contribution limits might "have a severe impact on political dialogue if the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy." Buckley, 424 U.S. at 21, 96 S.Ct. 612. Contribution limits, however, need not be perfectly set: the failure of the legislators to "engage in such fine tuning does not invalidate the legislation." Id. at 30, 96 S.Ct. 612. As we have indicated, "distinctions in degree become significant only when they can be said to amount to differences in kind." Id. We agree with the District Court's conclusion that the contribution limits imposed by Act 64 do not "amount to differences in kind."
 
 
 156
 As the District Court found, the limits imposed by Vermont hardly overwhelm the ability of candidates to engage in active and effective campaigning. The District Court marshaled evidence to support its findings, and conducted a fact-intensive analysis of what constitutes effective campaigning. 118 F.Supp.2d at 478-79. Moreover, Vermont has actually conducted an election since the imposition of these contribution limits (for Mayor of Burlington), and that election involved effective campaigns despite the contribution limitations. Id. at 471, 479. Subject to the applicable limits imposed by the statute, the mayoral candidates raised funds comparable to the amounts spent in State Senate races in the past. Id. The District Court further concluded that the limits may actually improve the ability of candidates to campaign, by freeing candidates from the time-consuming task of "wooing big donors." Id. at 480.
 
 
 157
 B. Limitations on Contributions to and by PACs and Political Parties
 
 
 158
 Act 64 also regulates the ability of PACs and political parties to give and receive contributions. The Act prohibits such organizations from accepting contributions of more than $2000 from a single source during any two-year general election cycle. See Vt. Stat. Ann. tit 17, § 2805(a). The Act further prohibits those organizations from making contributions to political candidates in excess of the general contribution limits—$200 for state representatives or local office, $300 for state senator or county office, and $400 for statewide office. See id. §§ 2805(a)-(b).
 
 
 159
 The District Court upheld these limitations, except as applied to contributions by political parties to their own candidates. 118 F.Supp.2d at 486-87. Upon review, we hold that all of these limitations are constitutional. We thus affirm the judgment of the District Court as to the constitutionality of most of the limitations, but reject the District Court's conclusion that political parties cannot be prohibited from contributing to candidates in excess of generally applicable limitations. We discuss three narrow issues that require further attention and, as to two of those issues, further proceedings before the District Court.
 
 
 160
 We first consider the issue of the $2000 limitation on contributions to political committees or political action committees and political parties. Act 64 defines "political committees" or "political action committees" as "any formal or informal committee of two or more individuals, not including a political party, which receives contributions or makes expenditures of more than $500.00 in any one calendar year for the purpose of supporting or opposing one or more candidates, influencing an election or advocating a position on a public question, in any election or affecting the outcome of an election." Vt. Stat. Ann. tit 17, § 2801(4). A political party is defined as including both the central party apparatus and "any committee established, financed, maintained or controlled by the party, including any subsidiary, branch or local unit thereof and including national or regional affiliates of the party." Id. § 2801(5).
 
 
 161
 Perhaps the most typical application of these rules would involve contributions to a political committee or political party that participates in the political process either by making contributions to or coordinated expenditures with candidates for office. As applied to these organizations, the $2000 limitation is unquestionably constitutional. Political action committees "derive rights from their members" and are accordingly due First Amendment protection. Colorado Republican II, 533 U.S. 431, 448 n. 10, 121 S.Ct. 2351, 150 L.Ed.2d 461. It is well established, however, that the state interest in fighting corruption, real and apparent, justifies limitations on contributions by individuals to particular candidate committees. Such a state interest is equally capable of justifying limits on contributions made to political parties or committees.
 
 
 162
 If the First Amendment rights of a contributor are not infringed by limitations on the amount he may contribute to a campaign organization which advocates the views and candidacy of a particular candidate, the rights of a contributor are similarly not impaired by limits on the amount he may give to a multicandidate political committee ... which advocates the views and candidacies of a number of candidates.
 
 
 163
 Cal. Med. Ass'n v. Federal Election Comm'n, 453 U.S. 182, 197, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981) ("CMA").
 
 
 164
 The plaintiffs do not dispute that, in principle, such limitations may be constitutional. Instead, they argue that Vermont's chosen limitations are overbroad, both because the statute applies to too many organizations and because it sets the contribution ceiling too low.
 
 
 165
 Regarding the first point, the plaintiffs assert that the restriction is an "overbroad, blunderbuss approach that punishes" even those organizations that are unlikely to corrupt the political process. They imply that certain types of PACs, "particularly legislative leadership PACs or ideological PACs," pose a weaker danger of corruption and should therefore be permitted greater latitude in determining how to allocate their contributions. The plaintiffs argue that the limits are unconstitutional because Vermont has not shown any independent evidence that political parties and PACs have a negative or deleterious effect on Vermont's politics. Further, the plaintiffs contend, these organizations are even less likely to corrupt in light of Act 64's other limitations on campaign financing. Private individuals cannot, for example, effectively funnel large gifts through political parties because parties can themselves only make contributions to candidates of between $200 and $400.
 
 
 166
 An argument identical to the plaintiffs' overbreadth argument was addressed and rejected in Buckley. There, the appellants argued that many large contributors have no interest in corrupting the political process, and the law was overbroad for restricting the rights of these unthreatening contributors. The Supreme Court upheld the constitutional validity of generally applicable contribution limits of $1000, even though "most large contributors do not seek improper influence over a candidate's position or an officeholder's action." Buckley, 424 U.S. at 29, 96 S.Ct. 612. The Court reasoned that the very corruption rationale which provides a foundation for the constitutional validity of contribution limitations supports their general applicability: "Not only is it difficult to isolate suspect contributions, but, more importantly, Congress was justified in concluding that the interest in safeguarding against the appearance of impropriety requires that the opportunity for abuse inherent in the process of raising large monetary contributions be eliminated." Id. at 30, 96 S.Ct. 612.
 
 
 167
 These arguments were also rejected by the Supreme Court in CMA, 453 U.S. at 197, 101 S.Ct. 2712. In that case, a California political action committee challenged a $5000 federal limit on annual contributions by individuals and associations to multicandidate political committees. See id. at 186, 101 S.Ct. 2712. Like the plaintiffs here, the parties in CMA asserted that such limitations do not serve the government's strong interest in preventing actual or apparent corruption in the political process. See id. at 197, 101 S.Ct. 2712. The Supreme Court concluded that "Buckley precludes any argument" that the government may not limit the size of contributions made to multicandidate committees, and rejected the assertion that such limitations do not further the government's interest in battling political corruption. Id. Without such limitations, individuals could evade the contribution limitation "by channeling funds through a multicandidate political committee." Id. at 198, 101 S.Ct. 2712.
 
 
 168
 In light of these prior holdings, we are unpersuaded by the plaintiffs' contention that Vermont had an obligation to divine which PACs and political parties pose the most serious risk of corruption, and develop a record that donations to each type of organization, narrowly defined, pose a strong threat of corruption. It is clear that, in principle, such limitations are an "appropriate means ... to protect the integrity of the contribution restrictions upheld... in Buckley." CMA, 453 U.S. at 199, 101 S.Ct. 2712. Thus, the Vermont provision is constitutional so long as the danger of corruption of the political system exists. Just as individuals may be limited from directly contributing to campaign organizations, individuals may be limited from doing so indirectly—that is, contributing large sums to PACs or political parties that funnel money to candidates. See Buckley, 424 U.S. at 38, 96 S.Ct. 612; cf. Federal Election Comm'n v. Beaumont, 539 U.S. 146, 155, 123 S.Ct. 2200, 156 L.Ed.2d 179 (2003) (explaining that "restricting contributions by various organizations hedges against their use as conduits for `circumvention of [valid] contribution limits'") (citation omitted; alteration in original). Vermont does not have the burden to show on a contributor-by-contributor basis that contributions have led to corruption.
 
 
 169
 The plaintiffs' second argument is that the $200, $300, and $400 limits on contributions to candidates for office are unnecessarily low, and that political parties and PACs should be exempt. The plaintiffs in Buckley also raised this argument, contending that the $1000 limitation regulated more contributions than necessary to accomplish its anti-corruption goals. Specifically, the appellants argued that even contributions of a larger amount did not carry a risk of corruption because no politician would throw away a career and reputation for a $1000 donation. As with the earlier overbreadth argument, the Supreme Court also has rejected this contention. See Buckley, 424 U.S. at 30, 96 S.Ct. 612. "[I]f it is satisfied that some limit on contributions is necessary, a court has no scalpel to probe, whether, say, a $2,000 ceiling might not serve as well as $1,000." Id. (quotations and citations omitted). The Court reaffirmed the validity of this approach in Shrink, stating that a contribution limit survives scrutiny only if the regulation is "closely drawn to match a sufficiently important interest, though the dollar amount of the limit need not be fine tun[ed]." 528 U.S. at 387-88, 120 S.Ct. 897 (citations and internal quotation marks omitted; alteration in original); see also Montana Right to Life Assoc. v. Eddleman, 343 F.3d 1085, 1095 (9th Cir.2003) (same).
 
 
 170
 In order to succeed, then, plaintiffs must establish that when the limitations are applied to political parties and political action committees, they impose such a severe burden that it results in a "difference[] in kind" from alternative limits. Buckley, 424 U.S. at 30, 96 S.Ct. 612. In other words, a party seeking a special exemption from such laws carries a large burden. Illustrative of the political parties' and political action committees' burden in this regard is Federal Election Comm'n v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) ("MCFL"). In that case, the Supreme Court considered the constitutionality of a federal law which bans corporations from making any political expenditures from general corporate funds. The statute's purpose was to regulate "the corrosive influence of concentrated corporate wealth." Id. at 257, 107 S.Ct. 616. The Federal Election Commission had sought enforcement of the provision against an incorporated, non-profit pro-life advocacy organization that had "features more akin to voluntary political associations than business firms." Id. at 263, 107 S.Ct. 616. The Court held that, as applied, the provision was unconstitutional because the stated interest does not apply to an incorporated association like MCFL. Id. at 263-64, 107 S.Ct. 616. The Court set forth specific and demanding criteria for determining when other corporations fall into this constitutionally mandated exclusion, which the advocacy organization was able to meet. Id.
 
 
 171
 We should expect that the plaintiffs here bear a similar burden of establishing their exceptionalism, even if the particular facts of MCFL do not apply. Unlike the situation in MCFL, the PACs here have offered no evidence that PACs and political parties have overriding features exempting them from the general findings about actual and apparent corruption in Vermont. Nor have they provided evidence that the limitations, when applied to these organizations, impose such a severe burden on speech as to constitute a difference in kind. As mentioned, the District Court concluded, after considering a large body of evidence, that the contribution limits are high enough so that they do not constitute a severe infringement—a difference in kind—of the ability to associate politically. 118 F.Supp.2d at 476-81. We thus agree with the judgment of the District Court and find that Act 64's contributions limits on political action committees and parties are constitutional.
 
 
 172
 The District Court did find support for one exception to the candidate contribution limits: those made by political parties. In this regard, we reject the District Court's conclusion that on account of their "unique role in the mechanics of our democracy," political parties must have greater freedom to provide their candidates with financial support. Id. at 486. Relying on the central place of political parties in elections, the District Court held that the generally applicable limits were too severe when applied to parties. This was despite the fact that the District Court had already concluded that candidates can receive sufficient funds to effectively exercise their First Amendment rights even when restricted by Act 64's contribution limits. Nevertheless the District Court held that "[s]uch limits would reduce the voice of political parties to an undesirable, and constitutionally impermissible, whisper." Id. at 487.
 
 
 173
 We see no other way to understand the District Court's position than as being founded on the belief that political parties operate as specially protected institutions under our Constitution and thus merit special treatment. Whatever the validity of this principle in other legal contexts, the Supreme Court has recently left no doubt that parties do not deserve a special exemption from generally applicable contribution limits. See Colorado Republican II, 533 U.S. at 480-82, 121 S.Ct. 2351. In that case, the Colorado Republican Party challenged the constitutionality of restrictions on expenditures it made in coordination with candidates for office, arguing that "coordinated spending is essential to parties because a party and its candidate are joined at the hip, owing to the very conception of the party as an organization formed to elect candidates." Id. at 477, 121 S.Ct. 2351 (citations and quotation marks omitted). The Court held that such limitations are a constitutional mechanism for ensuring that contributors do not circumvent the federal contribution limit and rejected the claim that political parties occupy some special place in our constitutional system. Above all, the argument fails because, just as with other political organizations, political parties "are necessarily the instruments of some contributors whose object is not to support the party's message or to elect party candidates across the board, but rather to support a specific candidate for the sake of a position on one, narrow issue, or even to support any candidate who will be obliged to the contributors." Id. at 479, 121 S.Ct. 2351. Thus, as it does with any other contributor to political campaigns, the government has an interest in restricting the flow of money from parties to candidates in order to reduce actual and apparent corruption. "The Party's arguments for being treated differently from other political actors subject to limitation on political spending under the Act do not pan out." Id. at 481, 121 S.Ct. 2351. Since we agree with the District Court's conclusion that Vermont's limits are "vital to deter avoidance of the individual contribution limits," 118 F.Supp.2d at 487, we hold that their application to political parties is supported by this strong governmental interest.
 
 
 174
 Having concluded that the restriction of contributions from political parties is supported by a constitutionally sufficient governmental interest, we turn to the question of whether the statute is sufficiently tailored to this interest. As discussed above, the District Court reviewed the limits based upon data reflecting the costs of elections and the views of citizens regarding what constitutes suspiciously large gifts. Based on this body of evidence, the District Court concluded that gifts in excess of the limits create the appearance of, and increase the likelihood of, corruption. Moreover, contributions in the amounts permitted by the Act provide citizens an adequate tool for "speaking their mind" by giving a donation in order to affiliate with a candidate. Id. at 478-80.
 
 
 175
 However, there are three narrower issues that require more individual attention. The first concerns the Act's definition of local and state party affiliates as a single entity. For the purposes of determining whether a political party has exceeded its various contribution limitations, Act 64 defines a political party as "any committee established, financed, maintained or controlled by the party, including any subsidiary, branch or local unit thereof and including national or regional affiliates of the party." Vt. Stat. Ann. tit. 17, § 2801(5). Vermont's Secretary of State has interpreted this provision, in conjunction with Vt. Stat. Ann. tit. 17, §§ 2301-2320, to require that state and local branches of political parties be considered a single unit for the purposes of applying contribution limits, and determining whether those limits have been reached or violated.
 
 
 176
 Plaintiff Vermont Republican State Committee argues that this definition requires the party to treat itself as a single monolithic unit, and requires the party to abandon its current, decentralized structure. However, the plaintiff has not cited any actual changes that will need to be made, except that local and state affiliates will now have to record and coordinate their contributions. In other words, the provision does not impose any organizational burden on the party outside of the campaign finance realm, and requires no broader organizational reform. Moreover, the District Court indicated doubt as to whether the Republican Party actually demonstrated that it operates in the decentralized form that it claims. For example, the state committee brought suit on behalf of all of the town and county committees without ever consulting them or asking them to approve the lawsuit. 118 F.Supp.2d at 487-88. The District Court also noted that federal election law treats state, county, and town committees as a single unit for the purposes of campaign finance. Id. We agree with the District Court that, insofar as Vermont's campaign finance law treats state and local affiliates as a single entity, it suffers from no constitutional defect.
 
 
 177
 Second, the plaintiffs have argued that Act 64 applies to even those political action committees that make wholly independent expenditures. Plaintiff Vermont Right to Life Committee-Fund for Independent Political Expenditures ("VRLC-FIPE"), which is affiliated with the Vermont Right to Life Committee ("VRLC"), is a political committee that, by its charter, cannot make contributions to candidates. It has asserted that it makes only independent expenditures, that is, it never coordinates its expenditures with candidates for office. Thus it argues that when applied to itself, the $2000 cap operates as a limitation on independent expenditures.
 
 
 178
 The statute does appear to lend itself to such an interpretation. On the one hand, the Act explicitly states that it does not apply to independent expenditures. The law explicitly states that "[t]he limitations on contributions ... shall not apply to contributions made for the purpose of advocating a position on a public question, including a constitutional amendment." Vt. Stat. Ann. tit. 17, § 2805(g). Nonetheless, it appears that VRLC may be correct that even political organizations that make solely independent expenditures, but nonetheless advocate the election of particular candidates, would be covered. See id. § 2801(4).
 
 
 179
 Thus, we remand for findings on the following points: (1) whether plaintiff VRLC makes solely independent expenditures and thus has standing to challenge this provision; (2) whether the Vermont law actually restricts independent expenditures by such organizations; and (3) whether Vermont has a sufficiently strong governmental interest in regulating PACs that do not coordinate their expenditures with candidates for office.
 
 
 180
 Finally, we remand for additional proceedings on the issue of how Act 64 implicates the ability of a state and local party affiliates to receive funds from national affiliates. Act 64 apparently limits the transfer of money from national to state and local parties, and that limit might impose a significant burden on political parties. Vt. Stat. Ann. Tit. 17, §§ 2801(5), 2805(a)-(b). How a party allocates money between its national, state and local affiliates constitutes an important component of party organization. It determines who in the party exercises decision-making authority, who speaks for the party, and how the party arranges its internal finances. At the same time, the failure to limit such transfers might create a loophole that would easily enable contributors to circumvent the $2000 limit on gifts to state parties. See McConnell, 124 S.Ct. at 671 (upholding federal legislation "sharply curbing" the ability of donors to circumvent contribution limits by channeling nonfederal or "soft" money through state political committees to finance "Federal election activity"). The District Court never made specific findings of fact regarding this issue, including how national and local affiliates of the political parties interact and how limitations on transfers of money might affect parties. Since we are reluctant to rule on this issue without the benefit of findings of fact on how such a provision might be expected to operate, we remand for further proceedings.
 
 
 181
 C. The Related Expenditure Provision is Constitutional as to Contributions
 
 
 182
 We also affirm the District Court's holding that the "related expenditure" provisions of Act 64 are constitutional because they serve to reinforce the anti-corruption goals of the contribution limitations. Pursuant to Act 64, "related expenditures" on behalf of a candidate by a third party count toward the third party's contribution limit as well as the candidate's expenditure limit. The Act defines related expenditures as those "intentionally facilitated by, solicited by or approved by the candidate or the candidate's political committee." Vt. Stat. Ann. tit. 17, § 2809(c). The plaintiffs challenge the provision on three grounds: (1) the phrase "facilitated by" is vague; (2) political parties and PACs should have greater abilities to engage in coordinated expenditures with candidates; and (3) the Act's rebuttable presumption that an expenditure benefiting six or fewer candidates is a related expenditure is a content-based speech restriction discouraging advertisements about a small number of candidates. We reject each claim.
 
 
 183
 Plaintiffs argue that the "facilitated by" standard is vague because it leaves open the possibility that any communication about a candidate's views with a third party that then undertakes independent expenditures will qualify as a contribution. The First Amendment permits the treatment of "coordinated expenditures" as contributions to a candidate. Buckley, 424 U.S. at 46-47, 96 S.Ct. 612. Independent expenditures may not be limited because "the absence of prearrangement and coordination undermines the value of the expenditure to the candidate, and thereby alleviates the danger that expenditures will be given as a quid pro quo." Federal Election Comm'n v. Nat'l Conservative Political Action Comm., 470 U.S. 480, 498, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985). The plaintiffs' objection to Act 64 is really one which assumes that the word "facilitated" has its broadest meaning, akin to giving any aid in support of the third-party expenditure. If that were what the statute meant, then we would agree that the provision might raise constitutional problems.
 
 
 184
 We think that, in light of the terms "solicited by or approved by" that accompany it, the term facilitated should be given a narrower reading. Such a reading would also resolve the ambiguity of the statutory language so as to guarantee the constitutionality of the statute. See WILLIAM ESKRIDGE, LEGISLATION: STATUTES AND THE CREATION OF PUBLIC POLICY 873-89 (3d ed. 2001) (discussing canon of constitutional avoidance). Accordingly, we construe the phrase "facilitated by" as requiring some "prearrangement" or "coordination" with the candidate. Nat'l Conservative Political Action Comm., 470 U.S. at 498, 105 S.Ct. 1459. Under such a construction, sharing routine information about a candidate is not sufficient to meet the "facilitated by" requirement. Thus, the provision is not constitutionally invalid.
 
 
 185
 Nor is there any constitutional barrier to applying this provision to related expenditures by PACs and political parties. The plaintiffs' argument on this point substantially restates their claim discussed above—that different contribution limits ought to apply to PACs and political parties. We reject it for the same reasons.
 
 
 186
 Finally, the provision's rebuttable presumption, which presumes that expenditures by political parties or PACs that benefit six or fewer candidates are contributions to those candidates, does not violate the Constitution by chilling protected speech. The plaintiffs argue that the presumption is unconstitutional because (1) the law may never presume that an expenditure is coordinated and (2) the presumption could never be rebutted and, as a result, chills independent advocacy of particular candidates. We find neither claim persuasive.
 
 
 187
 The Constitution does not bar the use of rebuttable presumptions in this context. The plaintiffs base their argument on Colorado Republican Federal Campaign Comm. v. Federal Election Comm'n, 518 U.S. 604, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) (Colorado Republican I). There, the Supreme Court struck down a federal provision that automatically treated all party expenditures, including those made independently, as contributions to candidates. The Court rejected the Court of Appeals' analysis that the government was entitled to a conclusive presumption that party expenditures are coordinated. Id. at 619, 116 S.Ct. 2309. The fact that the presumption was conclusive, however, played the critical role in that decision: it eliminated the need for a finding that the expenditures were in fact coordinated and foreclosed the possibility of a defense. Id. at 625, 116 S.Ct. 2309. Act 64 does nothing of the sort, since its presumption is rebuttable.
 
 
 188
 The plaintiffs' argument that the presumption is functionally conclusive because one "cannot prove a negative" is, at least in the legal arena, inaccurate. There are ample strategies that an accused party can employ to demonstrate that an expenditure was truly independent from the candidate it supported. The party can, for example, testify that no discussion took place with the candidate about advertising strategies, including the sharing of information about advertising plans. Candidates can testify that they never gave feedback on an independent advertising scheme or that the third parties never solicited such feedback. Adjudicative bodies can take such evidence, or other similar testimony, as proof and infer a lack of coordination. For these reasons, we uphold Act 64's rebuttable presumption concerning related expenditures.
 
 
 189
 D. The 25 Percent Limit on Out-of-State Donations is Unconstitutional
 
 
 190
 We can find no sufficiently important governmental interest to support the provision of Act 64 that limits out-of-state contributions to 25 percent of all candidate contributions. Unlike all of the other Act 64 provisions at issue in this appeal, the out-of-state contribution limit isolates one group of people (non-residents) and denies them the equivalent First Amendment rights enjoyed by others (Vermont residents). The District Court's decision in this regard should be upheld.
 
 
 191
 The District Court concluded that Vermont's interest in eliminating excessive out-of-state contributions was confined to unusually large contributions. 118 F.Supp.2d at 484. The District Court also noted that many non-residents have legitimate and strong interests in Vermont and have a right to participate, at least through speech, in those elections. Id. We find no support in the record for the alternative claim that Vermont has an important interest in singling out one class of contributors for limitations. See 1997 Vt. Laws P.A. 64 (H. 28) (1997) (finding No. 5) ("Increasing campaign expenditures require candidates to seek and rely on a smaller number of larger contributors, often outside the state, rather than a large number of small contributors."). There are only vague references to the danger of out-of-state contributions, and all refer to the danger of excessively large (not cumulatively great) contributions.
 
 
 192
 In the two reported decisions on the issue, courts have split on whether limitations of non-resident contributions may be upheld on corruption grounds. The Ninth Circuit has rejected, almost in bright-line form, limitations on non-resident restrictions. In VanNatta v. Keisling, the court struck down an Oregon initiative that effectively limited the use of non-resident contributions to 10 percent of total campaign expenditures. See VanNatta, 151 F.3d 1215, 1217-18 (9th Cir.1998), cert. denied sub nom., Miller v. VanNatta, 525 U.S. 1104, 119 S.Ct. 870, 142 L.Ed.2d 771 (1999); but see Montana Right to Life Assoc. v. Eddleman, 343 F.3d 1085, 1091 n. 2 (9th Cir.2003) (suggesting that VanNatta was superseded by Shrink). Addressing the asserted anti-corruption justification, the court held that the provision suffered from both over and underbreadth. Its overbreadth stemmed from the fact that it prevented all non-resident contributions once the 10 percent threshold had been reached, even those too small to have any corruptive influence. See VanNatta, 151 F.3d at 1221. The provision was underbroad because it did nothing to prevent corruptive (i.e., large) resident contributions; nor did it prevent corruptive non-resident contributions until the 10 percent limit had been reached. See id. In other words, the non-resident cap was "not closely drawn to advance the goal of preventing corruption." Id.
 
 
 193
 Because Act 64 contains contribution limits, it does not share all of the flaws of the Oregon statute considered in VanNatta. Act 64 does, for example, limit large resident and non-resident contributions. Nonetheless, the provision is overbroad in that it prohibits small contributions from out-of-state sources once the 25 percent threshold has been reached, even though such contributions are no more likely to corrupt than in-state contributions. Under this analysis, sustaining the provision would require an additional explanation for why exactly Vermont has an interest in eliminating such small donations only from non-residents.
 
 
 194
 The Alaska Supreme Court has attempted to craft such an explanation in State v. Alaska Civil Liberties Union, 978 P.2d 597 (Alaska 1999), cert. denied, 528 U.S. 1153, 120 S.Ct. 1156, 145 L.Ed.2d 1069 (2000). The Alaska law at issue capped out-of-state contributions but at lower percentages than Vermont's law. The court upheld the limitations on the grounds that out-of-state contributions have the ability to distort the Alaskan political system: "These nonresident contributions may be individually modest, but can cumulatively overwhelm Alaskans' political contributions. Without restraints, Alaska's elected officials can be subjected to purchased or coerced influence which is grossly disproportionate to the support nonresidents' views have among the Alaska electorate, Alaska's contributors, and those most intimately affected by the elections, Alaska residents. These restraints therefore limit the `potential for distortion.'" Id. at 617. Put another way, Alaska's "[m]ore than 100 years of experience ... have inculcated deep suspicions of the motives and wisdom of those who, from outside its borders, wish to remold Alaska and its internal policies." Id. The out-of-state limitation, according to this view, restrains their distorting influence. Id.
 
 
 195
 The analysis in the Alaska case is a sharp departure from the corruption analysis adopted by the Supreme Court in Buckley and Shrink. Even under the more expansive Shrink analysis, the fear was that candidates would become too compliant with the wishes of large contributors because they must rely on private interest groups for funding. The Alaska analysis permits limitations not to ensure candidate independence generally, but to limit the influence of one set of people—untrustworthy outsiders. Even assuming that the Alaska Supreme Court is correct that outsiders have bad motives and little to contribute to its political discourse, the government does not have a permissible interest in disproportionately curtailing the voices of some, while giving others free rein, because it questions the value of what they have to say.
 
 
 196
 The Alaska Court's concern could be understood another way: that when candidates are beholden to fundraisers, and not voters, then large contributions from non-residents distort the system. Again, this problem would endure even if officials were beholden to in-state contributors. Moreover, Vermont's expenditure limitations eliminate the major force behind candidates' excessive reliance on campaign contributors—their need to maximize their ability to raise funds by remaining pliant to the wishes of those who contribute to the political campaign system.
 
 
 197
 Based on our review of these cases and the governmental interests asserted by the defendants, we are unpersuaded that the First Amendment permits state governments to preserve their systems from the influence, exercised only through speech-related activities, of non-residents. Vermont has asserted no valid interest sufficiently strong to justify the provision, and we therefore hold it unconstitutional. Pursuant to Act 64's severability provision, the unconstitutional provisions should be severed.
 
 CONCLUSION
 
 198
 In summary, we conclude that Vermont has a sufficiently important governmental interest in support of Act 64's contribution limits—fighting the real and apparent corruption that accompanies unlimited campaign gifts—and that those contribution limits are closely drawn to achieve this goal. Accordingly, except as noted below, we uphold Act 64's contribution limits.
 
 
 199
 Vermont also has established two interests in favor of Act 64's expenditure limitations that, taken together, are constitutionally compelling: namely, protecting the time of candidates and elected officials, and preventing the reality and appearance of corruption. Although we find that these limits permit candidates for public office to engage in effective campaigns, additional fact-finding is required to complete this narrow tailoring inquiry. On remand, the District Court must determine whether the legislature might have chosen either another type of regulation or higher limits that would still achieve the goals we sanction and yet impinge less on the First Amendment rights at stake.
 
 
 200
 For the reasons set forth, we affirm the District Court's holdings that the following provisions of Act 64 are constitutional: (1) the limit on contributions that candidates may accept from individuals or political action committees (§ 2805); (2) the limit on contributions that political action committees and political parties may accept from any source (§ 2805(a)); (3) the definition of political parties as including state, county and town entities (§ 2801(5)); and (4) the classification of related expenditures as contributions (§ 2809(a)). We also affirm the District Court's finding that the limits on contributions from non-Vermont residents and organizations (§ 2805(c)) are unconstitutional and we uphold its injunction against enforcement of that provision.
 
 
 201
 We vacate the District Court's injunction against enforcement of the limitation on contributions by political parties to candidates (§ 2805(a)). We also vacate the judgment and remand for further proceedings with respect to the constitutionality of (1) limiting candidate expenditures (§ 2805a); (2) treating the "related expenditures" of third parties as candidate expenditures (§ 2809(b)); (3) restricting the ability of PACs to make wholly independent expenditures, to the extent the Act's provisions are read to impose such restrictions (§§ 2801(4), 2805(g)); and (4) limiting transfers of funds from national to state political party affiliates (§§ 2801(5), 2805(a)-(b)). Finally, we affirm the District Court's injunction against enforcement of Act 64's expenditure limitations, pending further proceedings.[29]
 
 
 202
 In vacating aspects of the District Court's injunction, we are mindful that Act 64's limitations are premised on a two-year election cycle. Given that further proceedings must be held, we remand to the District Court the issue of when the various limitations revived by this opinion should be given effect. We thus authorize the District Court to designate an appropriate effective date for these limitations that causes the least disruption to the current election cycle.
 
 
 203
 Each party shall bear its own costs on this appeal.
 
 
 
 Notes:
 
 
 [1]
 We draw some support for our interpretation ofBuckley from the Supreme Court's recent decision in McConnell v. Federal Election Comm'n, 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) (upholding legislation that, inter alia, limited "soft-money" campaign contributions and regulated electioneering communications). We recognize, of course, that McConnell addresses contributions rather than expenditures. Nevertheless, the McConnell Court, by focusing on political and societal developments since Buckley, see id. at ___, 124 S.Ct. at 648-54, clearly rejected a static approach to campaign finance reform. Just as the McConnell Court deferred to Congress'"predictive judgments" about the need for federal regulation of soft-money contributions, id. at ___, 124 S.Ct. at 673 (observing that Congress had "been taught the hard lesson of circumvention by the entire history of campaign finance regulation"), we respect the Vermont Legislature's similar reliance — in enacting regulations on both campaign contributions and expenditures — on its substantial historical experience with campaign finance reform and its informed predictions about Vermont candidate and donor behavior.
 
 
 [2]
 Our consideration of these issues could not help but take particular notice of theMcConnell majority's observation, in a discussion replete with descriptions of the distinct evil of ever larger sums of money in American politics, that many of the corporate soft-money contributions at issue in that case were motivated by the "desire for access." McConnell, 540 U.S. at ___, 124 S.Ct. at 649. The Court held that "Congress' legitimate interest" in regulating such contributions "extends beyond preventing simple cash-for-votes corruption to curbing undue influence on an office-holder's judgment, and the appearance of such influence." Id. at ___, 124 S.Ct. at 664 (citation and internal quotation marks omitted). The same issues were identified by the Vermont legislature in this case.
 
 
 [3]
 In 1916, Vermont took early steps to ensure the accountability of its elected officials by passing direct primary elections and mandating the post-primary disclosure of candidate expenditures. 1915 Vt. Laws 4, § 22; 1916 Vt. Laws (Sp. Sess.) 4, § 1. In 1961, the legislature adopted mandatory expenditure limits in primary elections, 1961 Vt. Laws 178, and applied those limits to general elections in 1971, 1971 Vt. Laws 259. In 1976, afterBuckley, Vermont repealed its expenditure limits but continued to limit the maximum contribution that candidates might accept. 1975 Vt. Laws (Adj. Sess.) 188. Over several decades, Vermont witnessed a period of growing disillusionment with its electoral system, and in 1993 instituted a system of voluntary expenditure limits. Former Vt. Stat. Ann. tit. 17, §§ 2841-42 (1991) (repealed 1997).
 
 
 [4]
 A previous lawsuit challenged other provisions of Act 64 which required (1) disclosure of who pays for "political advertisements" and the candidate, party or political committee "on whose behalf" the advertisement is published or broadcast; and (2) reporting of expenditures of "mass media activities . . . which included the name or likeness of a candidate for office" occurring within 30 days of a primary or general election. Vt. Stat. Ann. tit. 17, §§ 2881-2283See Vermont Right to Life Committee v. Sorrell, 221 F.3d 376 (2d Cir.2000).
 
 
 [5]
 Plaintiff Neil Randall is an incumbent representative in the Vermont legislature. Plaintiff George Kuusela is chairman of the Windham County Republican Party and has run for state legislative office. Plaintiff John Patch is chair of the Chittenden County Democratic Party and has plans to run for State Senate. Plaintiff Steven Howard was previously a candidate for State Auditor and a former state representative. Plaintiff Libertarian Party is a political party in Vermont and ran 44 candidates for office in 1998. Plaintiff Jeffrey Nelson is a longtime resident of Vermont and a financial supporter of the Republican Party. The plaintiffs also include the Vermont Right to Life Committee, the Vermont Republican State Committee, and various additional individuals
 
 
 [6]
 Unease withBuckley is not limited to those who argue that campaign finance regulations have a proper place in our constitutional system. In Shrink, Justices Thomas and Scalia both advocated overruling Buckley not to give legislatures greater leeway to pass needed campaign finance reform, but to heighten the constitutional review given to contribution limits. 528 U.S. at 410-12, 120 S.Ct. 897 (Thomas, J., joined by Scalia, J., dissenting); see also McConnell, 540 U.S. at ___, 124 S.Ct. at 737 (Thomas, J., concurring in part and dissenting in part). Justice Kennedy has expressed sympathy for their view. Shrink, 528 U.S. at 409-10, 120 S.Ct. 897 (Kennedy, J., dissenting); cf. McConnell, 540 U.S. at ___, 124 S.Ct. at 755-56 (Kennedy, J., concurring in part and dissenting in part) (characterizing Buckley's "unworkable" distinction between limits on contributions and limits on expenditures as having created an "awkward and imprecise test").
 More recently, in their respective McConnell dissents, Justices Scalia, Kennedy and Thomas observed with dismay that the McConnell majority went even further than the Court had gone in Buckley. See McConnell, 540 U.S. at ___, 124 S.Ct. at 729 (Scalia, J., concurring in part and dissenting in part) (characterizing the majority as "having abandoned most of the First Amendment weaponry that Buckley left intact"); id. at ___, 124 S.Ct. at 742 (Kennedy, J., concurring in part and dissenting in part) ("To reach today's decision, the Court surpasses Buckley's limits and expands Congress' regulatory power."); id. at ___, 124 S.Ct. at 730 (Thomas, J., concurring in part and dissenting in part) (accusing the majority of building upon the errors of Buckley by "expanding the anticircumvention rationale beyond reason"). Hence, it would be unrealistic for us to fail to notice the Court's expanding views.
 
 
 [7]
 The arguments to the contrary that are raised by the dissent largely reprise those presented by Senator Buckley and like-minded commentators in the early 1970s. While some of those arguments were then successful, they failed to result in having the Supreme Court hold that expenditure limits areper se unconstitutional — a fact that our dissenting colleague disputes.
 
 
 [8]
 Some scholars think that such regulations are more properly classified as "content-neutral."See, e.g., Elena Kagan, Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine, 63 U. Chi. L. Rev. 413, 517 n. 151 (1996) ("I treat the expenditure ceilings in Buckley as content neutral, as is the norm, because they cover spending for expression supporting all political candidates. It could be argued, however, that the ceilings imposed a subject-matter limitation because they applied only to spending in political campaigns.") (citing Laurence H. Tribe, American Constitutional Law § 13-27, at 1132-36 (2d ed.1988)).
 
 
 [9]
 See, e.g., City of Richmond v. J.A. Croson Co., 488 U.S. 469, 500, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (plurality opinion) ("The factfinding process of legislative bodies is generally entitled to a presumption of regularity and deferential review by the judiciary.") (citing Williamson v. Lee Optical of Oklahoma, 348 U.S. 483, 488-89, 75 S.Ct. 461, 99 L.Ed. 563 (1955)).
 
 
 [10]
 Amicus Brennan Center for Justice, arguing in favor of the spending limits, relies on the interest of "prevent[ing] the demonstrably corrosive effects of uncontrolled campaign spending on the democratic process." Amicus further characterizes "uncontrolled campaign spending" as a problem that "harms the quality of democratic representation," that is "undermining faith in the democratic process," and that "has a harmful impact on voter turnout." Amici States rely on the first three interests identified by Vermont, and also relied upon by intervenors, described as (1) "eliminat[ing] corruption and the appearance of corruption in the political process"; (2) "ensur[ing] that officeholders can spend less time fund-raising and more time performing their duties" and (3) "bolster[ing] equal access to political office and restor[ing] the public's confidence in the electoral system."
 
 
 [11]
 Reiterating points it had already made inBuckley and Shrink, the Supreme Court in McConnell clearly held that large campaign donations — even the so-called "soft-money" contributions at issue in McConnell — "can corrupt or, at the very least, create the appearance of corruption of federal candidates and officeholders." McConnell, 540 U.S. at ___, 124 S.Ct. at 661. The McConnell majority observed that during the 1996 and 2000 campaigns, "more than half of the top 50 soft-money donors gave substantial sums to both major national parties, leaving room for no other conclusion but that these donors were seeking influence, or avoiding retaliation, rather than promoting any particular ideology." Id. at ___, 124 S.Ct. at 663 (emphasis in original); see also id. at ___, 124 S.Ct. at 649 (citing evidence that "many corporate contributions were motivated by a desire for access to candidates and a fear of being placed at a disadvantage in the legislative process relative to other contributors, rather than by ideological support for the candidates and parties").
 
 
 [12]
 This phenomenon was also chronicled by theMcConnell Court, which quoted one former Senator as admitting that members of Congress "have limited amounts of time" but do make themselves available to meet with those who give "large sums." McConnell, 540 U.S. at ___, 124 S.Ct. at 664 (citations and internal quotation marks omitted). The same former Senator went on to explain that those meetings are "not idle chit-chats about the philosophy of democracy.... Senators are pressed by their benefactors to introduce legislation, to amend legislation, to block legislation, and to vote on legislation in a certain way." Id. at ___, 124 S.Ct. at 664-65 (citations and internal quotation marks omitted).
 Our dissenting colleague criticizes Vermont's reliance on this type of anecdotal evidence but the Supreme Court expressly credited similar testimony in McConnell where, as here, the record was "replete" with anecdotal examples of the type of access-peddling that concerned Congress. McConnell, 540 U.S. at ___, 124 S.Ct. at 664. The McConnell Court specifically observed the type of "particularized evidence of improper influence" required by our dissenting colleague, post at 190, would be particularly hard to come by. "Even if it occurs only occasionally, the potential for such undue influence is manifest. And unlike straight cash-for-votes transactions, such corruption is neither easily detected nor practical to criminalize." McConnell, 540 U.S. at ___, 124 S.Ct. at 666.
 
 
 [13]
 Although Judge Winter criticizes Act 64's proponents' reliance on the phenomenon of "bundling" or "pooling" contributions as a justification for the legislation,see post at 185-87, we note that the McConnell Court lauded Congress' similar efforts to anticipate, document, and respond to candidates', donors' and parties' evolving strategies for circumventing existing campaign finance reforms. See id. at ___, 124 S.Ct. at 661 ("[T]he First Amendment does not require Congress to ignore the fact that candidates, donors, and parties test the limits of the current law.") (citation and internal quotation marks omitted). Indeed, for example, no sooner had the Buckley Court construed federal law to cover "express advocacy," did the political spending system create "issue advertising." See Id. at ___, 124 S.Ct. at 650-52. Similarly, elaborate schemes involving the "solicitation, transfer, and use of soft money" grew out of FECA's imposition of limitations on the source and amount of contributions of "federal" or "hard" money. Id. at ___, 124 S.Ct. at 648-50. The McConnell Court recognized that such new developments — and Congress' general awareness of the realities of campaign fundraising — quite correctly had moved Congress to legislate. See id. at ___, 124 S.Ct. at 665-66. Clearly, bundling practices allow donors to achieve indirectly what contribution limits prevent them from doing directly. We do not diminish the legislature's reliance on this concern because, like the Supreme Court, we refuse to take a "crabbed view of corruption, and particularly of the appearance of corruption." Id. at ___, 124 S.Ct. at 665.
 
 
 [14]
 Amicus Brennan Center also points to evidence nationally that "raising necessary campaign funds has turned into a full-time job for many candidates and officeholders." And there is consensus among the five amici states — including Connecticut and New York — that "[a]lthough the States have a compelling interest in ensuring that the demands of fundraising not drain elected officials of the time and attention necessary to carry out their official duties, they are not succeeding." We find it significant that all three states that make up our Circuit have expressed concern over the all-consuming nature of unrestrained fundraising
 
 
 [15]
 Moreover,Buckley could not have anticipated the whole range of individual concerns faced by specific states, such as Vermont, given those states' unique experiences with state-level campaign finance reform in the three decades since Buckley was decided.
 
 
 [16]
 The General Assembly minced no words when describing this phenomenon: "Some candidates and elected officials, particularly when time is limited, respond and give access to contributors who make large contributions in preference to those who make small or no contributions." 1997 Vt. Laws P.A. 64 (H. 28) (finding No. 2)
 
 
 [17]
 Our dissenting colleague challenges our deference to the Vermont legislature with respect to its predictions about the effect that Act 64's contribution limits, standing alone, would have on candidate behaviorSee post at 189-94. Such "predictive judgments" by a legislature, however, should be accorded "substantial deference . . ., particularly when, as here, those predictions are so firmly rooted in relevant history and common sense." McConnell, 540 U.S. at ___, 124 S.Ct. at 673 (citation and internal quotation marks omitted); see also supra at 120 n. 14 (noting the consensus among the amici states that this time-protection interest is not unique to Vermont).
 
 
 [18]
 It further appears that the two interests analyzed here — anti-corruption and time protection — overlap and might be better described as one interest — "to protect the integrity of the electoral process — the means through which a free society democratically translates political speech into concrete governmental action."Shrink, 528 U.S. at 401, 120 S.Ct. 897 (Breyer, J., concurring), or, as amicus Brennan Center puts it, to "protect the quality of democratic representation." Since defendants did not defend Vermont's law on the basis of such an interest, however, and the Supreme Court has not relied on such an interest in its recent analyses of the constitutionality of campaign finance laws, we do not explicitly assess that interest here. We do note that this interest appears to underlie, in part, both of the interests asserted by the State — anti-corruption and time protection for candidates and elected officials — that we do analyze.
 
 
 [19]
 One commentator has described the Supreme Court's narrowly tailoring requirement this way: "The narrow-tailoring prong, then, involves essentially factual questions about whether the law is indeed narrowly drawn: Does the law further the interest; is the law limited to speech that implicates the interest; does the law cover all such speech; are there less restrictive alternatives that will serve the interest equally well?" Eugene Volokh,Freedom of Speech, Permissible Tailoring and Transcending Strict Scrutiny, 144 U. PA. L. REV. 2417, 2424 (1996) (footnotes omitted).
 
 
 [20]
 We note that examination of other forms of expenditure limits has often involved analysis of effective advocacy and campaigning. For example, the ability of corporations to communicate an effective political message, despite a state ban on the use of general treasury funds for candidate-oriented independent expenditures, was noted inAustin v. Michigan Chamber of Commerce, 494 U.S. 652, 660, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990) ("We find that the Act is precisely targeted to eliminate the distortion caused by corporate spending while also allowing corporations to express their political views.") (emphasis added).
 
 
 [21]
 Voluntary campaign expenditure limitations of one sort or another have been promulgated by governments in Hawaii, Kentucky, Maine, Maryland, Michigan, Minnesota, New Hampshire, Rhode Island, and WisconsinSee, e.g., Haw.Rev.Stat. § 11-219 (2003); Ky.Rev.Stat. Ann. § 121A.030 (2003); Me.Rev.Stat. Ann. tit. 21-A § 1125 (2003); Md.Code Ann. Elec. Law § 15-105 (2003); Mich. Comp. Laws Ann. § 169.267 (2003); Minn.Stat. § 10A.25 (2003); N.H.Rev.Stat. Ann. § 664:5-b (2003); R.I. Gen. Laws § 17-25-20 (2003); Wis. Stat. Ann. § 11.31 (West 2003) (enforcement enjoined by Wisconsin Realtors Ass'n v. Ponto, 233 F.Supp.2d 1078 (W.D.Wis.2002)).
 
 
 [22]
 We draw no conclusions at this stage about whether such a reason would be constitutionally acceptable
 
 
 [23]
 In addition, our dissenting colleague asserts that Act 64's definition of "expenditures" and "related expenditures" may mean that the spending totals for past campaigns understate the amount of expenditures as defined by Act 64. He also points out that the legal and record-keeping costs of compliance with the new law will also inflate future candidates' expendituresSee post at 172-73. Findings in this regard will also help inform the inquiry on the degree to which this provision impinges on First Amendment rights.
 
 
 [24]
 The dissent asserts that this least restrictive means inquiry is a "mixed issue of legislative fact and law" that does not require remandSee post at 203. The dissent's extensive discussion of the significance of the distinction between adjudicative and legislative facts seems to us tangential and unhelpful. The fact that this Court may ultimately undertake de novo review of any legislative facts found by the District Court on remand or that appellate courts take judicial notice of legislative facts under appropriate circumstances, see id., does not mean that we must resolve disputed legislative facts—particularly facts that are dispositive of the case before us—on an insufficiently developed record. Nor should we, under these circumstances, take judicial notice of facts relating to Vermont's political and electoral system, an arena in which this Court lacks substantial experience or expertise. By contrast, the types of "legislative facts" that have been addressed most recently in our caselaw deal with much more straightforward questions, e.g., geography and jurisdiction or the fact that cocaine is derived from coca leaves. See, e.g., United States v. Hernandez-Fundora, 58 F.3d 802, 812 (2d Cir.) (citations omitted), cert. denied, 515 U.S. 1127, 115 S.Ct. 2288, 132 L.Ed.2d 290 (1995).
 Judge Winter's fundamental disagreement with our opinion seems not to be one of appropriate characterization of facts. Rather, his dispute with our position is that he believes that a remand is unnecessary because there is nothing more to be learned. Obviously, we disagree. There are gaps in the record—likely the result of the District Court's abridged consideration of the issue of narrow tailoring—that ought be filled before any court undertakes to resolve the ultimate issue in this case: whether there are less restrictive alternatives that could have advanced Vermont's compelling interests.
 
 
 [25]
 Our dissenting colleague criticizes these guidelines for further inquiry on several grounds, none of which we find persuasive. At the outset, he asserts that the first two queries are simply straightforward questions of legislative historySee post at 204. Unfortunately, as noted supra at 132-34, the answers to these questions are not discernible from the existing record. To the extent that the dissent is suggesting that these questions are irrelevant, see post at 206-07, we disagree.
 We reject the suggestion that we are overly focused on what the legislature did. Of course, the ultimate issue for the District Court on remand is whether there exists a less restrictive type or degree of regulation that would serve Vermont's compelling anti-corruption and time-protection interests; it is not merely whether the legislature considered such an alternative. See supra at 132-35. Because our dissenting colleague concludes, without citation, that "a combination of public and private financing with low contribution limits is infinitely less restrictive ... and accomplishes all of the ostensible purposes of Act 64's expenditure limits," he deems a remand unnecessary. See post at 207. We, however, do not believe that proposition to be self-evident, nor is it supported by the current record.
 We are loath to presume, on an incomplete record, the reasons for the legislature's decision not to pursue such alternatives and we believe the District Court's—and perhaps eventually this Court's—evaluation of whether less restrictive alternatives exist will undoubtedly be aided by the legislature's own analysis of those alternatives, to the extent such analysis occurred. Indeed, even a modicum of deference to the legislature and consideration for principles of federalism would seem to require consideration of its reasons for rejecting a potentially-less-restrictive alternative scheme. But see post at 207 (concluding that the only possible reason for rejecting such a measure is the drafters' ulterior, incumbent-protective motive).
 So as not to restrict its proceedings upon remand in any way—and to avoid the strictures of the mandate rule, see, e.g., United States v. Ben Zvi, 242 F.3d 89, 95 (2d Cir.2001) (explaining that the mandate rule "compels compliance on remand with the dictates of the superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court") (citation, emphasis and internal quotation marks omitted) —we have elected to speak broadly in framing the inquiry to be undertaken on remand. To do as our dissenting colleague suggests, on the limited record before us, would unnecessarily and unwisely encroach on the essential role of the district judge in these proceedings.
 
 
 [26]
 Before leaving the issue of the constitutionality of the spending limits, we briefly address a concern raised by our dissenting colleague: that there is language in Act 64 relating to the expenditure limits that renders the provision impermissibly vagueSee post at 161-68. As a threshold matter, it must be pointed out that plaintiffs did not raise this claim either in the District Court or on appeal—and it is not because they were unfamiliar with such a claim. Indeed, plaintiffs made this kind of argument with regard to other provisions in Act 64 also at issue in this case, see infra at 87; and one plaintiff, represented by the same counsel as here, challenged other provisions of Act 64 in a previous case on these grounds. See Vermont Right to Life Comm., Inc. v. Sorrell, 221 F.3d 376, 387 (2d Cir.2000) ("VRLC identifies an additional constitutional problem posed by [the disclosure provisions]: They are impermissibly vague."). We will not strike down a state statute, in a pre-enforcement facial challenge, on grounds upon which it has not been challenged.
 The dissent takes issue specifically with several aspects of the statutory language that pertain to the expenditure limits—that the spending is made "for the purpose of influencing an election," that it applies to "anything of value," and the spending is attributable to a "candidate." See post at 161-65. Of these, the first two provisions have been a part of federal and state campaign finance laws for decades, and they have been upheld by the Supreme Court. See Buckley, 424 U.S. at 145-47, 96 S.Ct. 612; 2 U.S.C. § 431(8)(A)(i). As to the last provision regarding "spending attributable to a candidate," the notion that candidates do not know when they are candidates is belied by the specificity of the provision itself. As the dissent appears to acknowledge, Act 64 defines "candidate" as someone who has done one of three specific things. See post at 165. Though the dissent raises the possibility that a candidate could be deemed a candidate by some other "affirmative action" not defined by statute, see id., no plaintiff has raised this concern in light of the statute's clarity in this regard.
 Finally, we note that, of course, as with all campaign finance regulations, minor ambiguities, omissions or statutory quirks will be resolved in the normal course of administrative interpretation, legislative amendment and litigation. In any event, the ambiguities raised by the dissent do not, we believe, render the statute unconstitutional. Indeed, though raising the specter of a multitude of pitfalls latent in the statutory text, even our dissenting colleague would uphold the constitutionality of the majority of the Act—despite that many of those same ambiguities speak to portions of the Act unanimously upheld in Part II of this opinion.
 
 
 [27]
 Any amendment by the Vermont legislature to mandatory spending caps in the interim has the potential, of course, to moot litigation over its constitutionality
 
 
 [28]
 The District Court noted that by way of comparison, the Vermont law has a limit-constituency ratio (i.e., the maximum contribution allowed divided by the number of constituents) of .00068, compared to .00040 under the Missouri statute. 118 F.Supp.2d at 479
 
 
 [29]
 Because our original opinion was withdrawn, the petition for rehearing as to that opinion became moot. Upon the filing of this substituted opinion, however, the parties may, if they so desire, file petitions for rehearing as though this were our original decision
 
 
 
 204
 WINTER, Circuit Judge, dissenting.
 
 
 205
 I concur in part in the result reached by my colleagues' opinion. I respectfully dissent from their holdings as to Act 64's limits on expenditures by candidates, including "related expenditures" by individual supporters and political parties, and as to the Act's forced centralization of local political parties. In view of the length of this separate opinion, I begin with a table of contents.
 
 CONTENTS
 
 206
 I. INTRODUCTION ..................................................................150

 II. APPLICABLE CONSTITUTIONAL PRINCIPLES ..........................................152

 a) Overview ...................................................................152
 b) Money and Protected Political Speech .......................................153
 c) Freedom to Organize Political Parties ......................................154
 d) Sufficient Governmental Interests ..........................................155
 e) Requisite Precision of Regulation ..........................................156
 f) Appropriate Level of Scrutiny ..............................................157

III. THE PROVISIONS OF ACT 64 ......................................................159

 a) Overview ...................................................................159
 b) Two-Year Cycle .............................................................160
 c) Limits on Expenditures by Candidates .......................................161
 d) Limits on Contributions to Candidates ......................................165
 
 
 207
 e) Limits on "Related Expenditures" ...........................................166
 f) Costs of Compliance ........................................................168
 g) Treatment of the Press .....................................................168
 h) Administration and Enforcement .............................................169

 IV. THE BURDEN ON PROTECTED SPEECH ................................................170

 a) The Burden on Grassroots Political Activity ................................170
 1) Burden on Volunteer Activity ............................................170
 2) Burden on Local Party-Funded Activity ...................................171
 b) The Burden on Candidates' Speech ...........................................172
 1) Past Experience .........................................................172
 A) Inaccuracy of Reports From Past Elections ............................172
 B) Inadequacy of Average Spending in Past Elections as a
 Constitutional Standard ............................................173
 C) Evidence of Contested Elections in Vermont ...........................175
 2) Effect of Act 64's Expenditure Limits on Candidates .....................176
 c) The Burden on Challengers ..................................................178
 d) The Burden on the Press ....................................................181
 e) The Burden on Party Affiliates .............................................182

 V. THE CONSTITUTIONAL RESOLUTION .................................................183

 a) Restrictions on Political Activity for Which No Governmental Interests
 are Asserted .............................................................184
 b) Buckley Forecloses the Asserted Justifications for Expenditure Limits ......185
 c) The Insufficiency of the Governmental Interests ............................189
 1) Anti-Corruption .........................................................189
 2) Time Protection .........................................................192
 3) Public Confidence in Government .........................................194
 d) Stopping the "Arms Race," "Effective Advocacy," and Incumbent
 Protection ................................................................196
 1) The "Arms Race" .........................................................196
 2) "Effective Advocacy" ....................................................197
 3) Incumbent Protection ....................................................199
 e) The Excessive Discretion Accorded Administrators ...........................199

 VI. THE REMAND ON NARROW TAILORING ................................................202
 a) Legislative Facts, Adjudicative Facts, and Mixed Issues of Fact and Law ....202
 1) The Distinction Between Legislative and Adjudicative Facts ..............203
 2) Remand for "Findings" of Legislative Fact and of Law ....................204
 b) Failure to Define What is Restrictive About Act 64 .........................205
 c) The Existence of a Less Restrictive Alternative ............................206
 d) Remanding to the Wrong Forum ...............................................207

VII. CONCLUSION ....................................................................209

Appendix A .........................................................................210
 
 I. INTRODUCTION
 
 208
 On August 7, 2002, my colleagues filed an extensive majority opinion in this matter. I filed a partial dissent that was almost as long as the majority opinion. Although our opinions, subsequently vacated by my colleagues, were a clear and present danger to the forests of the nation, they failed to join issue in many ways.
 
 
 209
 My colleagues' opinion in the main adopted the stated purposes of the Vermont legislature and the opinions of its proponents as sufficient constitutional justifications for Act 64. My dissent was largely a detailed statutory analysis of Act 64, concluding that it limits or prohibits a vast range of ordinary political activities. The dissent also discussed the Act's pervasive ambiguities to be resolved through the often ad hoc discretionary decisions by those who must administer it and was critical of my colleagues for viewing the Act through the prism of what its proponents said about it instead of what the Act itself says.
 
 
 210
 Although my dissent has been substantially revised to address issues raised by my colleagues' decision to remand rather than reverse with regard to the expenditure limits issue, to elaborate in more detail the evidence that Act 64 is intended to protect incumbent legislators, and to provide a more particularized discussion of the evidence in the record, not much has changed since my colleagues vacated our earlier opinions. Their revised opinion does not discuss or even mention, to take only a few examples, the following concrete effects of Act 64:
 
 
 211
 (i) Act 64's limits on expenditures are so low that they are below the amount spent in the past by third-party candidates, see infra Part IV(b)(1)(C);
 
 
 212
 (ii) Act 64 limits a candidate who must run in both a primary and general election to the same expenditures as an opponent who runs only in the general election, see infra Parts III(b), IV(c);
 
 
 213
 (iii) a favorable press editorial after an interview with a candidate must be valued and treated as a contribution to, and expenditure by, the candidate's campaign subject to Act 64's limits, see infra Parts III(g), IV(d);
 
 
 214
 (iv) according to Vermont's Secretary of State, if a candidate provides a photo or written materials to a person who uses the photo or materials in a publication, the candidate must treat the cost of the publication as an expenditure by the candidate, see infra Parts III(g), IV(d); Appendix A;
 
 
 215
 (v) the draconian limits on the activities of autonomous local units of political parties resulting from Act 64's requirement that funding for all local activities, such as a town committee picnic, must be from a single statewide party bank account with the permission of the person who controls that account, see infra note 1, Part IV(a)(2), (e);
 
 
 216
 (vi) the need for campaign volunteers to keep records of every mile they drive to meetings, to campaign events, or on other campaign business over a two-year period, see infra Parts III(e), IV(a)(1);
 
 
 217
 (vii) the need of a campaign to treat the miles driven by volunteers as a campaign expenditure subject to Act 64's limits (and to keep records and report that mileage), and to prohibit further driving by volunteers whenever limited (by Act 64) campaign resources are needed for other activities or the expenditure limits have been reached, see infra Parts III(e), IV(a)(1); or
 
 
 218
 (viii) the restrictions on ordinary homeowners wanting to hold meet the candidates events (and again the need for a candidate's campaign to record and limit such events as campaign expenditures), see infra Part IV(a)(1).
 
 
 219
 My colleagues now remand Act 64's expenditure limits principally for an inquiry into whether the Vermont legislature considered somewhat higher limits as a less restrictive alternative. Even putting aside the Supreme Court's holding that expenditure limits are per se unconstitutional, see Buckley v. Valeo, 424 U.S. 1, 45, 54, 57, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), that language used in Act 64 is unconstitutionally vague, 424 U.S. at 44, 80, 96 S.Ct. 612, see infra note 6, and the fact that, even under the standard applied by my colleagues, the levels of Act 64's limits are unconstitutionally low and clearly protective of incumbents, the remand is something of an oddity. First, it involves largely legal issues described by my colleagues as factual. Second, the issue should be whether less restrictive alternatives exist, not whether the Vermont legislature considered them. Third, the degree of an alternative's restrictiveness cannot be evaluated without knowing what is restrictive, and to what degree, about the law in question. However, the only discussion of Act 64's specific restrictions on political activity is found in this dissent. Fourth, a speech-supportive and constitutionally sound alternative—a combination of private and public financing with low contribution limits—is obviously available. In fact, Act 64 itself limits contributions to such small amounts—$400 for statewide candidates, $300 for Senate candidates, and $200 for House candidates—that there is no evidence showing that the possibility of improper influence on officeholders is at present anything but negligible.
 
 
 220
 I therefore respectfully continue to dissent as to the constitutionality of two aspects of Act 64. See 1997 Vermont Campaign Finance Reform Act (codified as Vt. Stat. Ann. tit. 17, §§ 2801-2883) ("Act 64"). Those aspects are Act 64's limits on expenditures by candidates, including related expenditures by individual supporters and political parties, and its restrictions on fundraising and spending on party-building activities by state, county, and local committees of a political party. Id. §§ 2801(5), 2805a. Otherwise, based on Supreme Court precedent, I concur in the result reached by my colleagues.
 
 II. APPLICABLE CONSTITUTIONAL PRINCIPLES
 
 221
 a) Overview
 
 
 222
 Neither Act 64's limits on expenditures nor its restrictions on independent fundraising and expenditures by state or local party committees involve new issues of constitutional law.
 
 
 223
 Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), held, without qualification, that government may not limit campaign expenditures by candidates for electoral office. Id. at 45, 54, 57, 96 S.Ct. 612. Act 64 limits such expenditures notwithstanding Buckley. Indeed, the proponents of Act 64 never doubted its unconstitutionality under Buckley and enacted it for the explicit purpose of creating a vehicle for litigation to overturn Buckley. See infra note 2 and accompanying text. Act 64's limits on expenditures violate the First Amendment because they limit a broad spectrum of political speech and activity, including ordinary grassroots activities and editorializing and reporting by the press, for no permissible purpose. Further, they entrust those who enforce the law with unfettered, and unconstitutional, discretion to determine, often on an ad hoc basis, what acts of political advocacy are permitted and what are prohibited. Even if expenditure limits were not per se unconstitutional, the low level at which the limits are set by Act 64 so heavily favors incumbents that it can be upheld only by application of a legal test similarly skewed toward incumbents. See infra Part V(d).
 
 
 224
 Moreover, Act 64 treats a contribution to a local political party affiliate as a contribution to all affiliates and requires that all such contributions be initially deposited in the state party bank account. See infra note 1. This means that all funding for a local affiliate's activities—even for a six-pack of diet soda for a town committee picnic—must be approved and paid by the person who controls that statewide account. At a stroke, and without any proffered reason, much less a statement of a compelling governmental interest, this revolutionary provision destroys the autonomy of local affiliates of political parties from each other and from the state party organization, and thereby violates both freedom of speech and freedom of association.
 
 
 225
 Act 64 suppresses ordinary political activity at every level of the electoral process. It reflects the philosophy of one witness for the defense who testified that government ought to regulate political speech the way it regulates public utilities. Trial Tr. vol. V at 167 (Helen David-Friedman). Act 64 may be a popular law— although this dissent will note several instances of great disquiet and even shock among proponents upon learning what it actually says—but only because its proponents systematically divert attention from the law's actual provisions to the nobility of their goal—here the transfer of political power from "special interests" to "ordinary citizens." Maj. Op. at 116, Appellant's Br. at 24-29; Trial Tr. vol. IX at 57-62 (Gordon Bristol); id. at 137 (Elizabeth Ready); Trial Tr. vol. VII at 88 (Cheryl Rivers); Trial Tr. vol. VIII at 63-64 (Peter Smith). However, even this attractive rhetoric cloaks sinister purposes. Foiling "special interests" while empowering "ordinary citizens" is a rhetorical staple of electoral politicians of every viewpoint because the terms are used as synonyms for one's opponents and supporters respectively. In this light, the pursuit of this goal through the regulation of political speech is the road to the suppression of opponents.
 
 
 226
 As Justice Brandeis once noted, "The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." Olmstead v. United States, 277 U.S. 438, 479, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). And Justice Black has reminded us that "[h]istory indicates that urges to do good have led to the burning of books and even to the burning of `witches.'" Beauharnais v. Illinois, 343 U.S. 250, 274, 72 S.Ct. 725, 96 L.Ed. 919 (1952) (Black, J., dissenting). Act 64, which has its greatest impact in silencing those ordinary citizens whose active participation in politics takes place through organized groups, provides us with a modern reminder of the wisdom of those two statements.
 
 
 227
 b) Money and Protected Political Speech
 
 
 228
 The activities limited by Act 64 are the ordinary stuff of democracy that constitutes the core of the conduct protected by the First Amendment. There is "practically universal agreement that a major purpose of [the First] Amendment was to protect" political speech. Mills v. Alabama, 384 U.S. 214, 218, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966), quoted in McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 346, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995). Indeed, the First Amendment "has its fullest and most urgent application precisely to the conduct of campaigns for political office." Buckley, 424 U.S. at 15, 96 S.Ct. 612 (quoting Monitor Patriot Co. v. Roy, 401 U.S. 265, 272, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971)).
 
 
 229
 As Buckley held, because money is needed for access to resources of communication, any limit on the use of money for political speech is a limit on that speech. 424 U.S. at 19. Political speech without an audience is not worth the effort. Political speakers must therefore go to where voters are or speak through a medium that voters watch or hear. Without resources of communication, no speech is effective. Without money, resources are not obtainable. Cars use gas. Gas costs money. A candidate who has reached Act 64's limits on expenditures and may not even drive the family car to a town green to make a speech is as effectively barred from speaking as he or she would be if the law flatly prohibited the speech itself. As the Supreme Court has stated:
 
 
 230
 A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached. This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money. The distribution of the humblest handbill or leaflet entails printing, paper, and circulation costs. Speeches and rallies generally necessitate hiring a hall and publicizing the event.
 
 
 231
 Buckley, 424 U.S. at 19, 96 S.Ct. 612.
 
 
 232
 Proponents of Act 64 rarely acknowledge this fact in stressing their preference for limiting political speech to the "old-fashioned handshake campaign," Trial Tr. vol. IX at 47 (Gordon Bristol), including "meet and greet" events, Trial Tr. vol. X at 187 (Karen Kitzmiller), such as "spaghetti suppers," Trial Tr. vol. IX at 221 (Anthony Pollina), "little parties" for "150 people" to which "a couple hundred" people are invited by mail, id. at 141-42 (Elizabeth Ready), Rotary Club and Jaycees meetings, Trial Tr. vol. V at 43 (Donald Hooper), booths at county fairs, Trial Tr. vol. IX at 129 (Elizabeth Ready), barbecues, op-ed articles published in the press, id. at 135 (Elizabeth Ready), women's groups meetings, "various boards" meetings, Trial Tr. vol. VII at 17 (Toby Young), and so forth. However, all such activities consume resources for which someone makes, or has made, expenditures of money, e.g., use of a vehicle, gas, food, soft drinks, meeting rooms, postage, salaries for editors and deliverymen, a printing facility, and so forth. Act 64's proponents do not recognize these hard facts, but the Act does, and its limits on campaign expenditures directly affect—either by limiting or requiring a largely discretionary exemption for—each of the items described above.
 
 
 233
 c) Freedom to Organize Political Parties
 
 
 234
 The First Amendment requires that citizens be allowed freely to form political organizations at various levels of government. This protection extends to allowing organizations to be related to each other as affiliates of the same political party while still retaining much local autonomy. See Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (stating that "political parties' government, structure, and activities enjoy constitutional protection" and noting that a political party has "`discretion in how to organize itself, conduct its affairs, and select its leaders,'") (citing Eu v. San Francisco County Democratic Cent. Comm., 489 U.S. 214, 230, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989)); see also Buckley, 424 U.S. at 15, 96 S.Ct. 612 (recognizing the right "`to associate with the political party of one's choice'" and noting that "`[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association'") (internal citations omitted). Act 64 treats state, county, and local affiliates of a political party as a single aggregated unit for purposes of fundraising and contribution limits, see Vt. Stat. Ann. tit. 17, § 2801(5), and requires that all contributions to a political party so defined be initially deposited in a single, statewide checking account.[1] As a result, local affiliates can raise and spend money only through access to, and with the permission of, whoever controls that bank account.
 
 
 235
 d) Sufficient Governmental Interests
 
 
 236
 The Supreme Court has held that only the prevention of "corruption or the appearance of corruption" constitutes a sufficiently compelling interest to limit contributions to candidates. See Buckley, 424 U.S. at 25-28, 96 S.Ct. 612 (holding that limiting the actuality and appearance of corruption is a "constitutionally sufficient justification" for a contribution limitation, but dismissing other proffered justifications for the limitation). It has also held, however, that neither the anti-corruption rationale, the interest in equalizing the financial resources of candidates, nor the increase in money spent on political campaigns justifies the limiting of amounts that candidates for office may spend to promote their candidacy. Id. at 45, 54, 57, 96 S.Ct. 612. Indeed, the Court has stated that
 
 
 237
 [t]he First Amendment denies government the power to determine that spending to promote one's political views is wasteful, excessive, or unwise. In the free society ordained by our Constitution it is not the government but the people—individually as citizens and candidates and collectively as associations and political committees—who must retain control over the quantity and range of debate on public issues in a political campaign.
 
 
 238
 Buckley, 424 U.S. at 57, 96 S.Ct. 612.
 
 
 239
 Since Buckley, the Court has adhered to the distinction between the regulation of contributions and the regulation of expenditures. See Federal Election Comm'n v. Colorado Republican Federal Campaign Comm., 533 U.S. 431, 440-41, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001) ("Colorado II"). In Colorado II, the Court made the statement, reaffirmed even more recently in McConnell v. Federal Election Comm'n, 540 U.S. 93, 124 S.Ct. 619, 655, 157 L.Ed.2d 491 (2003), that "ever since we first reviewed the 1971 Act, we have understood that limits on political expenditures deserve closer scrutiny than restrictions on political contributions," because "[r]estraints on expenditures generally curb more expressive and associational activity," and "limits on contributions are more clearly justified by a link to political corruption." Id. The Court went on to state that "[g]iven these differences, we have routinely struck down limitations on independent expenditures by candidates, other individuals, and groups, while repeatedly upholding contribution limits." Id. at 441-42, 121 S.Ct. 2351 (citations and footnotes omitted) (emphasis in original).
 
 
 240
 One would think that the unqualified statements of the Supreme Court regarding the unconstitutionality of expenditure limits might be the end of the matter at this level of the court system, particularly since the sponsors of Act 64 have made no secret of their intention to enact it in order to provoke a test case to overrule Buckley with regard to expenditure limits. See Memorandum from Secretary of State Deborah L. Markowitz re: Review of Practical Policy and Legal Issues of Vermont's Campaign Finance Law (Jan. 9, 2001), available at http://vermont-elections.org/elections1/2001GAMemoCF.html ("2001 Memorandum"); see also Hearing on H. 28 Before the Vt. House Comm. on Local Gov't, 64th Biennial Sess. (1997) (statement of Anthony Pollina); Hearing on H. 28 Before the Vt. Senate Comm. on Gov't Operations, 64th Biennial Sess. (1997) (statement of Sen. William Doyle); Vt. House Comm. of Conf., Report on Campaign Finance, H. 28, 64th Biennial Sess. (1997).[2] However, the views of my colleagues require that I describe in some detail why Act 64 is unconstitutional in the particular respects noted above, even under the constitutional test that they create.
 
 
 241
 e) Requisite Precision of Regulation
 
 
 242
 There is another body of First Amendment jurisprudence that is of relevance here: Any regulation of protected speech must embody valid criteria sufficiently precise to ensure that officials apply those criteria. See Thomas v. Chicago Park Dist., 534 U.S. 316, 323, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002) (stating that the Supreme Court has "required that a time, place, and manner regulation contain adequate standards to guide the official's decision and render it subject to effective judicial review"); Forsyth County v. The Nationalist Movement, 505 U.S. 123, 131, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) ("`[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license' must contain `narrow, objective, and definite standards to guide the licensing authority.'") (quoting Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150-51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969)). Otherwise, the officials who administer the law will have the discretion to fashion and apply their own criteria without restraint. See Thomas, 534 U.S. at 323, 122 S.Ct. 775 ("Where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content."); Forsyth, 505 U.S. at 131, 112 S.Ct. 2395 ("If the permit scheme involves appraisal of facts, the exercise of judgment, and the formation of an opinion by the licensing authority, the danger of censorship and of abridgment of our precious First Amendment freedoms is too great to be permitted.") (internal citations omitted).
 
 
 243
 Far from precise, much of Act 64 is more a theory than a body of legal rules. What it actually means in practice has been, in a literal multitude of critical respects, simply left to future executive or judicial rulings. Act 64 bristles with interpretive issues—the meaning of "anything of value," "candidate," "for the purpose of influencing an election," "primarily benefits six or fewer candidates," "single source," "affirmative action to become a candidate," "services by individuals volunteering their time," and so on—and with valuation questions—of mileage, use of a room, office, computer, phone, professional services, etc.—and leaves resolution of all of these issues to those who must administer and enforce the statute. See Vt. Stat. Ann. tit. 17, § 2801; 2001 Guide, supra; see also discussion infra Part III(h).
 
 
 244
 f) Appropriate Level of Scrutiny
 
 
 245
 It is standard First Amendment jurisprudence that governmental restraints on protected speech must be subjected to exacting scrutiny to survive a constitutional challenge. See Buckley, 424 U.S. at 16, 44-45, 96 S.Ct. 612 (referring to the "exacting scrutiny required by the First Amendment," and applying exacting scrutiny to "limitations on core First Amendment rights of political expression"); Smith v. California, 361 U.S. 147, 151, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959) (applying "stricter standards" to a statute that has "a potentially inhibiting effect on speech," and noting that "a man may the less be required to act at his peril here, because the free dissemination of ideas may be the loser") (citing Winters v. New York, 333 U.S. 507, 509-10, 517-18, 68 S.Ct. 665, 92 L.Ed. 840 (1948)); see also McIntyre, 514 U.S. at 347, 115 S.Ct. 1511 (applying exacting scrutiny to invalidate an Ohio law that prohibited the distribution of anonymous campaign literature); Meyer v. Grant, 486 U.S. 414, 420, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988) (holding that a statute prohibiting use of paid petition circulators burdens core political speech and is therefore subject to exacting scrutiny); Lerman v. Bd. of Elections, 232 F.3d 135, 146 (2d Cir. 2000) (applying "exacting scrutiny" to restriction of "core political speech" in overturning local residency requirement for petition witnesses).
 
 
 246
 The most exacting scrutiny must be given to legislation that expressly seeks to reallocate political power—in the view of Act 64's proponents, from "special interests" to "ordinary citizens"—by limiting the political activity of candidates for office and their supporters. See Buckley, 424 U.S. at 14-15, 96 S.Ct. 612 (calling political campaigns the "fullest and most urgent application" of the First Amendment guarantee, and invoking the "`profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open'") (quoting New York Times v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).
 
 
 247
 As Justices Brandeis and Black have reminded us, the high-mindedness of a law's proponents is no guarantee that it does not flagrantly violate principles of freedom of expression. This is particularly true with regard to legislation that was, as I detail in Part VI(d) of this dissent, examined in the legislative process more for the nobility of its stated purposes than for what it actually says. Since Act 64's passage, surprise at its actual provisions and actual effects has been expressed by many of the law's proponents.[3] Notably, one vigorous supporter who has been described as its author, Anthony Pollina, see Vermont Reformer Says Law He Authored is Unconstitutional, Political Finance, The Newsletter, March, 2002, has since sought to run for office and brought a lawsuit claiming that Act 64 violates the First Amendment. See Ross Sneyd, Progressives Sue to Ensure Public Financing for Pollina, Associated Press, Mar. 12, 2002.
 
 
 248
 Moreover, high-mindedness is, for some, a mode of self-deception obscuring self-serving motives or, for others, a facade useful in disadvantaging political opponents, routinely referred to as "special interests." When campaign finance legislation is considered by those in power, there is both motive and opportunity to craft rules that will restrain the political activity of opponents. My colleagues caution that the self-interest of incumbents should not cause us to presume that such legislation is unconstitutional. However, most of the major factual premises underlying Act 64 posit incumbents who value reelection over their duties to constituents and personal honor. These premises should not hold center stage when examining the ostensible justifications for Act 64 only to disappear when scrutinizing what its actual effects will be.
 
 
 249
 I also note that some of Act 64's proponents relied upon and quoted by my colleagues have themselves demonstrated the importance of self-interest among its supporters. For example, one (then) incumbent state senator testified that Act 64 was needed to stop the "arms race" in which some of her opponents buy "ads" and "yard signs" that catch voters' attention and cause voters to wonder whether she is running for reelection. Trial Tr. vol. IX at 148 (Elizabeth Ready). Another, as noted, brought a constitutional challenge to Act 64 when it impeded his political career.
 
 
 250
 Moreover, our experience in a similar area suggests that great caution is in order where incumbent legislators pass laws affecting their electoral fate. Legislatures can directly affect the outcome of elections through two kinds of legislation: reapportionment and campaign finance regulation. Our experience with reapportionment is that, over time, the self-interest of incumbents has become the sole guiding star. See infra Part IV(c).
 
 
 251
 Indeed, whenever Congress takes up legislation involving campaign finance, the press now openly discusses how various proposals will affect the prospects of particular political parties and candidates. See, e.g., Ruth Marcus & Dan Balz, Democrats Have Fresh Doubts on "Soft Money" Ban; Some Fear GOP Would Gain Edge in Campaign Finances, Washington Post, Mar. 5, 2001, at A1; John Mintz, McCain's "Soft Money" Pledge Alarms GOP; Republican Leaders Say Curbs Would Hurt Party's Election Chances, Give Fund-Raising Edge to Democrats, Labor Unions, Washington Post, Feb. 22, 2000, at A6. The assumption that these possible effects never enter the minds of the candidates for reelection who enact such legislation might be questioned by even the least cynical observer. Truly searching scrutiny of campaign finance legislation is therefore essential.
 
 
 252
 I respectfully submit that my colleagues have not given this legislation careful, much less exacting, scrutiny. Their opinion describes the provisions of Act 64 in only cursory fashion. In a show of deference exceeding even that accorded decisions of an administrative body, it accepts the theory and factual assumptions proffered by the law's supporters at face value even when their actions belie their words. See infra Part VI(d) (failure to comply with reporting requirements); infra Parts IV(b)(1)(C), IV(c) (spending more than Act 64's limits); supra Part II(f) (bringing a lawsuit to challenge the constitutionality of the Act); infra V(e) (same). And it ignores the holding of Buckley that expenditure limits are per se unconstitutional.
 
 
 253
 Even without the direct precedent of Buckley, First Amendment jurisprudence does not allow laws that burden and prohibit political advocacy to be justified by the proffer of a theory based on spoken and unspoken factual assumptions without the most exacting judicial scrutiny of that theory, those factual assumptions, and the actual provisions of the law as enacted. Such scrutiny requires an examination of the details of the law passed, the degree of burden it imposes on protected speech, and the interests asserted as its justification. Accordingly, I turn to what Buckley directs as the first step of constitutional analysis, the details of the law challenged. 424 U.S. at 12, 96 S.Ct. 612.
 
 III. THE PROVISIONS OF ACT 64
 
 254
 a) Overview
 
 
 255
 Beginning with an overview, Act 64 limits the amount of resources—money and things of value—that may be used by candidates in campaigns and that may be provided by individual supporters or political parties.[4] See Vt. Stat. Ann. tit. 17, §§ 2805, 2805a. It therefore contains limits on direct expenditures of money or use of things of value by candidates for electoral purposes and on direct contributions of money or things of value to campaigns. See id. Such limits would not necessarily reach activities that consume resources purchased and used by individuals and political parties to support a candidate's campaign. However, Act 64 styles these activities "related expenditures" and treats them both as candidate expenditures and as contributions to a candidate subject to the statutory limits on those expenditures and contributions. See id. §§ 2809(a), (b). Act 64 also requires that, for purposes of applying the limits, contributions to, and campaign expenditures by, state, county, and local affiliates of political parties are determined by aggregating, that is, by treating all affiliates as a single unit. See id. §§ 2801(5), 2805(a), 2809(d). To that end, Act 64 requires that all money raised by state, county, and local affiliates be put in a single bank account. See supra note 1, and accompanying text.
 
 
 256
 Act 64 provides a public financing option for candidates for Governor and Lieutenant Governor. See id. §§ 2851-2856. Eligibility for public financing turns in part on Act 64's definitions of "contributions" and "expenditures," and, therefore, of "related expenditures." Were a candidate to raise or expend more than $500 before February 15 of the election year—or have supporters, including a political party, make related expenditures in excess of that amount—the candidate would not be eligible for public financing. See id. § 2853(a).
 
 
 257
 An effort like Act 64 of course must provide some definition of the conduct regulated and the substance of what is prohibited and what is permitted. Where limits on campaign expenditures and contributions are imposed by dollar value, a time frame must be selected. The statutory scheme must also include an enforcement scheme, a delicate matter when electoral speech by candidates and their supporters is regulated by governmental officials— often their opponents—and a multitude of statutory ambiguities and problems of interpretation and valuation abound. Scrutiny of the details of such regulation is necessary to inform the constitutional inquiry regarding the degree of impact on protected speech and conduct, the requisite nexus between the regulation and constitutionally permissible goals, and the accuracy, reliability, and likely adherence to those goals of the designated enforcement mechanisms.
 
 
 258
 b) Two-Year Cycle
 
 
 259
 As noted, establishing a basic legal framework for regulating political campaigns first requires selection of a time frame(s) for the provision of public financing and for totaling candidate expenditures, contributions, and related expenditures by individuals and political parties in order to enforce limits on their size. Act 64 is schizophrenic in that regard. For purposes of public financing, it establishes separate time periods and separate funding for primary and general elections in recognition of the obvious fact that some candidates must fund both a primary and general election campaign while others need fund only a general election. See id. § 2855(a).
 
 
 260
 For purposes of limiting contributions and expenditures, however, Act 64 imposes a so-called "two-year cycle" approach. See id. §§ 2805(a), 2805a(a); see also 2001 Guide, supra. Under that approach, expenditures by candidates, contributions, and related expenditures by individuals and political parties supporting candidates are totaled over a two-year period for purposes of enforcing the statutory limitations. The effect of the two-year cycle is not inconsequential. Vermont, like most American states, provides both for primaries and for subsequent general elections. See Vt. Stat. Ann. tit. 17, §§ 2103(15),(25), 2351. Because the two-year cycle lumps these elections together, contribution and expenditure limits, including related expenditures by individuals and political parties, are imposed on the total raised and spent by individual candidates in both electoral periods. In other words, Act 64 limits a candidate who must wage a serious primary fight to the same amount of total financing as his or her general election opponent who did not face a primary contest.
 
 
 261
 The two-year cycle introduces another complexity—and creates much room for anti-democratic manipulation—because party primaries in Vermont are not restricted to voters registered in the particular party but are open to all voters, including those registered in other parties. See id. § 2363; see also Ian Urbina, Leveling Politics in the Green Mountain State, The American Prospect, Sept. 25, 2000, at 41 (discussing Vermont's cross-over voting in primaries); Vermont's Senate Race, The Common Man, The Economist, Sept. 5, 1998, at 25. The amount that a candidate must spend in a primary, therefore, may be substantially affected by voters who are seeking to disadvantage the candidate in the general election.
 
 
 262
 c) Limits on Expenditures by Candidates
 
 
 263
 Act 64 defines candidate "expenditures" to include "payments, distributions, and disbursements of money or anything of value for the purpose of influencing an election." Vt.Stat. Ann. tit. 17, § 2801(3).[5] The breadth of this language is indisputable. Given its ordinary meaning, the language includes the value of the use of phones, computers, offices, rooms in residences or elsewhere, paper, pencils, autos, etc. See 2001 Guide, supra; 1999 Memorandum, supra. For example, according to Vermont's Secretary of State, a candidate's use of an auto is an expenditure. See 2001 Memorandum, supra. Candidates therefore may not drive their personal vehicles for campaign purposes without recording every mile driven and treating the costs of that driving as a campaign expenditure. See id. Vermont's Secretary of State has suggested that 31¢ per mile is an accurate measure of expense for this purpose. See id. (She has not changed this figure notwithstanding the facts that the price of gasoline has risen and official Vermont travel is now compensated at 37½¢ per mile. See id; Vermont Dept. of Personnel, Collective Bargaining Agreements, at http://www.Vermontpersonnel.org/employee/labor_dcba.cfm (effective July 1, 2003 to June 30, 2005) (setting mileage reimbursement for Vermont employees at level established by the U.S. General Services Administration, currently 37¢)). These expenditure limits also apply to candidates who exclusively use personal funds to fund their campaigns. See Vt. Stat. Ann. tit. 17, § 2805a(a).
 
 
 264
 Two terms are critical to determining what activities are "expenditures" subject to the limits: "for the purpose of influencing an election," see id. § 2801(3), and "candidate," see id. § 2801(1). Notwithstanding the assertion of a footnote in my colleagues' opinion,[6] the breadth of the phrase "for the purpose of influencing an election" is such as to be in substantial part hopelessly ambiguous and was said by the Supreme Court in Buckley[7] to be unconstitutionally vague. 424 U.S. at 44, 80, 96 S.Ct. 612; see supra note 6. At one end of an interpretive spectrum, that phrase would probably not include a candidate's cost of driving to a town hall to register to vote and, later, of driving to vote, although even that driving fits within Act 64's literal definition of expenditure. At the other end of the spectrum, candidate Jones's purchase of an ad stating "Vote for Jones Next Tuesday" would certainly be an expenditure. Between those extremes are a multitude of activities that may influence an upcoming election but lack an accompanying statement of express purpose. As to these, the statute offers no guidance.
 
 
 265
 Potentially the most significant area of ambiguity involves activities of incumbent officials. Members of the executive and legislative branches engage in relatively continuous communication with the public that involves the use of resources in a way that will help a reelection effort and would therefore fit within the definition of "expenditure," if done by a "candidate" "for the purpose of influencing an election." For example, Vermont's Secretary of State has a publicly funded website that does not avoid capitalizing on the political opportunity offered. See Vermont Secretary of State Website, at http://www.sec.state.vt.us/. The home page features a photo of her with a backdrop of mountains and pine trees. Other pages of the site also find it necessary to include a photo of the incumbent. Such a website not only offers favorable exposure but also involves the preparation of materials easily put to political use as flyers and ads.[8] The Vermont Democratic Party website underlines the political usefulness of the official Secretary of State website by offering visitors to the party's website a link to the official site. See Vermont Democratic Party Website, at http://www.vtdemocrats.org. See also Burlington GOP Website, at http://www.burlingtongop.com (linking to republican Jim Douglas' official Vermont Governor Website).
 
 
 266
 The statute offers no guidance on the many questions of how the relevant language is to be applied in practice to incumbents' activities, even though the answers may have a decisive impact on particular candidates. If most of the resource-consuming activities of officeholders are not "expenditures" because they occur in the course of the officeholders' public duties, incumbents will have an enormous advantage over challengers under expenditure limits. If most of these activities are "expenditures," an incumbent officeholder might well use the bulk of permitted expenditures in the first year of the two-year cycle. There are also hundreds of intermediary positions, all of which are arbitrary to one degree or another.
 
 
 267
 Some interpretive guidance, but not much, may be gleaned from the definition of "candidate." A "candidate" is someone who "has taken affirmative action to become a candidate."[9] Contrary to the assertion in a footnote in my colleagues' opinion,[10] the elastic phrase "affirmative action" and the self-evident circularity of using a word in its own definition leave ample room for disputes over the definition's meaning. Persons who fully intend to run for office, but have not announced, engage in all sorts of conduct to bring themselves into the public eye, to appear interested and informed on public issues, and to commend themselves as potential candidates to the media and political leaders. They attend meetings of school boards, selectmen, and various public forums. See Trial Tr. vol. IX at 135 (Elizabeth Ready). Even these efforts require the use of money or things of value, are intended to influence the outcome of an election, and therefore meet the definition of expenditure if done by a "candidate." That issue thus turns on whether such conduct constitutes an "affirmative action."
 
 
 268
 A degree of clarity is added by the next sentence of the definition, which states that affirmative action shall include three kinds of acts. However, most of the basic ambiguity is left in place because the use of language of inclusion does not suggest that what follows is an exclusive list of "affirmative act[s]." The first set of included acts involves accepting "contributions" or making "expenditures" in excess of a total of $500. See id. § 2801(1)(A). This brings into the definition of candidate all of the ambiguities of the term "expenditure" —and "related expenditure"—including the pre-campaign conduct noted above that is fully intended to influence the outcome of an election. In addition, as the Secretary of State has noted, an individual not fully decided upon, but considering, a run for statewide office will trigger the definition of candidacy by driving four round trips between Swanton and Brattleboro at (the now obsolete) 31¢ per mile. See 2001 Memorandum, supra. A person's official candidacy can also be triggered by acts of the person's political party deemed to be "related expenditures" valued in excess of $500. See Vt. Stat. Ann. tit. 17, §§ 2809, 2853(a); see also Ross Sneyd, Progressives' Poll Raises Question About Public Financing, Associated Press, Feb. 21, 2002. The two other acts included are filing a petition for nomination or announcing a candidacy. See Vt. Stat. Ann. tit. 17, §§ 2801(1)(B), (1)(C). However, these provisions clarify things that were not ambiguous.
 
 
 269
 The limits on expenditures by candidates over the two-year cycle vary with the office sought, as follows:
 
 Governor—$300,000
 Lieutenant governor—$100,000
 Other statewide offices—$45,000
 
 270
 State senator—$4,000 plus $2,500 for each additional seat in the district
 
 County office—$4,000
 
 271
 State representative, single member district—$2,000, two member district— $3,000.
 
 
 272
 See id. § 2805a(a).
 
 
 273
 Incumbents may spend 85%—except for legislators, who may spend 90%—of the expenditure limits. See id. § 2805a(c).
 
 
 274
 d) Limits on Contributions to Candidates
 
 
 275
 "Contributions" are similarly broadly defined as any "payment, distribution, advance, deposit, loan or gift of money or anything of value paid or promised to be paid to a person for the purpose of influencing an election . . . ." Id. § 2801(2).[11] The limits apply to "single source" donors, defined as "an individual, partnership, corporation, association, labor organization or any other organization or group of persons which is not a political committee or political party." See id. §§ 2801(6), 2805(a). Exempted from the definition of contribution are "services provided without compensation by individuals volunteering their time on behalf of a candidate." Id. § 2801(2).
 
 
 276
 Ambiguities lurk in the words "paid to a candidate" with regard to a resource used in a campaign by the resource's owner, for example, a campaign worker's use of a personal vehicle. Some of these ambiguities are cured in part by the definition of "related expenditures," discussed below.
 
 
 277
 Uncured are the ambiguities in the term "services provided without compensation" by volunteers. These uncertainties are particularly great—and very important— with regard to professional services, particularly legal services, which are of great value to a candidate who runs for office under Act 64. A few of the many questions that will arise are: If an employee or partner engages in political activity during working hours and the firm does not dock the appropriate amount of compensation, is that a contribution by the firm? Can professionals who are not solo practitioners provide free professional services to candidates? If a professional is not generally free under a firm's employment arrangements to moonlight professional services to others, is the provision of such services to a candidate in non-working hours a contribution by the firm to the candidate valued according to the firm's usual billing rate? And so on.
 
 
 278
 The definition of "single source" also contains ambiguities. For example, rendering a non-obvious interpretation, the Secretary of State has stated that partnerships may make contributions as separate entities from the partners themselves, who are free to make identical contributions as individuals. See 2001 Guide, supra. Questions also arise about corporations with only one shareholder, e.g., are professional corporations operated by solo practitioners firms separate from their owners for purposes of the contribution limits?
 
 
 279
 As noted, the contribution limits also apply to money, goods, or services provided to political parties, and the various affiliates of a party are treated as one unit for the purpose of these limits. That is, a contribution to a Democratic town committee is limited as noted immediately infra, see Vt. Stat. Ann. tit. 17, §§ 2801(5), 2805(a), and is viewed as a contribution to all Democratic town, county, and state committees. Further, that contribution must be paid into a single statewide bank account, see supra note 1 and accompanying text. This provision therefore necessitates statewide reporting and control of spending by affiliates, which can receive funds only from the statewide bank account.
 
 
 280
 The limits on contributions also vary by office sought and political committee as follows:
 
 
 281
 Political party/political committee— $2,000
 
 Statewide office—$400
 State senate/county office—$300
 
 282
 State representative/local office—$200.
 
 
 283
 See id. § 2805(a).
 
 
 284
 e) Limits on "Related Expenditures"
 
 
 285
 Turning now to "related expenditures," they are defined as "expenditures" (including, therefore, things of value and importing the ambiguities described above) "intentionally facilitated by, solicited by or approved by the candidate." Id. § 2809(c).[12] They include "expenditures" by individual supporters of candidates and by the political parties that sponsor the candidates. "Related expenditures" therefore include the value of mileage driven by campaign volunteers, the use by a volunteer of a residence, house phone, or computer, or other expenditures by volunteers for items such as paper, pens, etc. They also include the cost of polling, the printed information on candidates, and offices and phones, etc., provided by political parties.
 
 
 286
 The law regulates "related expenditures" in two ways. First, it treats them as contributions subject to the limits on contributions described above. Every use of an in-kind resource—car, phone, computer, etc.—must thus be valued and totaled with direct cash contributions on an ongoing basis. See id. § 2809(a). Use of the in-kind resource must cease when the contribution limit is reached.
 
 
 287
 Second, Act 64 also treats related expenditures as candidate expenditures. When an individual's or party's related expenditures exceed $50, the candidate on whose behalf they were made must treat them as campaign expenditures limited by the statute. See id. § 2809(b).[13] This means that, over a two-year period, every supporter of a candidate who drives the family car to campaign meetings or provides paper, pens, phones, refreshments, or rooms for meetings, must keep a running total and, when the total exceeds $50—driving an average of seven miles per month at 31¢ per mile triggers this—the candidate must fit the amount under the statutory limit on candidate expenditures.
 
 
 288
 As noted, related expenditures include activities of political parties, such as polls, mailings, dinners, and other events.[14] If such party activities fall within the definition, they must be treated as contributions to, and expenditures by, the candidate. Such activities can, therefore, trigger an official candidacy, destroy eligibility for public financing, or exhaust the total that a candidate may spend in the two-year cycle. See 2001 Guide, supra; see also Vt. Stat. Ann. tit. 17, §§ 2805a, 2853. It will be recalled that the district court struck down the provisions of Act 64 subjecting related expenditures by parties to the Act's contribution limits, e.g., no more than $400 in cash or related expenditures to a candidate for statewide office. Given the holding of Colorado II, 533 U.S. at 465, these provisions are now revived.
 
 
 289
 To illustrate the effect of these provisions, I have added as Appendix A a letter from the Secretary of State responding to an inquiry as to whether certain party activities should be deemed related expenditures attributable to a particular candidate. The letter makes it clear that parties and their candidates can avoid the risk of an unexpected attribution of a large sum to a campaign only by eschewing normal and necessary political activities. For example, according to the Secretary of State, there is danger in sharing party-funded poll results with candidates or potential candidates; candidates or potential candidates must avoid any knowledge of party mailings; candidates must avoid participation in planning or even approving a party event (a party event at which a candidate is introduced apparently must be a surprise party); and parties must avoid mailings that have a "primary thrust" of supporting candidates. See Appendix A, infra. The Secretary and Attorney General wisely advise, "Each party and potential candidate should review proposed activities with their own counsel," id., although this will be difficult for the candidate where he or she must remain ignorant of the event.
 
 
 290
 f) Costs of Compliance
 
 
 291
 The costs of complying with the law's various provisions are not exempted from the limits on expenditures. See 2001 Guide, supra. Raising contributions itself costs money and is an expenditure. See id. Indeed, the limits on the size of contributions increase these fundraising costs. Moreover, for a candidate to comply with the expenditure limits, he or she must, over a two-year period, either restrict the activities of supporters and the party organization, including the driving of personal vehicles, that constitute related expenditures, or keep in constant contact with supporters and the organization to monitor the size of such expenditures. A failure either to restrict or to monitor related expenditures will create the very real risk that, at a critical stage of the campaign, several supporters or party officials will report that they have exceeded the $50 limit and have, therefore, made expenditures that must be counted as candidate expenditures and may exhaust the campaign limit. In a statewide campaign, the monitoring and limiting of related expenditures by individuals or party organizations might well require a full-time staff member.
 
 
 292
 Moreover, a candidate who does not have legal counsel and other professional services runs great risks. The ambiguities detailed above and problems of valuation will confront candidates and supporters— or at least those who seek to comply with the law as written—with an ongoing need for professional advice. In fact, the Secretary of State and Attorney General advise that parties and candidates retain their own separate attorneys. See Appendix A. As noted, the cost of these attorneys, or the value of their services if obtained as unpaid-for related expenditures by individuals or a political party, are expenditures. See Vt. Stat. Ann. tit. 17, § 2801(3); infra Part V(e).
 
 
 293
 g) Treatment of the Press
 
 
 294
 Although this legislation was fostered by groups experienced in these matters, it does not contain the usual exemption for editorials, op-ed pieces, or even letters to the editor that endorse a particular candidate. See, e.g., N.Y. Elec. Law § 14-124 (exempting "any person, association or corporation engaged in the publication or distribution of any newspaper or other publication issued at regular intervals in respect to the ordinary conduct of such business"); Conn. Gen. Stat. § 9-333w(c) (exempting "any editorial, news story, or commentary published in any newspaper, magazine or journal on its own behalf and upon its own responsibility and for which it does not charge or receive any compensation whatsoever").
 
 
 295
 Vermont's Secretary of State (the one with the photo-heavy website) has warned that if any individual or organization "requests a photograph, written presentation, or other assistance or information and informs the candidate that the requested information will be used in a publication... [providing such] will trigger a related expenditure." 2001 Guide, supra. Therefore when: (i) a Vermont candidate meets with an editorial board, commentator, or columnist hoping for an endorsement; (ii) a supporter of the candidate uses campaign materials to author an op-ed article for a paper; (iii) a campaign official sends a letter to the editor; or (iv) a campaign official conveys information to a reporter hoping for a news story; the value of any such publication is, under Act 64, a contribution and a related expenditure. See Vt. Stat. Ann. tit. 17, § 2809(c). See also infra Part IV(d).
 
 
 296
 h) Administration and Enforcement
 
 
 297
 I turn now to the processes governing administration and enforcement of this law. Power is delegated to the Secretary of State to "adopt rules necessary to administer the provisions" regarding related expenditures. Vt. Stat. Ann. tit. 17, § 2809(f). Additionally, the Secretary of State has a general administrative role under Act 64, see, e.g., id. §§ 2803, 2810a, and she has actively offered her interpretations of the scope and application of the various provisions of Act 64, see, e.g., 2001 Guide, supra; 1999 Memorandum, supra; 2001 Memorandum, supra. As the discussion above indicates, interpretive and valuation questions abound and, as Appendix A indicates, answers that are not prolix or ambiguous are often not available. Moreover, there is at present every indication that the power to "adopt rules necessary to administer" the statute will be viewed by the Secretary of State as a very broad delegation of power. See infra Part V(e). For example, interpreting a provision requiring that all contributions in excess of $50 be made by check, the Secretary has said that Act 64 allows so-called "pass-the-hat" fundraisers at which persons may anonymously contribute up to $50 in cash. See 2001 Guide, supra. Because the givers are anonymous, a candidate is not expected to monitor how many times an individual may have put $50 into ever-moving "hats" at several "pass-the-hat" fundraisers. This ruling thus promotes fundraising practices that do not really control the size of cash contributions, unless, of course, an anonymous donor foolishly drops a $100 bill into a hat.
 
 
 298
 Finally, candidates who want to seek a determination that an expenditure is a related expenditure made on behalf of their opponents may bring an expedited action in the Vermont Superior Court. See Vt. Stat. Ann. tit. 17, § 2809(e). Candidates wanting clarification of their own expenditures, or persons wishing to make expenditures on behalf of candidates, may request advisory opinions from the Secretary of State. See 2001 Guide, supra. The costs of bringing or defending such actions, or making such inquiries, are not exempted from the definition of expenditure.
 
 IV. THE BURDEN ON PROTECTED SPEECH
 
 299
 a) The Burden on Grassroots Political Activity
 
 
 300
 I begin with Act 64's burdening of grass-roots political activities, not only because such activities are core-protected speech under the First Amendment—not to say indispensable to our democracy—but also because proponents of Act 64 purport to justify its ubiquitously restrictive provisions in the name of increasing and enhancing such activities. See 1997 Vt. Laws P.A. 64 (H. 28) (findings nos. 6 and 8); Trial Tr. vol. IX at 124, 131 (Elizabeth Ready). In fact, Act 64 relentlessly limits such activities and often renders them impossible. Indeed, the Act's most intrusive impact is not on the rich and powerful, who if necessary can engage in constitutionally protected independent political activity, but on the ordinary citizen, who needs to participate in organized activity to have a political voice.
 
 
 301
 As the Supreme Court noted in Buckley, even the humblest kind of political activity requires the expenditure of resources. Buckley, 424 U.S. at 19, 96 S.Ct. 612. If the law as drafted is upheld, the quality and quantity of grassroots activities will be severely diminished, although one may question whether a free people will even attempt serious compliance with a law that, were the constitutional stakes not so great, might easily be regarded as an act of legislative silliness. See infra Part VI(d) (failure of Act 64 supporters to comply with its reporting requirements); infra note 32 (reporting mileage expenses in round numbers, despite per mile valuation of 31¢); supra note 4 (lapel buttons and bumper stickers must identify who paid for them, the payor's address, and the candidate benefited).
 
 1) Burden on Volunteer Activity
 
 302
 As noted, Act 64 treats all related expenditures as contributions and, when they exceed $50, as expenditures by the candidate whose candidacy was supported. See Vt. Stat. Ann. tit. 17, § 2809(b). Related expenditures must therefore be counted in determining whether the candidate has complied with Act 64's spending limits. Because in-kind expenditures are included within related expenditures, any supporter engaging in the most common kind of political activities must keep detailed records over a two-year period of their value— every mile driven, every stamp used, every use of a residence for campaign events, refreshments, pads, pencils, use of phones, etc.—so that the total amount of such in-kind expenditures can be determined. If a supporter's related expenditures, alone or when added to monetary contributions to a candidate, reach the contribution limit, the supporter must stop all activities—even driving to a campaign event—or violate the law.
 
 
 303
 For example, if a supporter holds a "meet the candidate" event in his or her house, the value of the space used, possibly the costs of refreshments,[15] and the purchase of stamps and envelopes for mailing invitations to local citizens are all related expenditures. See 1999 Memorandum, supra. Vermont's Secretary of State has stated that it usually takes one hundred invitations to attract twenty persons to a "meet the candidate" event. See id. Thirty-seven dollars would thus be used for postage alone for one event for twenty people. See United States Postal Service, First-Class Mail Rate Highlights, available at http://www.usps.com/rate-case/first.htm. As the Secretary of State of Vermont has noted, such "meet the candidate" events are therefore severely limited by Act 64. See 1999 Memorandum, supra.
 
 
 304
 Adding to Act 64's intrusiveness on grassroots activities is its treatment of such related expenditures as expenditures by the candidate. Driving to meetings is among the most garden variety of grass-roots political activities. But, under the law, a supporter who averages seven miles per month over the two-year cycle will have exceeded $50 in mileage expenses, and the candidate in question must treat that and all other resource-consuming activities by the individual as campaign expenditures.
 
 
 305
 One effect is to prevent a candidate's supporters from exercising free choice as to what activities to undertake. Because the candidate's total expenditures are limited, the activities of all supporters must be coordinated and controlled top-down by the candidate for two full years so that the candidate can budget a campaign and not have to end it prematurely because of belatedly discovered related expenditures in excess of $50 that exhaust the expenditure limits. Were that to happen, a candidate, or any supporter over the $50 limit, would not even be able to drive the family car to the local town green to make a speech.[16]
 
 
 306
 Act 64 therefore creates great incentives for campaigns to reduce the level of grassroots activities. The danger of unexpectedly reaching the expenditure limits will require a campaign to monitor, at a cost of time and resources, those grassroots activities it allows. Fewer such activities will be allowed because of these monitoring costs and because expenditure limits require that priority be given to activities that reach the largest number of voters, such as media advertising.
 
 2) Burden on Local Party-Funded Activity
 
 307
 Many grassroots political activities are sponsored and subsidized by local political party affiliates. See Trial Tr. vol. IX at 138-39 (Elizabeth Ready) (party helps with "grass roots organizing," "voter I.D.," and "get-out-the-vote"). Act 64 diminishes almost to the point of elimination financial support for local party activity by treating all state, county, and local party committees as a single fundraising unit for purposes of raising, and therefore spending, money. Because all contributions must go to the state party account, all expenditures by every local committee must necessarily be funded out of it. Vt. Stat. Ann. tit. 17, §§ 2801(5), 2831; see supra note 1. The effect is, first, to reduce severely the amount of funding for such activity—under the limits on party related expenditures and contributions—and, second, to force political parties into some form of top-down control—under the single unit/single-bank-account rule for contributions to parties. See Secretary of State Being Criticized for Fund Raising Ruling, Associated Press, May 28, 1999 (reporting that both Republican and Democratic party leaders were shocked by the single unit rule); supra note 1. A town committee of a party may not even hold an organizational event with refreshments for its members without obtaining the modest funding needed from the statewide authority.
 
 
 308
 Moreover, limits on contributions and expenditures force political decisionmakers to give priority to activities that reach the largest number of voters. It is now known that Act 64 forces party committees, even without the newly-revived limits on party contributions and related expenditures, to concentrate more on mass media activities than grassroots activities. See 2001 Memorandum, supra; Campaigns Meant Cash for Vermont Media, Associated Press, Nov. 10, 2000 ("`That was one of the unintended consequences of the campaign finance law, that we saw much more spending on the media,' [Secretary of State Markowitz] said.").
 
 
 309
 b) The Burden on Candidates' Speech
 
 
 310
 The district court concluded that Act 64's limits on campaign expenditures are based on past experience and, with limited exceptions, are substantially the same as average expenditures by candidates in the past. See Landell v. Sorrell, 118 F.Supp.2d 459, 471-72 (D.Vt.2000). Putting aside for purposes of argument that expenditure limits are per se unconstitutional under Buckley, the level of the limits set by Act 64 clearly places unconstitutional restraints on the speech of candidates for office. First, past experience is no guide. Second, average spending in past elections is a standard that strongly favors incumbents and imposes a one-size-fits-all philosophy that severely constricts debate in the most important elections. Third, Act 64's spending levels are so low that, combined with the draconian restrictions on party spending, they will drastically reduce political debate in Vermont.
 
 1) Past Experience
 
 311
 A) Inaccuracy of Reports From Past Elections
 
 
 312
 It is impossible to determine the level of relevant campaign spending by Vermont candidates in the past, that is, "expenditures" using Act 64's definitions. It is not altogether clear what evidence the district court specifically considered in reaching its conclusions. However, on the face of the district court's decision, it appears that the court relied heavily on testimony, some of which was conflicting, see id. at 470-72, and did not scrutinize in detail documentary evidence of past practices.
 
 
 313
 More significantly, even the candidate disclosure reports filed under Vermont law for past elections will vastly understate the level of spending when Act 64's two-year election cycle and its new and much broader definitions of expenditures and related expenditures are used. There are some expenditure reports in the Trial Exhibits, but they are limited to particular candidates' out-of-pocket expenditures made during a "campaign." See, e.g., Trial Exs. vol. IV at E-1311 (Campaign Finance Report of Peter Brownell). Act 64's limits on expenditures, however, apply, as noted, to all expenditures made over a two-year period immediately following the last general election and ending with the next general election. See Vt. Stat. Ann. tit. 17, §§ 2801(9), 2805a(a).
 
 
 314
 Furthermore, under prior law, there was no provision regarding related expenditures. There was, therefore, no reason even to collect information on, much less to calculate and report, related expenditures by supporters and political parties. In particular, there was no reason to calculate the value of in-kind related expenditures by supporters, such as mileage, all of which count toward the expenditure limits under Act 64. Finally, there was also no need under prior law for candidates to segregate and calculate expenditures on their behalf by party committees, likely a huge amount. See infra note 19 and accompanying text. The value of such support must be treated under Act 64 as a candidate expenditure. See Vt. Stat. Ann. tit. 17, § 2809(d).
 
 
 315
 We know only one thing for certain: what candidates deemed to be expenditures in the past—generally direct cash expenditures out of a campaign's checking account—will be vastly less than what must be so regarded under Act 64's definitions of expenditures and related expenditures.
 
 
 316
 There is another reason why prior spending is not a reliable guide for the needs of campaigns operating under Act 64. Act 64 imposes substantial costs of compliance with its terms that were not encountered under the prior law. As noted, Vermont's Secretary of State has indicated that most candidates will be unable to proceed safely without legal advice, see Appendix A, and candidates running for statewide office may need the services of an accountant as well. In the case of legislative candidates, legal assistance alone could literally exhaust all the expenditures —e.g. $2,000 for House candidates —allowable under Act 64. Again, such assistance from a candidate's political party will be limited because retention of counsel by a party organization to help candidates would be a related expenditure allocable to individual campaigns.
 
 
 317
 Much time and possibly much support staff will also be consumed by the need to monitor, coordinate, and control related expenditures by supporters that must be charged to the campaign. Finally, some candidates may encounter costs in bringing and defending lawsuits concerning the myriad of interpretive questions that will arise as a result of Act 64's ambiguous provisions.
 
 
 318
 B) Inadequacy of Average Spending in Past Elections as a Constitutional Standard
 
 
 319
 The district court deemed the average campaign expenditures in past elections to be a relevant legal guide, Landell v. Sorrell, 118 F.Supp.2d at 471-72, and my colleagues agree, see Maj. Op. at 130-31.
 
 
 320
 However, even if accurately determined using Act 64's definitions, the use of average expenditures in past elections inevitably yields expenditure levels that strongly favor incumbents. First, incumbent legislators in Vermont and elsewhere have ample advantages over challengers under spending limits, discussed infra, and therefore prefer low limits. Second, the average of past expenditures is calculated by including legislative elections that were not seriously contested or perhaps not contested at all—elections in which little communication took place and little was spent. See Trial Exs. vol. III at E-0967 (appellees' expert's calculation of average expenditures, which includes low-spending candidates whose spending is unknown by assuming they spent $500, the maximum allowed before filing is required). It is altogether possible, therefore, that the average expenditure in past elections is less than the amount spent by every candidate who ran in a seriously contested race and perhaps even probable that it is less than the amount spent by any challenger who successfully challenged an incumbent.[17] Average past spending therefore has little relevance unless the goal is to disadvantage challengers.
 
 
 321
 The use of average past expenditures is inappropriate for other reasons. The average will reflect only past patterns of citizen behavior in acquiring political information and prior methods of candidate communications with citizens. When citizens congregate in very large numbers for frequent community events, those events may well be effective vehicles for candidate communication with voters. When large community events become less frequent or less important in peoples' lives and voters turn to other sources to acquire political information—some may rely heavily on a certain newspaper, some on particular radio or television stations, some on websites—other means of communication, perhaps far more expensive, must be used by candidates for effective communication.
 
 
 322
 Part of the problem is simply the one-size-fits-all philosophy of expenditure limits. Different legislative districts may require different modes of communication. Geographic size, the existence and nature of local newspapers, radio and television stations, demographic factors, the issues, and so on, all affect the costs of communication with voters and may do so differently in many districts for the same legislative house.
 
 
 323
 Moreover, because the one-size-fits-all philosophy fails to recognize the differences between elections, it strikes at the heart of democracy. The view that there is an average election that can serve as the compulsory norm for all elections is quite dangerous, even apart from its pro-incumbent bias. Past averages have almost nothing to do with the communication needs in elections in which candidates strongly disagree over issues that divide large portions of the public and a clear-cut attempt is being made to alter government policies on those issues.
 
 
 324
 It is the non-average election that is often the historic election, one in which the outcome is heavily contested, the debate is most widespread, the public interest is at its highest, and the most money is spent. Such an election was the New Hampshire primary of 1968, in which Eugene McCarthy, later a plaintiff in Buckley, badly damaged a sitting President in a debate over the Vietnam war in one of the most heavily financed primary races in history. McCarthy spent a then-unprecedented $12 per vote received in that single primary. See George F. Will, Rules to Keep the Rascals In, Newsweek, Jan. 26, 1976, at 80.
 
 
 325
 Vermont had a similar election in 2000, in which civil unions and other divisive issues were at stake. See Ellen Goodman, Vermonters Are Caught up in a Civil War over Civil Unions, Boston Globe, Nov. 2, 2000, at A27; Tom Puleo, Governor's Race Tests Vermont Values; "Gay Marriage" Issue Is Monopolizing a Bitter Battle, Hartford Courant, Oct. 30, 2000, at Al. More money was spent in the 2000 election than in any prior Vermont election. See Lawmakers To Revisit Campaign Finance Law, Associated Press, Nov. 14, 2000 (noting that the 2000 gubernatorial campaigns set the record for money spent); see also Ross Sneyd, Campaign 2000 Involved Lots of Spending, Associated Press, Dec. 18, 2000 (describing record spending levels for many elections across Vermont in 2000).
 
 
 326
 McCarthy's New Hampshire campaign of 1968 had national significance, while the 2000 Vermont gubernatorial election had unquestioned state, and possibly national, ramifications. Both involved unprecedented citizen participation. See 2000 General Election Results for Gubernatorial Race, available at http://cgi.sec.state.vt.us/cgishl/nhayer.exe ("2000 Election Results") (showing that voter turnout increased in Vermont by 34.5% in the 2000 election compared to previous election); Hugh Gregg, A Tall State Revisited, at app. (1993), available at http://www.politicallibrary.org/TallState/1968dem.html. And both involved, not surprisingly, unprecedented campaign spending.
 
 
 327
 C) Evidence of Contested Elections in Vermont
 
 
 328
 Campaign finance reports of Vermont candidates provide ample evidence, of which we may take judicial notice, Fed. R.Evid. 201; Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir.1991) (court can take judicial notice of records filed with the SEC), that contested elections in Vermont involve spending well in excess of Act 64's limits, even without including related individual and party expenditures. In the last two gubernatorial elections in Vermont, the major party candidates reported expenditures in amounts that were double or almost triple Act 64's limits. See Campaign Finance Report of Howard Dean, Dec. 18, 2000;[18] Campaign Finance Report of Ruth Dwyer, Dec. 18, 2000; Campaign Finance Report of Doug Racine, Dec. 14, 2002; Campaign Finance Report of Jim Douglas, Dec. 16, 2002. Moreover, even a third party candidate for governor exceeded the limits in one election, Campaign Finance Report of Anthony Pollina, Dec. 18, 2000, and another third party candidate came within a whisker of the limits in the next gubernatorial election, Campaign Finance Report of Cornelius Hogan, Dec. 16, 2002. In the last race for Lieutenant Governor, both major party candidates and a third party candidate exceeded the limits by 63%, 40%, and 38% respectively. See Campaign Finance Report of Peter Shumlin, Dec. 14, 2002; Campaign Finance Report of Brian E. Dubie, Dec. 16, 2002; Campaign Finance Report of Anthony Pollina, Dec. 16, 2002.
 
 
 329
 The factual support for the conclusion reached by my colleagues—that contested elections will not be substantially affected by Act 64's limits—is found largely in opinion testimony offered by proponents of the Act. The already slim value of that testimony is further undermined by the fact that many of those witnesses, when they ran for office, actually exceeded Act 64's limits in contested elections, again not counting related expenditures by individuals and parties. See Campaion Finance Report of Anthony Pollina, Dec. 18, 2000 (spent $335,412.46 in Governor's race, with expenditure limit of $300,000); Campaign Finance Report of Cheryl Rivers, Dec. 18, 2000 (spent $19,290.39 in senate race, with expenditure limit of $9,000); Campaign Finance Report of Elizabeth Ready, Dec. 18, 2000 (spent $77,313.47 in auditor's race, with expenditure limit of $45,000, and outspent opponent by 20%, although she had testified at trial that she would abide by Act 64's limit in that race); Trial Tr. vol. IX, at 147-51 (Elizabeth Ready) (testifying that she exceeded the current expenditure limits in four of her six senate races). In the view of some of these witnesses, of course, contested elections are "arms races" that should be prohibited. See Trial Tr. vol. IX, at 147-151 (Elizabeth Ready). See infra Part V(d)(1).
 
 
 330
 2) Effect of Act 64's Expenditure Limits on Candidates
 
 
 331
 Act 64's expenditure limits will, therefore, greatly hamper Vermont candidates in getting their message to the public. The Secretary of State has noted that the expenditure limit for State Treasurer— $45,000—leaves, after advertising, "no money to hire a campaign manager, do direct mail, lawn signs or bumper stickers." David Gram, Dems Needle Each Other On Spending in Treasurer's Race, Associated Press, May 29, 2002. Expenditure limits should be expected to have precisely such effects because they force candidates to give exclusive priority to the methods of communication that reach the greatest number of voters.
 
 
 332
 The Secretary of State has also noted that the "tight contribution limits" of Act 64 were part of the cause of an "unprecedented amount" of independent expenditures in the 2000 Vermont election. See 2001 Memorandum, supra. As a result, candidates complained that "mailings or advertisements made on their behalf attributed to them opinions they did not hold, or sent negative messages about their opponent, in violation of their stated intent to run a positive campaign." Id. Expenditure limits will encourage even more extra-campaign spending and leave candidates without the means to set the record straight.
 
 
 333
 Even grassroots "meet the candidate" events in supporters' homes are severely limited, see 1999 Memorandum, supra, as noted above, and, although my colleagues mention, among other things, town barbecues and dinners as cheap but effective campaign methods, see Maj. Op. at 130, the nature—when and where held and how often in the campaign season—usefulness —what kind of voters and in what numbers attend—cost—who pays—and legal status under Act 64—an "expenditure" or "related expenditure"—of these events is not elaborated in the record or discussed in my colleagues' opinion, notwithstanding the critical role such factors logically play in their opinion's analysis. In fact, these methods may be neither cheap—at least by Act 64's meager standards—nor effective.
 
 
 334
 There is, therefore, simply no data in the record suggesting that anything other than a drastic reduction of political speech will result from Act 64's expenditure limits. Indeed, the effect will likely be much harsher than most would expect for the reasons that follow.
 
 
 335
 First, low limits exacerbate the highly discriminatory and arbitrary effect of Act 64's selection of a two-year cycle. In a single-member Vermont House district, a candidate may spend—counting related individual and party expenditures—only $2,000 over the two-year cycle. Vt. Stat. Ann. tit. 17, § 2805a(a)(5). A candidate who seeks to comply fully with Act 64 will be severely constricted. Any legal fees will count toward that limit. Id. § 2801(3). Mileage and other expenses of supporters can quickly eat up the spending allowed. A candidate who has to run in a contested primary election may well be unable to communicate with the public at all—literally stuck in his or her driveway—in a general election against an opponent whose campaign is just beginning.
 
 
 336
 Second, the harshness of the limits on candidate expenditures is greatly exacerbated by the fact that a candidate's campaign cannot expect the candidate's party to provide the usual supplemental support of polls, offices, computers, phones, advertisements, mailings, and other events, such as a party-funded booth at a country fair, if the conduct "primarily benefits" fewer than seven candidates. See supra notes 12, 14. Parties may make contributions and related expenditures benefiting candidates that total, over a two-year period, no more than $400 for each candidate for statewide office, $300 for each candidate for the Senate, and $200 for each candidate for the House. See supra Part III(b)-(c). In Vermont, there are six statewide offices, thirty State Senators, and 150 State Representatives. Under Act 64, a political party—the state party and all affiliates combined—can, over a two-year period, make a total of only $41,400 in contributions to, or related expenditures on behalf of, all its candidates for non-federal office.
 
 
 337
 Although Colorado II allows such restrictions, 533 U.S. at 465, 121 S.Ct. 2351, their effect must be considered in gauging the impact of candidate expenditure limits. A statewide poll regarding candidates for the six statewide offices would cost over $6,000. Letter from Mark F. Michaud, Vermont Democratic Party, to Vermont Attorney General William Sorrell 1 (Feb. 28, 2002). If the poll data were shared with the six candidates, the poll would exceed Act 64's limits ($400 by 6) by over 100%. See Appendix A. The full effect of Act 64's limits has, of course, not been experienced yet,[19] because the district court invalidated candidate expenditure limits and the contribution/related expenditure limits on political parties. With these limits now revived, limits on expenditures by candidates will dramatically lessen political debate in Vermont.
 
 
 338
 Finally, as noted, Act 64's one-size-fits-all approach makes no provision for candidates to adjust to economic, demographic, cultural, or technological changes that increase the costs of campaigns. Although Act 64 is premised on the view that elections are "too expensive"—a view expressly rejected as a valid reason for expenditure limits in Buckley, 424 U.S. at 57, 96 S.Ct. 612—and that candidates can make them cheaper, the "costs" of campaigning are not within the control of candidates.
 
 
 339
 The costs of resources to be used in campaigns are determined by competitive markets. Resources used in campaigns are also used, and far more extensively, for non-political communication. The prices of those resources are therefore set in markets that are independent of political campaigns and in which candidates for office must compete with non-political consumers. An inability to pay market price for communication resources will stifle political speech. Nevertheless, there is no provision for future inflation in Act 64's limits, although even slight annual increases in the consumer price index will in a few short years substantially reduce further the ability of candidates to communicate with voters. For example, the cost of postage stamps is now higher than when Act 64 was passed. See It Now Costs 3 Cents More to Mail a First-Class Letter, N.Y. Times, June 30, 2002, at 18. For another example, the price of gasoline has risen considerably since then. (The reimbursement rate for mileage driven by federal employees has been increased from 31¢ at the time of Act 64's passage to 37½¢ in July, 2004. See U.S. General Services Administration, Privately Owned Vehicle Reimbursement Rates, at http:// www.gsa.gov (effective Jan. 1, 2004)).
 
 
 340
 As noted above, the effect of rising costs has already been observed by Vermont's Secretary of State. With regard to a campaign for State Treasurer—with an expenditure limit of $45,000—she noted that, "The cost of paid media has changed quite a bit in the last four or five years. With prices for television ads, and even radio ads, running a campaign on $45,000 will leave you no money to hire a campaign manager, do direct mail, lawn signs or bumper stickers." David Gram, Dems Needle Each Other on Spending in Treasurer's Race, Associated Press, May 29, 2002. It goes without saying that there also would be no room under the spending cap for grassroots activities that would have to be included as related expenditures.
 
 
 341
 Act 64 also does not take into account the fact that a combination of demographic, cultural and technological changes may require resort to ever more costly methods of communication. Campaigns may communicate with voters only by going to where voters are or using a medium watched or listened to by voters. My colleagues assume the existence of numerous public events in which large groups of voters frequently congregate and can be personally addressed. See Maj. Op. at 130. However, voters are not required to abide by such assumptions and to congregate in great numbers at scheduled times during political campaigns or even to welcome an interruption of free time at home by a candidate's personal visit. Rather, they may prefer to get their information through technology that puts candidates at the mercy of a competitive market and technological advances.
 
 
 342
 For example, because the development of cable television broadened viewership opportunities for the public, it also required candidates who wished to communicate through television to buy ads on many, instead of a few, channels. For another example, the development of the Internet has made it possible for candidates to offer websites to provide information to potential voters, a fantasy fifteen years ago. The Executive Director of the Vermont Democratic Party has opined that a candidate website is now "a necessity." Nancy Remsen, Election Notebook 2002, Burlington Free Press, Sept. 9, 2002, at 1B.
 
 
 343
 Act 64 takes a Luddite view of political communication—one witness for the defense even suggested the bicycle as a means of travel in campaigns, Trial Tr. vol. IX, at 134 (Elizabeth Ready)—and prevents candidates from adjusting to new demographic and cultural patterns and costs, even though the Supreme Court has expressly declared that government is not to make that choice. See Meyer, 486 U.S. at 424, 108 S.Ct. 1886; Buckley, 424 U.S. at 57, 96 S.Ct. 612.
 
 
 344
 c) The Burden on Challengers
 
 
 345
 The fact that limits on candidate expenditures tend to disadvantage challengers in campaigns against incumbents is recognized both in the provisions of Act 64— which has slightly lower limits for incumbents —and in its legislative history. See, e.g., Hearing on H. 28 Before the Vt. House Comm. on Local Gov't, 64th Biennial Sess. (1997) (statement of Rep. Terry Bouricius); Hearing on H. 28 Before the Senate Comm. on Gov't Operations, 64th Biennial Sess. (1997) (statements of Sens. Seth Bongartz and Jean Ankeney). The Supreme Court has also noted that limits on candidate expenditures may "handicap a candidate who lacked substantial name recognition or exposure of his views before the start of the campaign." Buckley, 424 U.S. at 57, 96 S.Ct. 612.
 
 
 346
 Incumbents in effect have capital—name recognition, an existing organization, tested donor lists, etc.—to draw upon without making expenditures as defined in Act 64, while virtually every significant capital-building activity by newcomers requires the use of resources that count toward the expenditure limits. Equally important is the fact that incumbents have methods of getting their name before the public that are not limited by Act 64, while challengers do not.
 
 
 347
 To take an example from Vermont, the State Treasurer, an elected official, publishes newspaper ads at state expense listing names of Vermonters who may have funds in dormant bank accounts, unclaimed insurance refunds, or unclaimed stock dividends. These ads have contained photos of the incumbent Treasurer and have run in the October of election years. In 2001, the ad read, "Jim Thompson, Vermont state treasurer, may have money for you." Treasurer Candidates Show Signs of Restraint, Burlington Free Press, Sept. 23, 2002, at 1B. To take another Vermont example, whereas a challenger to an incumbent Secretary of State can obtain a Madison Avenue-type website only by spending money counted as an expenditure, the incumbent can use state funds for such a site, and post on it materials casting a favorable light on the incumbent, omitting only the words "Vote for me." See Vermont Secretary of State's Website, at http://www.sec.state.vt.us; Office of the Attorney General Website, at http://www.atg.vt.us; see also supra Part III(c). Moreover, the Secretary's political party provides visitors to its site a link to the Secretary's site. See supra Part III(c).
 
 
 348
 The term "arms race" has acquired an almost talismanic quality in the course of this litigation, serving as a quip that answers every concern about Act 64's effect on political speech. In fact, however, slogans about stopping the "arms race" are often cover for the disarming of challengers. See infra Part V(d).
 
 
 349
 For example, one of the witnesses whose testimony is relied upon heavily by my colleagues, Maj. Op. at 116-17, 118, 122, 127, 130-31 is a very successful electoral official in Vermont who testified to the "arms race" at the State Senate level, Trial Tr. vol. IX, at 147, 150 (Elizabeth Ready). As an incumbent and undoubtedly well-meaning supporter of Act 64's limits, which she had exceeded (not including related individual and party expenditures) in most of her (always successful) campaigns, see id. at 147, supra Part IV(b)(1)(C), she testified that she had been forced to make larger expenditures because her opponents ran advertisements and posted yard signs that gained the attention of voters. She was then compelled to do the same, instead of relying on her preferred campaign method of person-to-person contact, because voters seeing her opponents' ads and yard signs wondered whether she was running for reelection. See id. at 147-48. In her view, the "arms race" forcing her to run ads and post yard signs should be stopped.
 
 
 350
 So used, "arms race" is a pejorative term that refers to contested elections in which challengers spend resources to run serious campaigns. Incumbents do not restrain their own acquisition and use of perquisites of office that help them win reelection, but these perquisites are never mentioned as part of the "arms race." For example, the witness described above, who offered yard signs as evidence of an "arms race," now holds the elected post of State Auditor with a website that has her photo and various pages listing her goals and accomplishments. Office of the Vermont State Auditor Website, at http://www.state.vt.us/sao. To boot, the Vermont Democratic Party website offers visitors a link to the Auditor Website. See supra Part III(c). Expenditure limits therefore stop "arms races" by challengers, leaving incumbents with ample weapons.
 
 
 351
 Moreover, Act 64's selection of the two-year cycle as the governing time period collapses primary and general elections under one expenditure limit and will in the main favor incumbents, who face serious primary challengers less frequently than those seeking a party nomination to challenge an incumbent. Indeed, there appears to be little other reason justifying the choice of the two-year cycle.
 
 
 352
 The degree of the adverse effect of Act 64 on challengers will depend in large part on discretionary, arbitrary, and often ad hoc rulings on what kinds of activities and speech by incumbents will be deemed to be official communication by officeholders to the public and what kinds will be deemed to be campaign expenditures. Of course, virtually every activity by an incumbent officeholder intending to seek reelection will have a political effect, and such officeholders will to one degree or another take that effect into account in determining their behavior. The law provides for marginally lower limits on expenditures by incumbents, but this largely inconsequential difference will be rendered irrelevant so long as the substantial communications by incumbents are not deemed campaign expenditures. Conversely, the advantage of incumbents under the Act's limits will also depend on what activities by non-announced challengers are deemed to be by a "candidate" and "for the purpose of influencing an election." See generally Vt. Stat. Ann. tit. 17, § 2801(1), (3).
 
 
 353
 These issues, of course, will likely be addressed in the first instance by an incumbent official, the Secretary of State. See 2001 Guide, supra; see also infra Part V(e). Should these rulings be adverse to incumbents—a not very likely scenario— the incumbents can overturn them by legislation. If the rulings favor incumbents, challengers have no such option.
 
 
 354
 Because the hands-off approach of my colleagues accords expansive deference to legislative judgments as to expenditure limits, see Maj. Op. at 114 & n.9, incumbents are given a weapon that can be manipulated as needed in the future. Should the limits of Act 64 prove inadequate and the "arms race" continue to result in ads and yard signs by challengers, they can be altered at will.[20]
 
 
 355
 Act 64's major factual premise is that Vermont incumbents so crave reelection that they ignore official duties and personal honor to that end. My colleagues abandon this premise in reassuring us that self-interest will not influence campaign finance regulation despite the considerable evidence that self-interest contributed, albeit below the public radar, to the level of expenditure limits set by Act 64 and to adoption of the two-year cycle.
 
 
 356
 Moreover, there is powerful evidence that self-interest will prevail. Incumbent legislators can exercise a direct influence on the outcome of elections in two ways: campaign finance regulation and reapportionment. The importance of self-interest is dramatically confirmed by the effect of legislative reapportionment on election districts for the United States House of Representatives, an area in which courts have deferred to legislative judgment. See White v. Weiser, 412 U.S. 783, 794-95, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973) ("From the beginning, we have recognized that reapportionment is primarily a matter for legislative consideration and determination.") (internal citation omitted); see also Miller v. Johnson, 515 U.S. 900, 915-16, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995). Reapportionment of federal House districts now has one and only one guiding star: incumbent protection. See John Harwood, No Contests: House Incumbents Tap Census, Software to Get a Lock on Seats, Wall St. J., June 19, 2002, at A1 ("Thanks to the play-it-safe strategies of Republicans and Democrats alike, and to the sophisticated technology now used in redistricting, competition is being squeezed out of the House—with huge consequences."); id. (describing the practice of "sweetheart" gerrymandering by incumbents of both parties); Richard Perez-Pena, With 2 Congressional Seats Lost, Albany Begins Battling Over Who Must Go, N.Y. Times, Jan. 22, 2002, at B1. These sources demonstrate that reapportionment is now widely regarded as little but the "rigging" of elections in the name of the special interest—incumbency—that dominates legislative decisions. I know of no reason why the guiding star in reapportionment decisions will not become the guiding star in campaign finance regulation.
 
 
 357
 d) The Burden on the Press
 
 
 358
 As noted, the law does not exempt the media from the definitions of "contribution," "expenditure," or "related expenditure." Media support is a "thing of value" that, if "facilitated" or "solicited" by a candidate, would be a "related expenditure." See Vt. Stat. Ann. tit. 17, §§ 2801(3), 2809(c); see also 2001 Guide, supra. Indeed, as noted above, Vermont's Secretary of State has warned candidates that providing a photo, written materials, or "other assistance or information" to anyone for use in a publication will trigger a related expenditure. See id.
 
 
 359
 The extent of the burden imposed on the press by Act 64 is potentially vast, again depending largely on discretionary rulings by those who must administer Act 64. See infra Part V(e). Certainly, editorials or op-ed endorsement(s) of candidates fall directly within Act 64's language, as would publication of letters to the editor from a candidate, a campaign official, or even a supporter. One witness relied upon in my colleagues' opinion testified that she authored articles on issues for the press as a no-cost campaign tactic, Trial Tr. vol. IX, at 135 (Elizabeth Ready), but publication of these articles would clearly fall within the related expenditure language of Act 64. Media sponsorship of debates might also, particularly if some candidates were excluded or if some did not want to appear. Ordinary news stories about campaign events brought to a newspaper's attention by a candidate or campaign official, or even news reports on interviews with candidates, also fall squarely within the ruling by the Secretary of State described above. See 2001 Guide, supra.
 
 
 360
 None of this is inconsistent with Act 64's underlying philosophy. The theory underlying Act 64 would easily include the media as a powerful special interest having a stake in government action just like any other profit-making business or organized economic interest—e.g., the newspaper quoted by my colleagues is part of a huge multi-national organization, undoubtedly one of the larger companies doing business in Vermont. See Gannett Co. Inc. Operations, available at http://www.gannett.com/map/units.pdf (listing The Burlington Free Press as a subsidiary). A candidate enjoying the editorial support of the local press, favorable coverage of his or her campaign events, and publication of his or her op-ed articles receives benefits bestowed at considerable expense, including past capital investment and current spending. Unless expenditure limits include the value of media support, an opponent who does not enjoy such support and labors under an expenditure limit exempting media support is in a real sense facing a candidate who is allowed to spend more because of a powerful economic supporter. Of course, unconstitutional restraints on the press are not validated by a need for fairness created by unconstitutional restraints on political candidates. See infra note 21.
 
 
 361
 However, many proposals to regulate campaign finance exempt the media, see, e.g., N.Y. Elec. Law § 14-124; Conn. Gen. Stat. § 9-333w(c), often including a definition of what organs of communication constitute exempted media, see e.g., Bipartisan Campaign Reform Act of 2002, § 201(f)(3)(B), Pub. L. No. 107-155, 116 Stat. 81 (codified at 2 U.S.C. § 431 et seq.).[21] Nevertheless, Act 64 does not contain such an exception. Given the plain language of Act 64 and the consistency of its theory with that language, Act 64 can fairly be said to burden the press, and any candidate who seeks its support, quite as much as the Act burdens other candidates and their supporters.
 
 
 362
 e) The Burden on Party Affiliates
 
 
 363
 As noted, Act 64 treats a contribution to a state, county or local party affiliate as a contribution to all affiliates, and requires that all such monies be deposited in a single bank account. See Vt. Stat. Ann. tit. 17, §§ 2801(5), 2831; see also supra note 1.
 
 
 364
 My colleagues note that "the local and state affiliates will now have to record and coordinate their contributions," but reassure us that "the provision does not impose any organizational burden on the party outside of the campaign finance realm, and requires no broader organizational reform." Maj. Op. at 144. Of course, under Act 64, the "campaign finance realm" is not some incidental, out-of-the-way matter but covers virtually every organizational activity, including even the cost of char-coal, hotdogs, hamburgers, and soft drinks for a town committee picnic. Moreover, the "record[ing] and coordina[tion]" is required to be done through a single bank account. See Vt. Stat. Ann. tit. 17, §§ 2801(5), 2831; supra, note 1. If a party town committee wants $50 for a picnic, it must petition the state party official authorized to sign checks from the statewide account to obtain the only money that can legally pay for those items. Local party-funded booths at country fairs were mentioned as a person-to-person method of campaigning by one witness relied upon by my colleagues, see Trial Tr. vol. IX, at 138 (Elizabeth Ready), but such funding must also come from the statewide account.
 
 
 365
 By requiring that the recording and coordination of all party financing be done through a statewide party organization that parcels out funds, Act 64 not only disrupts but revolutionizes the organization of American political parties and their critical role in a free society. The centralizing of party funding will of course make all grassroots political activities by local party affiliates—the indispensable stuff of American politics—subject to the whim of state party officials. In fact, when the Vermont Secretary of State ruled that a contribution to one party organization constituted a contribution to all affiliates, both Republican and Democratic state leaders registered shock—another example of the lack of scrutiny given the actual provisions of Act 64—and opined that grassroots activities would be severely inhibited. See Secretary of State Being Criticized for Fund Raising Ruling, Associated Press, May 28, 1999 (noting one political operative's stunned response as being "Someone's totally taken leave of their senses").
 
 V. THE CONSTITUTIONAL RESOLUTION
 
 366
 Some of Act 64's severe limitations on political advocacy are unconstitutional because no governmental interest, much less a compelling interest, has been offered to justify them. These include the two-year cycle for limits on contributions and expenditures, see Vt. Stat. Ann. tit. 17 §§ 2801(a), 2805(a), 2805a(a), the forced centralization of local party affiliates, see id. §§ 2801(5), 2831, and the imposition of expenditure limits on candidates' self-funded campaigns, see generally id. § 2805a(a).
 
 
 367
 Even if expenditure limits may be constitutionally enacted notwithstanding Buckley's holding to the contrary, Act 64's limits are so low that they are unconstitutional by any reasonable test. Indeed, they survive in the present case only by my colleagues' creation of a standard that allows legislatures to adopt low, incumbent-protecting limits.
 
 
 368
 With regard to the governmental interests asserted as justifications for Act 64,[22] my colleagues rely upon two in particular: government's interests in eliminating corruption or the appearance thereof and in affording candidates more time to spend with non-donor voters. See Maj. Op. at 124-25. As discussed in my colleagues' opinion, however, these interests are broadly defined and include eliminating special access or the appearance of special access of donors to officeholders, reducing the influential or agenda-setting effect of "bundled" contributions, and increasing citizen confidence in the electoral process. See id. at 115-25; see also 1997 Vt. Laws P.A. 64 (H.28). All of these interests were rejected by the Supreme Court in Buckley, 424 U.S. at 25-26, 96 S.Ct. 612, but, even if they had not been, they have not been demonstrated in the present case as having a constitutionally sufficient nexus to the limits on candidate expenditures and related expenditures.
 
 
 369
 a) Restrictions on Political Activity for Which No Governmental Interests are Asserted
 
 
 370
 As to some of the restrictions on political activity imposed by Act 64, no governmental interest whatsoever has been proffered as a justification. Absent the assertion of a justifying governmental interest, any significant restraint on political speech should be struck down as per se unconstitutional. See Eu, 489 U.S. at 222, 109 S.Ct. 1013 ("If the challenged law burdens the rights of political parties and their members, it can survive constitutional scrutiny only if the State shows that it advances a compelling state interest.")
 
 
 371
 First, no reason is offered for the adoption of the arbitrary and highly discriminatory two-year cycle for limiting contributions and expenditures. See Vt. Stat. Ann. tit. 17, §§ 2801(9), 2805(a), 2805a(a). A two-year cycle does not reduce the influence or access to officeholders of special interests, reduce time pressures on candidates, or increase citizen or voter confidence in government. Act 64's public financing provisions recognize the self-evident need for greater financing on the part of those who must run two campaigns rather than one. See id. §§ 2855(a), (b). Collapsing primary and general elections under a single expenditure limit is thus a flat-out suppression of speech for no asserted reason, save perhaps for the unspoken reason of incumbent protection, as discussed supra.
 
 
 372
 Similarly, no justification or governmental interest is offered for Act 64's treatment of a contribution to any party affiliate as a contribution to all affiliates, with the statutory requirement that all contributions to, and thus, expenditures by, all party affiliates—state and local—be from a single bank account. See id. §§ 2801(5), 2831; supra note 1. Because Act 64 limits contributions to, and related expenditures on behalf of, particular candidates by political parties on an aggregated basis, contributions to separate affiliates cannot serve as a conduit allowing individuals to evade the limits on single source contributions. See Colorado II, 533 U.S. at 464-65, 121 S.Ct. 2351 (permitting restriction of coordinated party expenditures to minimize circumvention of contribution limits). Neither the interests in eliminating corruption, saving candidates' time, nor increasing confidence in government are therefore served by aggregating contributions to affiliates of political parties.
 
 
 373
 While serving none of Act 64's asserted goals, the aggregated treatment of contributions to affiliates eliminates the right of local committees to be free from centralized control in raising funds for local party-building activities. One of the most vital and fertile areas of democratic political activity in America is the local party committee, which, while loosely related to larger party organizations, is the source of grassroots activities that permit citizens to participate and seek change. Local party activities are a critical means by which a changing public opinion is absorbed gradually into the political system, rather than going unheard until it reaches explosive force. Because these activities require funding, Act 64 directly impairs them. See Secretary of State Being Criticized for Fund Raising Ruling, Associated Press, May 28, 1999 (noting that leaders of both parties warn that "the ruling would have the effect of undermining the goal of Vermont's new campaign finance law to encourage more grassroots political activity"). See supra Part IV(a).
 
 
 374
 Freedom of association includes the right not only to engage in group activities but also to affiliate groups with one another, on a horizontal, vertical, or hierarchical basis, loosely or with centralized control. The choice is to be made by the citizens involved, not by government. See Timmons, 520 U.S. at 358, 117 S.Ct. 1364; Meyer, 486 U.S. at 424, 108 S.Ct. 1886; Buckley, 424 U.S. at 57, 96 S.Ct. 612.
 
 
 375
 Finally, no reason is given for applying expenditure limits to candidates who desire to fund their own campaigns. See generally Vt. Stat. Ann. tit. 17, § 2805a(a). Such candidates already have "access" to themselves and need not spend excessive time fund-raising. Again, speech is suppressed for no reason. See Buckley, 424 U.S. at 44-45, 96 S.Ct. 612.
 
 
 376
 b) Buckley Forecloses the Asserted Justifications for Expenditure Limits
 
 
 377
 Turning to the reasons given by my colleagues as constitutional justifications for expenditure limits, each of them has already been considered and rejected by the Supreme Court. Buckley rejected in the most explicit terms the notion that government may, under a Constitution containing the First Amendment, limit the amount of political speech by candidates and ordinary citizens. See id. It is no surprise that many of the arguments made in favor of Act 64 rehash those considered in Buckley because Act 64 was intended by its proponents as a vehicle to overturn the Buckley ruling. See 2001 Memorandum, supra; Hearing on H. 28 Before the Vt. House Comm. on Local Gov't, 64th Biennial Sess. (1997) (statement of Anthony Pollina); Hearing on H. 28 Before the Vt. Senate Comm. on Gov't Operations, 64th Biennial Sess. (1997) (statement of Sen. William Doyle); Vt. House Comm. of Conf., Report on Campaign Finance, H. 28, 64th Biennial Sess. (1997).
 
 
 378
 For example, the question of special donor access or the appearance thereof was highlighted both by the Congress that enacted the expenditure limitations struck down in Buckley, see Minority Views on Report of the Comm. on House Admin. to Accompany H.R. 16090 (July 30, 1974), reprinted in Legislative History of Federal Election Campaign Act Amendments of 1974, at 749 (1977), and by the Court of Appeals for the District of Columbia, which upheld those limitations and was reversed in Buckley. Buckley v. Valeo, 519 F.2d 821, 838 (D.C.Cir.1975), aff'd in part and rev'd in part, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). That court expressly noted that "[l]arge contributions are intended to, and do, gain access to the elected official," id., an observation interchangeable with language in my colleagues' opinion. To be sure, the Supreme Court did not use the word "access" in Buckley, but it did use the stronger term, "improper influence." Buckley, 424 U.S. at 27, 45-46, 96 S.Ct. 612. Having held that corruption itself or the appearance thereof—bribes—was not sufficiently compelling to justify limits on expenditures by candidates, id. at 55, 96 S.Ct. 612, the Court hardly had to go on to say that access or the appearance of access—returning or taking a phone call from a donor—was also not compelling. Reducing bribes is generally regarded as a far more compelling interest than reducing phone calls.
 
 
 379
 It is also suggested that the practice of bundling contributions by those with common interests justifies expenditure limits. My colleagues assume that the practice of bundling was unknown at the time of Buckley. Maj. Op. at 118.[23] However, the concept of pooling contributions by persons with common interests is hardly new. Indeed, at the time of Buckley, proponents of the 1974 Act relied heavily on pooled contributions by various firms in particular industries as evidence of improper influence. See Senate Floor Debates on S. 3044 (Mar. 28, 1974, Apr. 3, 1974) (statements of Sens. Griffin, Baker), reprinted in Legislative History of Federal Election Campaign Act Amendments of 1974, at 259, 365-66 (1977); House Floor Debates on H.R. 16090 (Aug. 8, 1974) (statement of Rep. Dickinson), reprinted in Legislative History of Federal Election Campaign Act Amendments of 1974, at 917 (1977). An amendment in the House that would have prohibited pooling was introduced, voted on, and rejected. See Minority Views on Report of the Comm. on House Admin. to Accompany H.R. 16090 (July 30, 1974), reprinted in Legislative History of Federal Election Campaign Act Amendments of 1974, at 752-53 (1977); House Floor Debates on H.R. 16090 (Aug. 7, 1974), reprinted in Legislative History of Federal Election Campaign Act Amendments of 1974, at 858-59 (1977).
 
 
 380
 This was all explicitly before the Supreme Court in Buckley. In fact, "bundling" was considered so significant that the findings of the Buckley district court as to large contributions cataloged them by industry as well as by individual donor. See Joint Appendix at 86-143, Buckley (Nos. 75-436 and 75-437). In particular, much attention was given at the time of Buckley to the 1972 campaign contributions by the dairy industry, in which milk producers pooled a large sum and then broke it down into contributions by small committees to avoid disclosure. See Senate Floor Debates on S. 3044 (Mar. 26, 1974, Mar. 27, 1974, Mar. 28, 1974, Apr. 3, 1974, Apr. 4, 1974) (statements of Sens. Hathaway, Griffin, Hollings, Baker, Kennedy), reprinted in Legislative History of Federal Election Campaign Act Amendments of 1974, at 205, 225, 257, 365, 376-77 (1977). This incident was a highly publicized scandal at the time. It was featured in the Court of Appeals decision that upheld expenditure limits, Buckley, 519 F.2d at 839 n. 36, and that was reversed by the Supreme Court, Buckley, 424 U.S. at 55, 96 S.Ct. 612. Finally, an example of "bundling" was mentioned during the oral argument in the Supreme Court in Buckley. 1976 Landmark Briefs and Arguments of the Supreme Court of the United States: 2 Buckley v. Valeo 729 (Phillip B. Kurland and Gerhard Casper, eds. 1977) (appellees' argument that disclosure of small contributions necessary because of "the problem of culminating, of combining contributions, if you have a large number of people who are affiliated"). The term "bundling" may be new, therefore, but the concept is long in the tooth.
 
 
 381
 My colleagues now emphasize a governmental interest mentioned only in passing in their original opinion, the belief that expenditure limits will reduce the time spent fundraising by candidates, with the hope that the extra time will be spent conferring with ordinary citizens. Maj. Op. at 120. This justification overlaps with the access issue and, to that extent, was decided in Buckley as discussed above.
 
 
 382
 In any event, the arguments regarding the time politicians spend fundraising were, as conceded by my colleagues, known and made before the Supreme Court in Buckley. Because my colleagues quote a commentator for the proposition that in Buckley, "`candidate time protection was almost wholly ignored as a justification for campaign spending limits,'" Maj. Op. at 120 (quoting Vincent Blasi, Free Speech and the Widening Gyre of Fund-Raising: Why Campaign Spending Limits May Not Violate the First Amendment After All, 94 Colum. L. Rev. 1281, 1285-86 & n.15 (1994)), I quote the pertinent passages from the briefs and lower court decision in the margin. The time-protection argument was relied upon by the Court of Appeals in Buckley in upholding the statute,[24] was the subject of an entire subsection of the brief filed in the Supreme Court on behalf of the Attorney General and Solicitor General,[25] was argued as a justification in the brief filed in the Supreme Court by intervening parties defending expenditure limits,[26] and was mentioned by the Supreme Court itself.[27] The claim that this issue was not fully before the Court in Buckley is therefore incorrect.
 
 
 383
 c) The Insufficiency of the Governmental Interests
 
 
 384
 Even putting aside Buckley's binding precedent, the various interests asserted in defense of expenditure limits fail to satisfy First Amendment requirements.
 
 1) Anti-Corruption
 
 385
 Act 64 drastically reduced the limits on contributions established in prior Vermont law. There is no evidence in the record that Act 64's new low limits on contributions alone will not suffice to eliminate any improper influence. All of the—largely sparse, anecdotal, and conclusory—evidence of improper influence dates from a time when the contribution limits were much higher.
 
 
 386
 Prior Vermont law allowed contributions of $1000 per election to any candidate. See Vt. Stat. Ann. tit. 17, § 2805(a) (1996). (amended 1997). As noted, Act 64 limits contributions to candidates for statewide office to $400, for the state senate to $300, and for the state house to $200. See Vt. Stat. Ann. tit. 17, § 2805(a). The reduction is greater than might be perceived because Act 64's contribution limits apply over a two-year cycle and related individual and party expenditures—e.g., mileage, house parties—must be counted in determining whether a donor has reached the limit. See id. § 2801(a), 2805(a), 2805a(a), 2809(a); see also supra Part III(b)-(e).
 
 
 387
 In assessing the anti-corruption effect of expenditure limits, my colleagues rely on a portrait of Vermont politics drawn from testimony by a handful of proponents of Act 64. That portrait is essentially as follows. The money spent on campaigns has been spiraling over the forty or more years in which Vermont has toyed with expenditure limits. See 1997 Vt. Laws P.A. 64 (H. 28) (finding no. 1); Maj. Op. at 101-02, 124-25. The urge to raise campaign money has increased accordingly, see id. at 124-25, leading to an "arms race" caused by the fear of being "vastly outspent," id. at 127, in which, because one candidate may, for example, buy materials for yard signs, others must do so also, see Trial Tr. vol. IX, at 148 (Elizabeth Ready). We are also told that candidates for legislative office have historically spent less in their campaigns than the limits set by Act 64. See Maj. Op. at 130. In concrete terms, this means that the average campaign cost, the "arms race," for single-member Vermont House or Senate races has over 40 years spiraled to $2,000 and $4,000 respectively. See generally Vt. Stat. Ann. tit. 17, §§ 2805a(a)(4), (a)(5).
 
 
 388
 We are also told that raising these sums creates such a dependence among legislators on large contributors—at the time, a $1,000 maximum—that for the entire two years after each election, the legislators engage in "perpetual fundraising," Maj. Op. at 97, and have little time to talk with ordinary citizens. See id. at 124-25. The selections from the testimony highlighted in my colleagues' opinion portray members of the Vermont legislature as susceptible to corruption and so obsessed with soliciting or conferring with cash donors that they have very little time to confer with ordinary citizens. See Maj. Op. at 123 (describing candidates as being "locked away" while fundraising instead of "out with the public" because "candidate time is effectively for sale").
 
 
 389
 The record justifying Act 64's massive regulation of political speech is not strong; in fact, it is pitifully weak. Even if Vermont legislative candidates had to raise cash amounts well in excess of $4,000, this task would hardly leave them so obsessively dependent on large contributions (now a maximum over a two-year cycle of $400, $300, $200, depending on office), see Vt. Stat. Ann. tit. 17, § 2805(a), that large contributors would thereafter be able to demand the right to most of the legislators' free time. What little actual evidence there is to the contrary is on its face gross hyperbole. For example, the testimony of a person described by my colleagues as a "lobbyist," who offered descriptions of Governor Dean meeting only with contributors, Trial Tr. vol. IX at 195-96 (Anthony Pollina), is heavily relied upon in their opinion, Maj. Op. at 122, 123-24. In fact, that person was a lobbyist for the passage of Act 64, whose success in that regard— with the Governor's support—entirely belies his assertions about elected officials listening only to large contributors.
 
 
 390
 There are also, of course, the accusations of corruption with precisely the same scripted sound-bites that are used in every talk-show discussion of these issues. In fact, my colleagues' opinion overstates this testimony by omitting important qualifications offered by the witnesses relied upon, such as their lack of knowledge of any legislative vote ever cast solely because of a campaign contribution, Trial Tr. vol. VII at 48-49 (Toby Young); Trial Tr. vol. VII at 105 (Cheryl Rivers) ("I am not talking about selling votes."), their denial of present improper influence in contrast to their fear of future behavior under the old contribution limits, Trial Tr. vol. VII at 37 (Toby Young) (opining that Vermont elections are clean); id. at 50 (opining that an official would grant preferential access to a thousand-dollar donor); Trial Tr. vol. VII at 137-38 (Cheryl Rivers) ("I don't think the present situation is good, and I think if we don't do something, it's going to get worse."); Trial Tr. vol. IX at 167-69 (Elizabeth Ready) (accepting $1000 and $2000 contributions appeared improper though she was not influenced), and their knowledge of the ready access of ordinary citizens to lawmakers, Trial Tr. vol. VII at 27-28 (Toby Young) (stating that typical state public officials in Vermont will see anyone who wants to see them).
 
 
 391
 The only particularized evidence of improper influence relied upon by my colleagues consists of one anecdote. It involved "widely reported" meetings of major dairy companies with unnamed officials when such meetings were denied to smaller dairy organizations, Maj. Op. at 122. We are asked to assume in this case that unspecified contributions—in contrast to, perhaps, numbers of voters involved—were the decisive factor. Moreover, not only are the details of this episode unknown, but it also took place before Act 64's limits on contributions. It is therefore not particularly relevant.
 
 
 392
 In any event, the First Amendment does not permit the suppression of speech based on such untested anecdotal evidence. See, e.g., United States v. Playboy Entm't Group, Inc., 529 U.S. 803, 820-21, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) (requiring more than "anecdotal evidence" of "signal bleed" problem in support of a regulation requiring broadcasters to fully scramble sexually-oriented programming); Stanley v. Georgia, 394 U.S. 557, 567, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) ("Given the present state of knowledge, the State may no more prohibit mere possession of obscene matter on the ground that it may lead to antisocial conduct than it may prohibit possession of chemistry books on the ground that they may lead to the manufacture of homemade spirits.").
 
 
 393
 Moreover, if the claims of widespread, improper influence are true, anecdotes should not be the only available evidence. Disclosure of contributions has been required in Vermont for years, offering documentary support for the claims, if accurate, of dependence on large or bundled contributions and of the influence of those contributions. See, e.g., Vt. Stat. Ann. tit. 17, §§ 2811(a)(1)-(4) (effective July 1, 1982) (amended 1997) (requiring campaign reports for candidates' contributions and expenditures). The lack of reference to available hard evidence of who gave what to whom even under the prior higher contribution limits suggests that the portrait of corruption painted by my colleagues is vastly overdrawn.
 
 
 394
 When the Supreme Court decided Buckley, it had before it detailed records of actual large, bundled contributions and the amount of out-of-pocket expenditures by candidates.[28] See, e.g., Buckley, 424 U.S. at 32-34 & nn. 35-40, 96 S.Ct. 612; Joint Appendix at 264, 483, Buckley (Nos. 75-436 and 75-437); see also supra note 22. Nevertheless, it struck down the expenditure limits as facially unconstitutional. See Buckley, 424 U.S. at 54-55, 96 S.Ct. 612. Here, the opposite result is reached based on anecdotal evidence, even though better evidence, if corruption exists, is available.[29]
 
 2) Time Protection
 
 395
 I turn now to the claim that expenditure limits are necessary because "endless fundraising[] drastically reduces opportunities that candidates have to meet with non-contributing citizens." Maj. Op. at 122. As noted, this argument was squarely before the Supreme Court in Buckley. See supra notes 24-27. It was, understandably, given only passing attention by the Court because it is not compelling in any sense. The time protection argument, baldly stated, is that law can force candidates to engage in more personal communications with voters by limiting candidate spending on other means of communication.
 
 
 396
 The evidence in the record of excessive time consumption reveals that it is not a testable proposition but can be repeatedly stated as fact and in exaggerated terms. There is no doubt that candidate time is spent fundraising and that some of it is wearisome. However, there is also no doubt that one can say that candidates spend too much time fundraising without knowing how much time is actually spent, because no one else knows either. This particular record contains almost no evidence of the specific time spent fundraising. To the extent that a particular amount of time was described, it was brief, such as an afternoon. Trial Tr. vol. IX at 151 (Elizabeth Ready) ("That afternoon that I had to raise that extra money, I wasn't in front of the Grand Union nor was I going door to door.").
 
 
 397
 Time protection is a useful political argument for a number of additional reasons. It allows legislative proponents of expenditure limits to avoid saying that limits are needed because they themselves might be tempted to vote for or against a measure solely to get a campaign contribution. Instead, they can say, without fear of any future verification, that they need more time to spend with "ordinary citizens."
 
 
 398
 The time protection argument is also useful because it can easily be exaggerated. There is often no dividing line between donors and "ordinary citizens" who support a candidate or between fundraising and other campaign events. Meetings with supportive voters can often be described either as "fundraising" or as "person-to-person contact with voters," depending on the point to be made. The type of campaign events at which money is raised might well be held even if no contributions were sought. After all, even a holiday dinner with family members can be described as being "locked away" with large donors. See Vt. Stat. Ann. tit. 17, § 2805(f) (contributions by candidates and their immediate families unlimited).
 
 
 399
 In a more sinister vein, time protection is a particularly useful argument for incumbents. It is on its face either a remarkable example of incumbent self-sacrifice or a remarkable example of self-interest. Should we believe that incumbent legislators, who generally can raise campaign money more easily than non-incumbents, want major-party and third-party challengers to spend less time fundraising so that the challengers can spend more time engaged in supposedly more effective personal meetings with ordinary citizens? Or, is it possible that incumbents may want to stress the value of person-to-person contact over other methods of communication with voters, knowing that those other methods of communication with voters will still be substantially available to incumbents even under expenditure limits while not—or much less—available to potential challengers. For incumbents, the time protection argument is less about increasing person-to-person contact with voters than it is about limiting their opponents' overall contact with voters. Time protection and incumbent protection thus usefully coincide. Finally, person-to-person contact between candidates and voters will not increase under an incumbent-rigged system. Potential challengers will be deterred from running, and incumbents who will be protected by the law's expenditure limits will have less need for person-to-person contact.
 
 
 400
 Governmental interests that are so speculative —or incumbent protective—are not sufficient to override significant First Amendment interests. E.g., Stanley, 394 U.S. at 567, 89 S.Ct. 1243.
 
 
 401
 In any event, Act 64 actually diverts candidates from meeting with voters. As my colleagues concede, limiting the size of individual contributions necessarily increases the amount of time that must be spent raising a particular amount of money. Maj. Op. at 123. Moreover, expenditure limits also impose time consuming tasks on candidates themselves, particularly because expenditure limits may preclude the hiring of staff. As noted, expenditure limits require candidates to mapout, monitor, and put values on activities by supporters or party organizations that involve related expenditures, which, if they exceed $50 with regard to a single source, must be totaled within the permissible expenditure and contribution limits. See Vt. Stat. Ann. tit. 17, § 2809(a)-(c); see also supra Part III(e). Every campaign event involving supporters—e.g. buying yard signs and driving to where they will be placed, holding meetings or dinners—must involve close calculations by candidates as to whether the particular activities constitute expenditures or related expenditures and what value should be attributed to particular in-kind expenditures. Act 64's provisions will actually force candidates to spend more time than ever on non-speech-related activities.
 
 3) Public Confidence in Government
 
 402
 This brings me to the argument of Act 64's proponents that the expenditure limits of Act 64 will restore public confidence in government and thereby increase citizen and voter participation in elections. Of course, every attempt to suppress speech is based on claims that the speech in question, if allowed to go on freely, will induce behavior that is undesirable. Critics of literature, theater, or television with explicitly sexual or violent themes claim that such speech may induce the behavior portrayed. See, e.g., 1 American Psychological Association, Report of the American Psychological Association Commission on Violence and Youth, at 6 (1992), available at http://www.apa.org/pi/pii/violence-and-youth.pdf (stating that exposure to violence in mass media increases the risk of youth involvement in violence). Those who would censor political speech will always argue that such speech will reduce confidence in government. I have no doubt that supporters of the Alien and Sedition Acts made such arguments and that many incumbent officeholders view vigorous opponents as undermining confidence in government.
 
 
 403
 Governmental suppression of speech must be based on a compelling demonstration that the speech will incite conduct—here an alleged indifference to politics on the part of citizens—that government has a right to prevent. See Boos v. Barry, 485 U.S. 312, 335, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (Brennan, J., concurring in part and concurring in the judgment) ("Our traditional analysis rejects such a priori categorical judgments based on the content of speech, requiring governments to regulate based on actual congestion, visual clutter, or violence rather than based on predictions that speech with a certain content will induce those effects.") (internal citations omitted); Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 508, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) ("[I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression."). I do not doubt that government can and ought to take steps to enhance citizen confidence, but suppressing political activity will not encourage either more confidence or more political activity.
 
 
 404
 In fact, no little part of the public confidence argument is a quintessential self-fulfilling prophesy. The confidence of Vermont citizens in their state government is unlikely to be substantially enhanced so long as Act 64's proponents make unsupported claims about the corrupt nature of that government.
 
 
 405
 In any event, an indifference to politics cannot be traced to excessive spending for electoral purposes. To the contrary, the New Hampshire 1968 primary and the Vermont 2000 election involved heavy citizen participation because of voter interest in the issues and the critical fact that candidates who were divided on those issues could raise and spend money debating them. The theory of Act 64, as stated in the legislative findings, is that public involvement decreases as spending increases. See 1997 Vt. Laws P.A. 64 (H. 28) (findings nos. 4 and 10). However, record amounts were spent on the Vermont 2000 gubernatorial election, see Ross Sneyd, Campaign 2000 Involved Lots of Spending, Associated Press, Dec. 18, 2000, but a full—perhaps also record breaking—34.5% more people voted in the 2000 election than in the prior gubernatorial election. See 2000 Election Results, supra.
 
 
 406
 Nor is there experience elsewhere to the contrary. Before 1976, presidential general elections were privately funded with no limits on contributions and expenditures. Claims of a lack of citizen confidence were made. From 1976 through 1988—before the era in which so-called soft money played a growing role—presidential general elections were fully funded by government and subject to expenditure limitations. No appreciable increase in turnout or confidence in government was noted.
 
 
 407
 As in the one-size-fits all concept of an average election, there is much in the public confidence argument to fear. Proponents of Act 64 rely upon evidence such as a poll showing that 75% of voters believe that large corporations have too much influence and on a newspaper article (published by a very large corporation) stating similar conclusions. If polls suggesting that citizens believe that some groups have too much power demonstrate a governmental interest sufficient to silence those groups, political speech, including freedom of the press, cannot be protected.
 
 
 408
 Act 64 reduces the contribution limits for statewide races to $400, Senate races to $300, and House races $200. See Vt. Stat. Ann. tit. 17, § 2805(a). There is nothing in the record of this case to suggest that these limits are not sufficiently low to dispel any possibility of corruption or the appearance of corruption, at least as viewed by reasonable persons. See Buckley, 424 U.S. at 55, 96 S.Ct. 612 (holding that "[t]he interest in alleviating the corrupting influence of large contributions is served by the Act's contribution limitations and disclosure provisions," and therefore does not justify campaign expenditure limitations). The proponents of Act 64 mention only hypothesized, large, cash contributions as leading to an improper influence on government. There is no evidence whatsoever that expenditures by supporters for "meet the candidate" events, or that supporters' use of a residence, computer or phone, purchase of stamps, or driving to meetings have ever caused a problem that calls for redress.
 
 
 409
 Moreover, there is nothing in the record to suggest that disclosure of amounts and sources of a candidate's campaign funds, in conjunction with low contribution limits and/or a form of public financing, is not the proper democratic method of enhancing voters' confidence in the character of the people they elect. Nor is there anything in the record to suggest that a reduction of campaign activity, in particular grassroots activity, will lead to persons of better character being elected, particularly under the terms of a law enacted by those of purported lesser character.
 
 
 410
 The theory of Act 64 is that less political advocacy is better for us as a polity because too much political activity is engaged in by powerful groups. Because these groups are theoretically able to use every means of communication as a conduit of influence, political activity at every level must be reduced. Act 64 is, therefore, designed to impose relative silence on everyone, with two exceptions. First, incumbents will ensure that they can communicate with the public. Second, the truly rich and powerful can still engage in constitutionally protected independent political activities or buy a media outlet. Expenditure limits do not limit the influence of a Richard Mellon Scaife, a George Soros, or the politically concerned persons that publish the Washington Post, New York Times, National Review, and New Republic. Candidate expenditure limits in fact enhance the power of these wealthy individuals to set the political agenda while the ordinary citizen—who must speak, if at all, through organizational activity—is silenced.
 
 
 411
 d) Stopping the "Arms Race," "Effective Advocacy," and Incumbent Protection
 
 
 412
 As noted, the term "arms race" has been much used in this litigation, see, e.g., Appellants' Br. at 26-27; Maj. Op. at 117, 119, 122, 123, 127, 132, 134; Trial Tr. vol. VIII at 57 (Peter Smith); Trial Tr. vol. VII at 56 (Cheryl Rivers), but in a way that suggests that it is so obviously an appropriate analogy that an explanation of its relevance is unnecessary. When examined, however, the analogy has no logical or factual support. It is also antithetical to the First Amendment because it suggests that government may set a low maximum limit on political speech and, to boot, one that is particularly harmful to challengers.
 
 
 413
 1) The "Arms Race"
 
 
 414
 The "arms race" analogy is a useful— and therefore oft-used—political slogan for proponents of Act 64 because it suggests subliminally a catastrophic spectre of millions being killed and perhaps elimination of the species itself. However, the analogy between nuclear-tipped ICBM's—which many people would want to eliminate completely —and political advertisements—in Vermont, yard signs—is not one that meets the straight-face test, much less one that fits well within First Amendment jurisprudence, and this aspect of the analogy is unworthy of further discussion.
 
 
 415
 What other lessons the slogan "arms race" is deemed to further are difficult to detect because it is used as an argument-stopper rather than argument-advancer. It may suggest that much of political spending is superfluous—beyond a certain point additional spending does not change votes. This is a suggestion that posits candidates who keep spending even though it will not benefit them. If so, the empirical basis for that suggestion is not visible in this record. Nor is there a visible basis for believing that the particular point at which further persuasion stops is the low expenditure limits imposed by Act 64.
 
 
 416
 Perhaps the implication is that spending becomes superfluous at some point but candidates have no idea where that point is and continue to spend anyway. However, if the critical point cannot be determined by a candidate in a particular campaign, it certainly cannot be determined on a one-size-fits-all basis by a self-interested legislature or by a reviewing court.
 
 
 417
 My colleagues apparently do not use "arms race" to imply superfluous spending. Rather, they perceive the "race" to result from the fear of being "vastly outspent" by better financed opponents. Maj. Op. at 127. They do not deny that on election night, election officials do not count the dollars spent by a candidate to determine the winner, and thus, that a fear of being outspent necessarily associates spending with voter persuasion. See id. at 123 (quoting Act 64 supporter for proposition that contribution limits without expenditure limits would lead to competitions "to see who could raise the most money and outspend their opponent and therefore win the race") (emphasis added). "Arms race" is therefore a pejorative method of describing competition over voter persuasion, the very heart of the democratic process.
 
 
 418
 The proponents of Act 64, like my colleagues, also use the slogan "arms race" to argue that any such race should be prevented because, in their view, (supposedly) low cost, person-to-person contacts are the most effective campaign tactics. Trial Tr. vol. IX at 143, 150 (Elizabeth Ready) (personal contact more effective than paid media); Trial Tr. vol. VII at 100 (Cheryl Rivers) (challenger spending more than incumbent is not serious detriment to incumbent, who "can make it up with grass roots effort"). Therefore, campaign expenditures above a certain level (somehow determined) can be eliminated without disadvantaging any candidate.
 
 
 419
 What is not explained, however, is why, if spending above that somehow determined level is ineffective, such spending by a candidate is feared by the candidate's opponent. The answer must be, and is, that the additional spending does persuade voters. As the incumbent Senator, whose testimony is relied upon by my colleagues, testified, she had to spend more than she wished because her opponents' ads and yard signs caused voters to wonder whether she was running for reelection. Trial Tr. vol. IX at 148 (Elizabeth Ready) ("[W]hen everybody has yard signs out and everybody's on the radio and the TV, your constituents will say, Aren't you running Elizabeth? I see that so and so has got a million yard signs out. You don't have any yard signs.") Her opponents, in short, had gotten the attention of voters, who appear to have been more oblivious to her person-to-person campaign than she would have liked. In fact, as used in the present record, "arms race" is a term by which incumbents describe contested elections.
 
 
 420
 2) "Effective Advocacy"
 
 
 421
 I turn now to the test adopted by my colleagues to determine whether the level of expenditure limits set by Act 64 is unconstitutional. That test asks whether the limit is so low that it prevents "effective advocacy" by "driv[ing] the sound of a candidate's voice below the level of notice." Maj. Op. at 128-29 (internal citation omitted). Two aspects of this test must be emphasized. First, it is a minimum speech test, expressly authorizing government to silence candidates once they reach "the level of notice" (assuming no less restrictive methods are available). Second, my colleagues, by equating (understated) average past expenditures with the threshold "level of notice," id., further reduce the minimum at which government can silence candidates, see supra Part IV(b)(1).
 
 
 422
 Despite the unconditional statements by the Supreme Court that contribution limits "`entai[l] only a marginal restriction upon the contributor's ability to engage in free communication,'" McConnell, 124 S.Ct. at 655 (quoting Buckley, 424 U.S. at 20, 96 S.Ct. 612), while "limitations on expenditures [are] direct restraints on speech," id. at 647, my colleagues take the "effective advocacy"/"level of notice" standard from a discussion of contribution limits in Shrink, 528 U.S. at 395-96, 120 S.Ct. 897, and force it into the quite different context of expenditure limits.
 
 
 423
 Contributions pose the spectre of improper influence and may be substantially limited. Colorado II, 533 U.S. at 440-41, 121 S.Ct. 2351 ("limits on contributions are more clearly justified by a link to political corruption than limits on other kinds of political spending are"). The language taken by my colleagues from Shrink says no more than that, even given the governmental interest in reducing improper influence, contribution limits may not be set so low as to prevent an otherwise viable candidate with large numbers of potential small donors from raising enough money even to be noticed by voters. 528 U.S. at 395-96, 120 S.Ct. 897. It does not say that such a candidate may, having raised a substantial amount in small contributions, be prevented from spending more than what (government believes) is needed to reach the minimum level of notice. Indeed, Shrink itself repeatedly and conspicuously emphasized the constitutional distinction between contribution limits and expenditure limits. 528 U.S. at 386, 120 S.Ct. 897 ("expenditure limits [are] direct restraints on speech, which nonetheless suffer[] little direct effect from contribution limits"); id. at 387, 120 S.Ct. 897 (noting a "similar difference between expenditure and contribution limitations in their impacts on the association right"); id. ("restrictions on contributions require less compelling justification than restrictions on independent spending") (internal citation omitted). This distinction was recently reaffirmed by the Court in McConnell, 124 S.Ct. at 655 (reaffirming practice of "subject[ing] restrictions on campaign expenditures to closer scrutiny than limits on campaign contributions" because "contribution limits, unlike limits on expenditures, entail only a marginal restriction on the contributor's ability to engage in free communication").
 
 
 424
 Unlike expenditure limits, which directly restrain speech, Buckley made clear that "[t]he quantity of communication by the contributor does not increase perceptibly with the size of the contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing." 424 U.S. at 21, 96 S.Ct. 612. "A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication ... [because] the transformation of contributions into political debate involves speech by someone other than the contributor." Id.
 
 
 425
 It is from this premise—as long as the candidate can speak effectively, the contributor also can speak—that the effective advocacy test was born. See also McConnell, 124 S.Ct. at 655-56 ("Because the communicative value of large contributions inheres mainly in their ability to facilitate the speech of their recipients, we have said that contribution limits impose serious burdens on free speech only if they are so low as to prevent candidates and political committees from amassing the resources necessary for effective advocacy.") (internal quotation marks and alteration omitted). In no way do the cases evaluating contribution limits use the effective advocacy test to restrain the direct political speech occasioned by expenditures.
 
 
 426
 Were these cases read otherwise, they would represent a complete abandonment of the First Amendment's standard of a free, robust discussion in which citizens "retain control over the quantity and range of debate on public issues in a political campaign," even when those who control the government believe the spending to be "wasteful, excessive, or unwise." Buckley, 424 U.S. at 57, 96 S.Ct. 612. That test, which emphasizes freedom, would be replaced by a test that permits government to cap the amount of permissible speech.
 
 3) Incumbent Protection
 
 427
 The rhetoric of the "effective advocacy"/"level of notice" standard based on average past expenditures conceals a legal test lethal to challengers. A "level of notice" is something that incumbents generally have and challengers generally lack. Under my colleagues' test, therefore, an incumbent's campaign starts at the "level of notice" at which a challenger's campaign may be stopped by government. This anti-challenger effect is aggravated by the use of average past expenditures to determine the "level of notice." See Maj. Op. at 129-31. As detailed above, see supra Part IV(b)(1), past averages, even if accurately calculated—a result not attainable given Act 64's new definitions—include uncontested, or barely contested, elections. See Trial Exs. vol. III at E-0967 (appellees' expert's calculation of average expenditures, which includes low-spending candidates whose spending is unknown by assuming they spent $500, the maximum allowed before filing is required); id. at E-1019 (appellees' expert's report criticizing appellants' expert for failing to include low-spending candidates, whose spending is unknown, in his averages of campaign expenditures).
 
 
 428
 e) The Excessive Discretion Accorded Administrators
 
 
 429
 In their first opinion, my colleagues, noting that "[i]t is beyond cavil that an opponent of the Act will argue its ambiguities and statutory peculiarities," addressed the merits of that argument and stated that the discretion accorded administrators by Act 64 was not constitutionally excessive. Landell v. Sorrell, 2002 WL 1803685, slip op. at 9156 (withdrawn). They now argue that the issue need not be addressed. Maj. Op. at 136-37, n.26. I disagree.
 
 
 430
 The discretion issue is clearly before us. The degree to which Act 64 limits political activity is the first part of the calculus that is before the court. The second part of the calculus is the sufficiency of the reasons proffered in its support. Where only acts of administrative or judicial discretion can mitigate the harshness of restrictions on protected activity so as to render the justifications for the restrictions constitutionally sufficient, the constitutionality of that discretion itself is obviously put in issue.
 
 
 431
 Mild or incidental restrictions on political activity require less compelling justifications than do harsh restrictions. FEC v. Beaumont, 539 U.S. 146, 123 S.Ct. 2200, 2210, 156 L.Ed.2d 179 (2003) (level of scrutiny applied to "political financial restrictions" is "based on the importance of the political activity at issue to effective speech or political association") (internal citation omitted). Much of what Act 64 says harshly limits political activity; much else is left to future elaboration. Perhaps we may rely upon the wisdom of Vermont's Secretaries of State, Attorneys General, and its courts, to mitigate the harsh effects of Act 64's language and to resolve its pervasive ambiguities in favor of freedom, rather than suppression, of political speech. If so, the reasons offered in support of the Act might seem sufficient. However, mitigating rules—e.g. reducing the effect on the press or allowing local party affiliates self-financing—would involve wholly discretionary or arbitrary decisions, and the very existence of that discretion is itself a constitutional problem that cannot be avoided.
 
 
 432
 Limits on campaign expenditures are like all limits on speech. If the limits are triggered, further speech is forbidden. It is standard First Amendment jurisprudence that such a restriction on speech must be precisely crafted to avoid vesting those who administer the law with excessive discretion as to its interpretation. See Forsyth, 505 U.S. at 131, 112 S.Ct. 2395 (requiring "narrow, objective, and definite standards"). The requirement that a law regulating speech embody workable and known standards is necessary both to alert those who are regulated to its terms, see Gentile v. State Bar of Nevada, 501 U.S. 1030, 1048, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991) (requiring regulation of speech to give "fair notice" to those to whom it is directed), and to prevent enforcers from making decisions based on impermissible grounds, see id. at 1050-51, 111 S.Ct. 2720 ("The prohibition against vague regulations of speech is based in part on the need to eliminate the impermissible risk of discriminatory enforcement."); Forsyth, 505 U.S. at 131, 112 S.Ct. 2395 (noting "danger of censorship" where regulation allows excessive enforcement discretion).
 
 
 433
 Act 64 simply lacks discernible criteria for the many interpretive and valuation questions that it creates. If there is to be compliance with Act 64—instead of candidates and their supporters generally ignoring it as a silly law—there must be constant interpretation by the Secretary of State, the Attorney General, and the Vermont courts with regard to the vast number of questions that will arise election-by-election, campaign-by-campaign, and day-by-day. The answers to those questions are the equivalent of granting or denying a permit to speak. In interpreting the statute, however, the Secretary of State and the Vermont courts are afforded almost no guidance except for the manipulable proposition that the influence of "special interests" is to be reduced and that of "ordinary citizens" increased.
 
 
 434
 For example, the statute says nothing about the payment of debts or wind-down expenses of prior campaigns during the next two-year cycle. See 1999 Memorandum, supra. It is also unclear whether the (paltry) exception for expenses for "meet the candidate" events applies only to party-sponsored events or all such affairs. See supra notes 14-15; see generally Vt. Stat. Ann. tit. 17, §§ 2809(d)(1)-(3).
 
 
 435
 If Act 64 is enforced, valuation questions regarding the donation or use "of anything of value" will themselves be a constant issue. When the Act was passed, the Secretary of State set the cost of mileage at 31¢. Although travel on behalf of a candidate's campaign is a related expenditure counting toward the contribution limit, see Vt. Stat. Ann. tit. 17, § 2809(c), she has arbitrarily not changed that figure notwithstanding the substantially increased price of gas and the pervasive availability of public and private mileage guidelines. In fact, employees of the State of Vermont are compensated at 37 ½¢ per mile at present. Vermont Dept. of Personnel, Collective Bargaining Agreements, at http://www.vermontpersonnel.org/employee/labor_cba.cfm (effective July 1, 2003 to June 30, 2005) (setting mileage reimbursement for Vermont employees at level established by the U.S. General Services Administration, currently 37½¢). Given the two-year cycle and the low contribution/related expenditure limits, mileage valuations are of enormous importance, but those valuations appear essentially to be matters of caprice under Act 64.
 
 
 436
 There will also be ubiquitous questions concerning whether particular activities of officeholders, "candidates," or would-be "candidates" have "the purpose of influencing an election." See generally Vt. Stat. Ann. tit. 17, § 2801. Indeed, the Supreme Court stated in Buckley that the last-quoted phrase was unconstitutionally vague unless more narrowly confined than it is in Act 64. See supra note 6. There is also little guidance as to what conduct is an "affirmative action to become a candidate," see supra notes 9-10, or what professional services are donations or related expenditures by a firm rather than volunteer services. See id. §§ 2801(1), 2809.
 
 
 437
 Furthermore, the definition of "related expenditures" can provoke thousands of questions regarding actions of individuals or political parties as to which the answer turns — after a potentially intrusive inquiry into the fine details of what candidates and political parties want to do or did, what they said, and what they thought — on what was the "primary thrust" of the activity. See Appendix A. In addressing such questions, the Secretary herself has noted that the likelihood of so many different factual circumstances arising prevents the drafting of precise rules regarding whether particular efforts by a party will be related expenditures on behalf of candidates — one of the most important questions arising under Act 64. See id.
 
 
 438
 All of these issues are serious, bristling with First Amendment implications, and their resolution will oft-times award an election to one candidate rather than another. If a party's poll is deemed a related expenditure on behalf of a candidate for the House, most or all of that candidate's expenditure limits for two elections may be exhausted. If a particular activity by an incumbent legislator is deemed an expenditure, rather than the performance of an official duty, that legislator may be barred from driving the family automobile to the local town green to make a speech during the campaign. If the activity is not an expenditure, the incumbent legislator may be allowed to engage freely in very helpful electoral activities that are denied to his or her opponent. If a candidate has a supporter who is a lawyer and whose professional services are not deemed related expenditures, that candidate will have a great advantage over another whose supporters are not lawyers, including the ability to bring litigation against the opponent that will exhaust the opponent's campaign funds. A ruling allowing lawyers to contribute professional services without counting such services as contributions or related expenditures is hardly out of the question under Act 64, even though lawyers are not less apt than other citizens to seek favors from elected officials for themselves or their clients.
 
 
 439
 The Secretary of State's opinions allowing partners to make double donations — once by the partnership, once by the individual partners — and endorsing the legality of "pass-the-hat" fundraisers in which donors are allowed to remain anonymous and on the honor system as to how much they give are only the first examples of how Act 64 will come to mean what the Secretary of State and Vermont courts say it means. See 2001 Guide, supra. Mileage is now computed at 31¢ no matter what the price of gas. See 2001 Memorandum, supra. Such uncabined discretion cannot be squared with the First Amendment's requirements that speech be regulated according to spelled out and precise criteria.
 
 
 440
 Equally important, such discretion cannot be squared with increasing confidence in government, which, in enforcing Act 64 against those running for government office, will necessarily appear inefficient and arbitrary. Only an organ of government can administer and interpret these laws. However, that interpretation consumes time when time is of the essence[30]—Appendix A is a letter dated December 3, 1999, responding to an inquiry dated October 8 — and is susceptible to colorable claims of partisan influence.
 
 
 441
 In Vermont, the purported author of Act 64 was denied public financing because his party took a poll that, if attributed to his candidacy, would be a related expenditure causing him to exceed the maximum contribution and expenditure limits for candidates eligible for public financing. See Ross Sneyd, Progressives' Poll Raises Question About Public Financing, Associated Press, Feb. 21, 2002 (describing Anthony Pollina's violation of the campaign finance law). The Democratic party then objected to his receipt of public financing. See Ross Sneyd, Democrats Ask that Pollina Be Disqualified from Public Financing, Associated Press, Feb. 28, 2002. The Secretary of State and the Attorney General, both Democrats, undertook an investigation into the activities of the candidate's party. See Ross Sneyd, Progressives Sue to Ensure Public Financing for Pollina, Associated Press, Mar. 12, 2002; see also Ross Sneyd, Pollina's Lawyer Says He Won't Cooperate with AG's Probe, Associated Press, Mar. 22, 2002. The candidate was then quoted as saying, quite understandably, "You have the Democratic Party asking the Democratic Attorney General based on an opinion of a Democratic secretary of state to investigate a Progressive Party candidate." Christopher Graff, Anthony Pollina's Campaign Demeans Legislators, Associated Press, Mar. 17, 2002. A system in which partisan politicians investigate and make rulings on how vigorous a campaign their opponents may wage is not a confidence-builder.
 
 VI. THE REMAND ON NARROW TAILORING
 
 442
 My concerns over the remand to the district court for various "findings" are fourfold. First, my colleagues' opinion draws no distinction between legislative facts, mixed questions of legislative fact and law, adjudicative facts, and issues of law — on this record distinctions of crucial importance to any further proceedings in the district court and in this court. Second, it is unclear what parts of Act 64 my colleagues deem to be restrictive, and to what degree, thereby hampering if not precluding any comparison with alternatives. Third, vastly less restrictive alternatives with no constitutional implications are so obvious that a remand is unnecessary. Fourth, on many issues, the forum that needs to be heard from is not the district court but the Vermont legislature.
 
 
 443
 a) Legislative Facts, Adjudicative Facts, and Mixed Issues of Fact and Law
 
 
 444
 One of the difficulties I had with my colleagues' earlier opinion — but did not elaborate in my earlier dissent — was that it did not make clear which facts are of a legislative nature — facts that determine the appropriateness of a rule of law — and which facts are of an adjudicative nature — facts that affect the legal relations of the particular parties to a particular lawsuit. See Fed.R.Evid. 201, Notes of Advisory Committee on Rules (explaining the "fundamental differences between adjudicative facts and legislative facts. Adjudicative facts are simply the facts of the particular case. Legislative facts, on the other hand, are those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body."); see also Langevin v. Chenango Court, Inc., 447 F.2d 296, 300 (2d Cir.1971) ("Adjudicative facts" are "facts about the parties and their activities, businesses, and properties, as distinguished from general facts which help the tribunal decide questions of law and policy and discretion.") (Friendly, C.J.) (internal quotation marks and citation omitted). Nor did my colleagues' earlier opinion separate factual matters from mixed issues of legislative fact and law. The remand for "fact finding" has now pushed these issues to the forefront.
 
 
 445
 1) The Distinction Between Legislative and Adjudicative Facts
 
 
 446
 I recognize that the distinction between legislative and adjudicative facts is no bright line and is often judicially finessed. See Kenneth Culp Davis, An Approach to Problems of Evidence in the Administrative Process, 55 Harv. L. Rev. 364, 403 (1942) ("courts have generally treated legislative facts differently from adjudicative facts, even though the distinction has not been clearly articulated"). In the present case, however, the perceived need for a remand appears to be based on the conviction that adjudicative facts need to be resolved. In my view, that is not so.
 
 
 447
 Legislative facts are factual assumptions or conclusions that cause a court to choose one rule of law rather than another or to hold that certain circumstances meet a particular legal test. See Fed.R.Evid. 201, Notes of Advisory Committee on Rules. Legislative facts thus govern all future cases implicating the particular rule of law or its application and are not subject to future challenge by a litigant save by an attempt to have the rule of law overruled. My colleagues' repeated reliance on the existence of an "arms race," their adoption of the "level of notice"/"effective advocacy" test defined by average past expenditures, and their conclusion that Act 64's expenditure limits meet that test, all rest on factual assumptions about candidate spending. These assumptions are quintessential legislative facts.
 
 
 448
 Determination of legislative facts is not governed by the Federal Rules of Evidence. See Fed.R.Evid. 201, Notes of Advisory Committee on Rules. Nor are they subject to clearly erroneous review under Fed.R.Civ.P. 52. See In re Asbestos Litigation, 829 F.2d 1233, 1252 n. 11 (3d Cir. 1987) (citing Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986)). Instead, they are subject to de novo review, and appellate courts not only can find legislative facts on their own but they also usually do so. See Davis, supra, at 403-07 (describing Supreme Court and other cases in which appellate courts found legislative facts). The practice is so common that what technically might be called mixed issues of legislative fact and law are often treated simply as issues of law. Whether expenditure limits set at the level of average past spending are sufficient for "effective advocacy," for example, is just such an issue.
 
 
 449
 Adjudicative facts determine the legal relations of particular parties with regard to particular issues of controversy. Adjudicative facts do not govern the results of future litigation — save for the application of doctrines of preclusion such as res judicata and collateral estoppel. Determination of these facts is governed by the Federal Rules of Evidence and may be based on credibility determinations. Significantly, adjudicative facts are subject to clearly erroneous review on appeal under Rule 52. Fed.R.Civ.P. 52(a). Examples of adjudicative facts are whether one party struck another by driving an auto through a red light.
 
 
 450
 2) Remand for "Findings" of Legislative Fact and of Law
 
 
 451
 In my view, my colleagues fail to observe the adjudicative/legislative distinction because they view legislative facts relating to the constitutionality of Act 64 as the sole province of the district court, while an appellate court may address only the legal issues arising from these facts. As their opinion expressly states, "[A]lthough we do not question the validity of the factual findings developed by the legislature in support of Act 64, our system of judicial review provides plaintiffs the opportunity to present competing evidence, assigns to the District Court the responsibility for making findings of fact and conclusions of law after weighing the evidence, and leaves to the Court of Appeals the independent responsibility to assess the legal significance of these factual findings." Maj. Op. at 114 (footnote omitted). As a result, the remand in the present case seeks findings on legislative facts, mixed issues of legislative fact and law, and even pure questions of law.
 
 
 452
 My colleagues remand for findings on whether higher limits would achieve the anti-corruption and anti-time consumption goals and "impinge less on the First Amendment rights of candidates and voters." Id. at 135-36. This inquiry is described by them as a "fact intensive question of whether that point is set in Act 64 or appreciably higher" and apparently is viewed as an adjudicative fact as to which the district court may make credibility determinations that are binding on this court unless clearly erroneous. See id. at 136; Fed.R.Civ.P. 52(a). However, the issues are clearly ones of mixed legislative fact and law that can and should be decided by this court.
 
 
 453
 It is undisputed that: (i) the view that Act 64's limits will not substantially affect candidate spending is arrived at only by averaging in spending in essentially non-contested elections and using a definition of spending much narrower — one that excludes all related expenditures by individuals and political parties — than that used by the Act; and (ii) even under the narrow definition, the limits are far below spending in actual contested elections in Vermont, including spending by third party candidates. All that is left is the legal question of the sufficiency of the governmental interest in justifying the restrictions on speech.
 
 
 454
 My colleagues also remand for what they describe as "fact-finding on [the] issues" of
 
 
 455
 (1) what alternatives were considered by the legislature, including both alternative types of regulations and alternative amounts for the limits; (2) why these alternatives were rejected; (3) whether and how these alternatives would impinge less on First Amendment rights; and (4) whether the alternatives would be as effective as the mandatory spending limits in advancing the time-protection and anti-corruption interests.
 
 
 456
 Maj. Op. at 136 (footnote omitted). None of these issues involves adjudicative facts. Issues (3) and (4) are clearly questions of mixed legislative fact and law, if not solely of law, while issues (1) and (2) involve determinations of legislative history.
 
 
 457
 For yet another example, footnote 23 of my colleagues' opinion indicates that "findings" are to be made on remand as to a pure matter of law: whether required reports of spending by candidates for past elections included "related expenditures" as defined in Act 64, i.e. including spending by individuals and political parties. Id. at 135 n. 23. This is an issue of Vermont law over which there is no dispute. Prior Vermont law never mentioned "related expenditures"; the term was first introduced and defined in Act 64; before that there were contribution limits on individuals, and political parties could give and spend freely; there are, therefore, no "facts" to find.
 
 
 458
 In the same footnote my colleagues also ask for findings with regard to whether "legal and record-keeping costs of compliance with [Act 64] will also inflate future candidates' expenditures." Id. My colleagues appear to concede that such costs are expenditures and are therefore limited by Act 64. What more need be known? There are no adjudicative facts at issue here. The Secretary of State has advised candidates to obtain legal advice, and any legal or record keeping costs will drastically affect, say, a House candidate who must wage both a primary and general election contest with a total two-year expenditure limit of $2,000. The trees in Vermont may be beautiful, but needed professional services do not grow on them.
 
 
 459
 My colleagues now concede that this court will apply de novo review to legislative facts found by the district court. Id. at 135 n. 24. However, my colleagues make no attempt to inform the parties and the district court of what findings are to be of legislative fact and what are to be of adjudicative fact. For example, my colleagues remand for "fact-finding" on the types and amounts of limits rejected by the Vermont legislature and the reasons for rejection. Id. at 136. I see no comparative advantage in the district court's researching this question of legislative history unless it is contemplated — and I assume it is not — that the district court will take testimony on the state of mind of the then-legislators, resolve credibility issues, and find facts on these issues.
 
 
 460
 My colleagues do agree that a distinction between legislative and adjudicative facts exists and that legislative facts are reviewed de novo while adjudicative facts are reviewed under the "clearly erroneous" standard. However, they never identify which of the many "findings" to be made on remand are legislative and which are adjudicative, and, therefore, what rules to apply to each. This failure will greatly complicate further proceedings.
 
 
 461
 In my view, virtually all the issues remanded are ones of legislative fact or of law, and, therefore, there is no reason for a remand. Moreover, if my colleagues believe that further findings of legislative fact are needed, they can request briefing of the relevant issues by the parties, rather than returning questions of law to the district court only to have us later resolve them de novo.
 
 
 462
 b) Failure to Define What is Restrictive About Act 64
 
 
 463
 Clarification is also needed with regard to the inquiry on remand as to whether there are less restrictive alternatives available. As I said at the outset of this dissent, my colleagues still fail to analyze much of what Act 64 actually says and does, and, as a result, their opinion contains few descriptions of significant political speech that they deem to be restrained by Act 64. An inquiry into less restrictive alternatives requires some identification and discussion of those restrictions for which an alternative might be substituted. That is to say, an available legal rule may be deemed less restrictive only after its restrictions are compared with the restrictions of an existing legal rule. Colorado II, 533 U.S. at 464-65, 121 S.Ct. 2351 (comparing restrictiveness of existing limitation on coordinated expenditures with available legal rule limiting contributions alone). However, my colleagues' opinion neither acknowledges nor denies that Act 64: intrudes on grassroots activities of ordinary citizens, restricts the press' editorializing or reporting on political events, disadvantages candidates who must run in two elections rather than one, and so on and so on.
 
 
 464
 The lacunae in my colleagues' opinion are nowhere better exemplified than by the remand with regard to related expenditures. Maj. Op. at 137. The two sentences directing this remand precede a discussion upholding Act 64's treatment of related expenditures as contributions. That discussion notes that limits on related expenditures are designed to avoid evasions of the limits on contributions. Id. at 145-46. For example, if someone can both lend office space to a candidate and make a cash contribution at the maximum limit, that person can evade the limits.
 
 
 465
 Before this discussion, their opinion states "On remand, independent of the constitutionality of expenditure limits, the district court should evaluate [the constitutionality of treating related expenditures as candidate expenditures]." Id. at 137. Of course, one reason the related expenditure provision was included in Act 64 was that cash or in-kind expenditures by individuals coordinated with a campaign are an obvious method of evading candidate expenditure limits as well as contribution limits. To return to the prior example, if a person lends office space to a candidate, the cost must be treated as an expenditure subject to the limits on campaign expenditures, or those limits can be evaded. Because Act 64 reflects the view that expenditure limits cannot be effective without treating individual and party related expenditures as expenditures by the candidates, it is enigmatic, to say the least, to ask the district court to evaluate "this issue ... independent of the constitutionality of expenditure limits." My colleagues appear to be troubled by Act 64's limits on related expenditures but fail to describe or discuss the reasons for their disquiet. Such a description or discussion would surely be helpful to the district court and the parties.
 
 
 466
 c) The Existence of a Less Restrictive Alternative
 
 
 467
 I turn now to the question of whether, if Act 64 contains the restrictions described in this dissent, there are less restrictive alternatives. My colleagues frame this issue as an inquiry into what alternatives were actually considered by the Vermont legislature. See Maj. Op. at 135. That is not the proper inquiry.[31] A state may not impose laws suppressing political speech and then successfully defend them on the ground that it was ignorant of alternatives. Rather, the issue is the existence of less restrictive alternatives, not whether a particular legislature considered them. See Boos v. Barry, 485 U.S. 312, 329, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988); Wygant v. Jackson Bd. of Education, 476 U.S. 267, 280 n. 6, 106 S.Ct. 1842, 90 L.Ed.2d 260 (noting that the term "narrowly tailored" "require[s] consideration of whether lawful alternative and less restrictive means could have been used").
 
 
 468
 Moreover, when properly framed, the answer to the inquiry is so self-evident in the present case that a remand is unnecessary: a combination of public and private financing with low contribution limits is infinitely less restrictive — is actually speech supportive — and accomplishes all of the ostensible purposes of Act 64's expenditure limits. Public financing of campaigns is of unquestioned validity, see Buckley, 424 U.S. at 57, n. 65, 85-109, 96 S.Ct. 612, and, combined with low limits on private contributions, can guarantee a critical mass of funds to all candidates, thereby freeing candidates of improper influence from particular donors and relieving candidates of the need for extensive fund-raising. Such a combination of public and private financing with low contribution limits would impose only a modest burden on taxpayers, who, we are told, are anxious to eliminate undue influence by donors.
 
 
 469
 My colleagues suggest in a footnote, see Maj. Op. at 136 n.25, that the conclusion that a combination of public and private financing would satisfy the goals of Act 64 is neither self-evident nor supported by the record. To the contrary, if any conclusion is established, it is this one. As my colleagues' opinion repeatedly states, low contribution limits further the anti-corruption goal. And, as the Vermont legislature has stated, public financing (provided in gubernatorial races) furthers both the anti-corruption and time protection goals. 1997 Vt. Laws P.A. 64 (H. 28) (findings nos. 11 and 12). Public funding money does not come from private sources, is quickly obtained, and lessens the need for private money because it is as negotiable.
 
 
 470
 The problem with this speech-supportive alternative is not its dubious merit but the fact that incumbent legislators know that a combination of public and private financing would vastly increase the number and viability of challengers. The dark secret of campaign finance reform is that its proponents avoid this alternative in a Faustian bargain with incumbent legislators who reject it out of self-interest. Incumbents prefer speech-limiting expenditure limits, a preference that will gain in intensity if federal courts will allow such limits to be based on past average spending and to be upheld so long as they do not drive challenger campaigns below "the level of notice."
 
 
 471
 d) Remanding to the Wrong Forum
 
 
 472
 As I have argued above, even if expenditure limits were not per se illegal, the limits set by Act 64 are so ridiculously low that they fail under any reasonable standard. In fact, they are so low that they would diminish spending by third party candidates, not generally regarded as generators of "arms races," and would limit even modest grassroots activities by supporters. Similarly, the restrictions on spending by local party affiliates fail because no reason has been offered to justify them. Holding the expenditure limits and the restrictions on the financial organization of political parties unconstitutional would send these issues back for reconsideration to the proper forum — the Vermont legislature.
 
 
 473
 My colleagues show great deference to the Vermont legislature and to the various legislative proponents of Act 64 whose views are in the record. This deference is entirely undeserved. There is not the slightest evidence that either the legislature or those proponents ever examined the details of the Act or how they impact those ordinary political activities that are indispensable to democratic rule. Consequently, the legislators never weighed Act 64's costs in suppressed activity. There is no evidence of any discussion of, inter alia, the effects on grassroots activity, the two-year cycle, the effect on the press, the costs of legal services to candidates, or the radical restructuring of political parties.
 
 
 474
 In fact, their own testimony suggesting that "meet and greet events" such as "spaghetti suppers," "little parties" for "150 people" to which "a couple hundred people" are invited by mail, booths at county fairs, barbecues, and op-ed articles in the press are campaigning methods not involving Act 64's expenditure limits, see supra Part II(b), itself reflects an awesome ignorance of Act 64's provisions. Moreover, it is certainly hard to find any explanation other than ignorance of the contents of Act 64 for the fact that the executive director of the Vermont Democratic party challenged, as harmful to grassroots activities, the ruling by the Secretary of State that Act 64's limits on contributions to parties treat all party affiliates as a single unit, see Secretary of State Being Criticized for Fund Raising Ruling, Associated Press, May 28, 1999, even though the ruling simply followed the plain language of the Act.
 
 
 475
 The lobbyist who secured passage of Act 64, who has been described as its author, and who is quoted at great length in my colleagues' opinion, has since brought an action in the district court to have the treatment of related expenditures declared unconstitutional as infringing on the (his) right to engage in political activities. See Vermont Reformer Says Law He Authored Is Unconstitutional, Political Finance, The Newsletter, March, 2002 (describing Anthony Pollina's lawsuit to have Act 64 ruled unconstitutional); Ross Sneyd, Progressives Sue To Ensure Public Financing for Pollina, Associated Press, March 12, 2002 (noting that Anthony Pollina calls his lawsuit "ironic"); see also Complaint at 1, Pollina v. Markowitz, No. 2:02-CV-63 (D.Vt. Mar. 11, 2002) ("Plaintiffs claim that certain provisions of Act 64 violate their First Amendment free speech and association rights, do not serve compelling state interests, and violate equal protection and due process of law, both facially and as applied.").
 
 
 476
 Officeholders have filed disclosure forms that indicate a continuing lack of knowledge of the requirements of Act 64, in particular the need to record and disclose mileage and the value of office space and outside professional services. See, e.g., Campaign Finance Report of William Doyle, Dec. 16, 2002 (listing no mileage expenses for himself or any supporters, or any value derived from use of office space, computers, utilities, etc., or any outside legal or accounting services); Campaign Finance Report of William Doyle, Sept. 25, 2002 (same); Campaign Finance Report of William Doyle, Oct. 25, 2000 (same); Campaign Finance Report of Anthony Pollina, Dec. 16, 2002 (listing no mileage expenses for any supporters or any value derived from use of office space, computers, utilities, etc., or any outside legal or accounting services); Campaign Finance Report of Jeb Spaulding, Dec. 15, 2002 (same); Campaign Finance Report of Deborah Markowitz, Dec. 16, 2002 (listing no expenses for value of office space, computers, utilities, basic office supplies, etc., or any outside legal or accounting services); Amended Campaign Finance Report of Deborah Markowitz, Oct. 29, 2002 (same); Campaign Finance Report of Deborah Markowitz, Dec. 18, 2000 (same). The actual spending by other proponents of Act 64 also belies their opinions as to the reasonableness of Act 64's limits. See supra, Part IV(b)(1)(C) (describing Act 64 proponents who exceeded its limits in past elections).[32]
 
 
 477
 Deference to a legislative judgment is due when some minimal effort has been made by legislators to weigh the relevant factors and strike a minimally informed balance. There is no evidence of any such legislative effort with regard to Act 64's actual effect on political activity.
 
 
 478
 Even under my colleagues' legal theory, therefore, the Act's limits on expenditures must be struck down as well below any reasonable constitutional standard, and the limits on local party affiliates must be invalidated for the lack of any proffered justification. Such a ruling would leave the Vermont legislature in a position to deliberate on the full ramifications of its actions in considering new legislation but still free to pursue it. See Quill v. Vacco, 80 F.3d 716, 742 (2d Cir.1996) (Calabresi, J., concurring) ("no court need or ought to make ultimate and immensely difficult constitutional decisions unless it knows that the state's elected representatives and executives — having been made to go, as it were, before the people — assert through their actions (not their inactions) that they really want and are prepared to defend laws that are constitutionally suspect"), rev'd, 521 U.S. 793, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997); United States v. Then, 56 F.3d 464, 466 n. 1 (2d Cir.1995) (Calabresi, J., concurring) ("when factual developments have made a law's prior justification constitutionally invalid, it is up to the legislature to decide whether to advance another state interest in support of that law") (citing Abele v. Markle, 342 F.Supp. 800, 810-11 n. 18 (D.Conn.1972) (Newman, J., concurring), vacated, 410 U.S. 951, 93 S.Ct. 1412, 35 L.Ed.2d 683 (1973)); Tunick v. Safir, 209 F.3d 67, 74 (2d Cir.2000) (implying that state suicide statute could have been interpreted not to ban assisted suicide because "the New York Court of Appeals had never clarified, and the legislative history cast some doubt upon, the question of whether the New York ban on assisted suicide, first enacted in 1828, was ever meant to apply to a treating physician") (internal quotation marks omitted).
 
 VII. CONCLUSION
 
 479
 In holding, with only one dissenting vote, that limits on candidate expenditures are unconstitutional, Buckley simply followed the mainstream First Amendment jurisprudence that is applied to communicative activity of far less constitutional significance than political speech. See, e.g., Stanley, 394 U.S. at 567 (disallowing speculative governmental interest in banning obscene material as justification for statute restricting nonpolitical speech); Smith v. California, 361 U.S. 147, 151, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959) (applying "stricter standards" in statutory scrutiny where statute has "a potentially inhibiting effect on speech"). That jurisprudence calls for scrutiny that does not take unquestioningly and at face value the claims of a law's proponents without actually examining the law. See Buckley, 424 U.S. at 40-41, 96 S.Ct. 612 (stating that "[b]efore examining the interests advanced" in support of legislation, "[c]lose examination of the specificity of the statutory limitation is required where, as here, the legislation imposes criminal penalties in an area permeated by First Amendment interests"); id. at 41, 96 S.Ct. 612 ("The test is whether the language of [the statute] affords the `[p]recision of regulation [that] must be the touchstone in an area so closely touching our most precious freedoms.'") (quoting NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)). That jurisprudence demands that a law restricting speech, including editorializing speech by the press, spell out what it permits and what it prohibits in intelligible detail, see Forsyth, 505 U.S. at 131, 112 S.Ct. 2395, and not leave vast areas of discretion to those who must implement it. See Thomas, 534 U.S. at 323, 122 S.Ct. 775. That jurisprudence denies to government "the power to determine that spending to promote one's political views is wasteful, excessive, or unwise," Buckley, 424 U.S. at 57, 96 S.Ct. 612, and "to control ... the quantity and range of debate on public issues in a political campaign," id. Under that jurisprudence, Act 64's limits on expenditures and party financing cannot be upheld. Under that jurisprudence, forcing a reorganization of political parties that reduces the autonomy of local party committees for no articulated reason is unconstitutional.
 
 
 480
 If one looks at what Act 64 says instead of what its proponents say about it, it is quite apparent that the Act does indeed embody the theory of the defense witness who opined that government may regulate political speech the way it regulates electric companies, see supra Part III(a). Although Act 64 is said to be aimed at reducing the corrupt influence of "special interests" while enhancing the role of "ordinary citizens," it substantially disables ordinary citizens from meaningful participation in the political process. It cripples party organizations, particularly at the local level, and prevents individual grassroots activities on behalf of candidates, while organized economic interests retain the ability to engage in costly independent political advocacy. Moreover, the Act distinctly benefits the "special interest" that enacted it: incumbents.
 
 
 481
 In the beginning of this dissent, I quoted Justices Brandeis and Black on the dangers of high-minded assaults on liberty. In waging its broad attack on political activity in pursuit of its goal of transferring political power from "special interests" to "ordinary citizens," Act 64 also exemplifies the wisdom of another, albeit less August, source, Walt Kelly: "We have met the enemy, and he is us."
 
 APPENDIX A
 State of Vermont
 Office of the Secretary of State
 December 3, 1999
 Representative Terry Bouricius
 56 Booth Street
 Burlington, VT 05401
 Re: Your e-mail of October 8, 1999
 
 482
 Dear Representative Bouricius,
 
 
 483
 Please accept my apology for the delay in responding to your questions. The review of my proposed opinion took longer than anticipated. This letter is in response to the two questions which you raised in your e-mail. I will restate the questions to make sure we understand the fact patterns which I am addressing.
 
 
 484
 1. Can a political party which has no "candidates" as defined in 17 V.S.A. § 2801(1) at the time the proposed poll is conducted, pay in excess of $500 for the conducting of a professional poll to seek potential voters opinions about selected potential candidates, both Progressive and otherwise, and share the poll results with potential candidates without the polling expense and associated political party activities triggering either a person named in the poll becoming a "candidate" as defined in § 2801(1), nor disqualifying a person named in the poll from seeking public financing from the Vermont Campaign Fund, if a person named in the poll later decided to become a candidate?
 
 
 485
 The conducting of a poll by a political party to "test the waters" for various potential candidates will not trigger a "candidacy" for a person named in the poll even if more than $500 per potential candidate is expended by the party for the poll so long as only the general results are used for recruiting, media releases, or other generalized activities. The conducting of the poll itself falls within the types of activities generally pursued by a political party for its overall organization, planning, and strategy. The political party can conduct a poll and can make the general results or the poll public without triggering any candidacies. The party can use the results of the poll in a general way for recruiting candidates. (For example, telling John Jones that he was the favorite in a potential race with 3 other names, would be general information which can be used for recruiting.) However, as I will discuss below, the acceptance of detailed data and information from the poll by an individual will trigger a candidacy if the cost of the poll which is attributable on a pro rata basis to the provision of specific information and data to a particular candidate exceeds $500.
 
 
 486
 The Vermont campaign finance law does not specifically address polling activities and expenses. The definition of "candidate" in 17 V.S.A. § 2801(1) states that "an affirmative action" of "(A) accepting contributions or making expenditures of over $500" will trigger a candidacy. The definition of contribution includes "a gift of money or anything of value." It is when an individual accepts the detailed data and information gained from the professional poll, that "a gift of anything of value" is accepted, and if the specific information given to an individual cost over $500 to produce on a pro rata basis, then a candidacy will be triggered.
 
 
 487
 Because it is the acceptance of the gift of detailed data from the poll, not the polling itself, which can trigger a "candidacy," the political party could conduct a professional poll at any time but wait until after February 15, 2000 to offer any detailed data or information from the poll to an individual in order to avoid the prohibitions of the Vermont campaign fund (public financing). The law states that if a person becomes a candidate before February 15 of the general election year, that person shall not be eligible for Vermont campaign finance grants, 17 V.S.A. § 2853(a). Therefore, if before February 15th, a person accepts detailed data from a professional poll which is a gift of "anything of value" which cost over $500 to produce on a pro rata basis, the person has become a candidate by accepting a contribution totaling $500 or more, and will not be eligible for the Vermont campaign finance grants.
 
 
 488
 In summary, the political party can conduct polls and make the general results of the poll public without triggering any candidacies. If specific data and information is accepted by an individual which cost over $500 to produce on a pro rata basis, a candidacy is triggered. If the candidacy is triggered before February 15, 2000, the candidate will not be eligible for campaign finance grants. A political party and any individual considering accepting the detailed results of a poll should consult their own attorney to discuss specific fact patterns and how the law would be applied to those specific facts.
 
 
 489
 2. Can a political party spend in excess of $500 to arrange and sponsor dinners, other events, or party mailings for the purpose of educating party supporters or potential contributors about Vermont campaign finance grants and the need for "qualifying contributions"? Can the party make other preparations to assist a future candidate in gathering "qualifiers" for use after February 15, 2000?
 
 
 490
 Your question leaves room for many fact patterns so we will address three possible scenarios for such preparations, including dinners, events or mailings which we do not believe will trigger a candidacy and then discuss some additional considerations that might raise issues in the mind of an opposing candidate who could raise the issue using the process in 17 V.S.A. § 2809(e).
 
 
 491
 A. If the proposed events are for the sole purpose of educating voters about the need for many small contributors in order to qualify for Vermont campaign finance grants, to explain the importance of party organization, or to discuss any other topics related to general campaigning, the expenditures clearly would not trigger a candidacy.
 
 
 492
 B. If the party conducts mailings in which individuals are named or discussed as potential candidates because the party is hoping to generate interest in candidacies, but the individuals do not have knowledge of the fact that their names are mentioned, and the primary thrust of the activities are party organization and education of voters about the requirements of the campaign finance grant law, then the mailings would not trigger a candidacy.
 
 
 493
 C. If the party conducts other activities to develop a database of persons who might be willing to contribute "qualifying contributions" or solicits conditional pledges if an individual decided to run (see Secretary of State Letter of July 6, 1999), these activities would not trigger a candidacy.
 
 
 494
 D. However, if the party conducts dinners, events or mailings or solicits pledges in which potential candidates are introduced and discussed, and the potential candidates have participated in the planning of the events or given approval to them, the potential candidates will need to evaluate when or whether they might cross the line into candidacy by either accepting contributions or making expenditures of $500 or more by way of "accountability of related expenditures" as described in 17 V.S.A. § 2809. We cannot anticipate every possible fact pattern that may develop as the party and potential candidates proceed, so we merely want to raise the prospect that at some point the activities may raise questions in another candidate's mind and the opposing candidate may use § 2809(e) to seek findings and a determination from a court. Each party and potential candidate should review proposed activities with their own counsel to examine the particular facts to evaluate whether they may fall into the category of activities addressed in 17 V.S.A. § 2809 as "related expenditures" and possibly trigger a candidacy based upon accountability for a related expenditure of $500 or more.
 
 
 495
 This letter represents my opinion on the issues which you have raised. You may seek your own counsel to advise you in these matters. Assistant Attorney General Michael McShane has reviewed this advisory opinion on behalf of the Office of the Attorney General and that office concurs with this opinion. If you have any questions please contact me at 828-2304 or kdewolfe@sec.state.vt.us.
 
 
 496
 Sincerely,
 
 Kathleen S. DeWolfe
 Director of Elections and Campaign Finance
 
 
 Notes:
 
 
 [1]
 Act 64 contains the following pertinent provisions. It states, by way of definition:
 "Political party" means a political party organized under chapter 45 of this title or any committee established, financed, maintained, or controlled by the party, including any subsidiary, branch or local unit thereof and including national or regional affiliates of the party.
 Vt. Stat. Ann. tit. 17, § 2801(5). In particular, it is this definition that governs the application of both the limits on contributions to, and expenditures by, "political parties," e.g. any contribution to an affiliate of a party is a contribution to all affiliates and the state party.
 The Act further provides:
 Candidates who have made expenditures or received contributions of $500.00 or more and political committees shall be subject to the following requirements:
 (1) All expenditures shall be paid by check from a single checking account in a single bank publicly designated by the candidate or political committee.
 (2) Each candidate and each political committee shall name a treasurer, who may be the candidate or spouse, who is responsible for maintaining the checking account.
 Vt. Stat. Ann. tit. 17, § 2802.
 Each political committee and each political party which has accepted contributions or made expenditures of $500.00 or more shall register with the secretary of state stating its full name and address, the name of its treasurer, and the name of the bank in which it maintains its campaign checking account within ten days of reaching the $500.00 threshold.
 Vt. Stat. Ann. tit. 17, § 2831(a).
 I do not read these provisions to prevent local affiliates from having separate bank accounts. I do read them, however, to require that all contributions to parties go initially to the single checking account mentioned in Section 2831 for purposes of reporting and enforcing the limits on contributions to parties. Withdrawal from that checking account must be only with the consent of those authorized to sign checks.
 
 
 [2]
 The desire to challengeBuckley, even at the cost of living under a bad law, is exemplified by an astonishing statement of Vermont's Secretary of State. In transmitting to the Vermont legislature a review of the operation of Act 64, she cautioned against any amendment or repeal that would render the present litigation moot, even if the legislature thought the amendment or repeal in the public interest, because such an action would "frustrat[e] the express legislative goal of giving the Supreme Court an opportunity to reevaluate its decision in Buckley v. Valeo." See 2001 Memorandum, supra.
 
 
 [3]
 Surprise at the actual provisions of campaign finance laws is as old as the laws themselves. A veteran civil-liberties lawyer tells the following story. In the summer of 1972, three old-time dissenters came into the offices of the New York Civil Liberties Union in Manhattan and told an extraordinary story. In May of that year they and a few like-minded others had drafted and sponsored a two-page advertisement that appeared inThe New York Times. The advertisement was sharply critical of Richard M. Nixon, the President of the United States. The ad claimed that President Nixon had authorized the secret bombing of Cambodia, in violation of international law, and should be impeached and removed from office. The ad set forth the text of an impeachment resolution that had been introduced in the House of Representatives and contained an "Honor Roll" listing eight House members who had co-sponsored that resolution. The advertisement cost approximately $17,850, and the ad hoc group called itself the National Committee for Impeachment. Before the ink on the ad was barely dry, the group was sued by the United States Justice Department for running the advertisement.
 When Randolph Phillips, one of the sponsors of the ad, told this story to the lawyers at the New York Civil Liberties Union, we were incredulous. How could a group of citizens be sued by the Federal Government for publishing a criticism of the President of the United States? After all, this was 1972, and First Amendment law seemed at its most vigorous in the protections of public speech, one of the shining legacies of the Warren Court. What possible justification could the government have for suing this small group of protestors? We soon discovered the answer: campaign finance reform." Joel M. Gora, No Law ... Abridging, 24 Harv. J.L. & Pub. Pol'y 841, 842-43 (2001) (reviewing Bradley A. Smith, Unfree Speech (2001)) (footnote omitted). The law in question was the Federal Election Campaign Act of 1971, which defined a political committee as any group that spent more than $1,000 annually "for the purpose of influencing"—language used in Act 64—a federal election and imposed various requirements on a committee's purchase of advertisements relating to a federal candidate. See United States v. Nat'l Comm. for Impeachment, 469 F.2d 1135, 1139 (2d Cir. 1972).
 
 
 [4]
 Because other provisions of Act 64 strike at the heart of the democratic political system, I will note only in a footnote one egregiously overreaching provision. Act 64 requires that all political advertisements identify who paid for them, with an address, and which candidate is benefited. The Secretary of State has sought an exemption from this requirement for buttons and lapel stickersSee 2001 Memorandum, supra. So far, she has been unsuccessful.
 
 
 [5]
 The pertinent provision reads:
 "Expenditure" means a payment, disbursement, distribution, advance, deposit, loan or gift of money or anything of value, paid or promised to be paid, for the purpose of influencing an election, advocating a position on a public question, or supporting or opposing one or more candidates.
 Vt. Stat. Ann. tit. 17, § 2801(3).
 
 
 [6]
 My colleagues assert that the phrase expenditures "for the purpose of influencing an election" was "upheld" against a claim of unconstitutional vagueness by the Supreme Court inBuckley. Maj. Op. at 136 n.26. In fact, what the Court said was virtually the opposite.
 The relevant passage in Buckley addressed a limit "for the purpose of influencing an election" on expenditures by persons who were neither candidates nor political committees. The "for the purpose of . . ." language was modified by the phrase "relative to a clearly identified candidate." Buckley stated that the definition of expenditures was unconstitutionally vague unless the adjectival phrase was construed narrowly to apply only to "communications that in express terms advocate the election or defeat of a clearly identified candidate." 424 U.S. at 44, 96 S.Ct. 612 (expenditure limits apply only "to communications containing express words of advocacy of election or defeat, such as `vote for,' `elect,' `support,' `cast your ballot for,' `Smith for Congress,' `vote against,' `defeat,' `reject'", id. at n. 52, 96 S.Ct. 612; limits struck down on other grounds). As to reporting requirements imposed on persons who were neither candidates nor political committees regarding expenditures and contributions not made to candidates or political committees, the Court also held those to be impermissibly vague unless the phrase "for the purpose of influencing an election" was construed "in the same way" as the aforementioned terms, i.e., to apply only to expenditures and contributions expressly advocating the election or defeat of a clearly identified candidate. Id. at 80, 96 S.Ct. 612.
 Act 64 does not contain the language "relative to a clearly identified candidate," and relevant Vermont authorities have not construed Act 64 in this limited manner, see 2001 Guide, supra. As a result, the holding in Buckley invalidates Act 64's expenditure limits for vagueness.
 
 
 [7]
 The Supreme Court's recent decision inMcConnell did not alter the Buckley analysis. McConnell upheld the phrase "electioneering communication"—where those funding such communications faced restrictions and disclosure requirements—against a challenge of unconstitutional vagueness. The term is defined as "`any broadcast, cable, or satellite communication'" that "`refers to a clearly identified candidate for Federal office,'" is made during certain time periods, and "`in the case of a communication which refers to a candidate other than President or Vice President, is targeted to the relevant electorate.'" McConnell, 124 S.Ct. at 686-87 (quoting 2 U.S.C. § 434(f)(3)(A)(i)). A communication is "`targeted to the relevant electorate'" if it "`can be received by 50,000 or more persons' in the district or State the candidate seeks to represent." Id. In upholding the term "electioneering communication," the Court explained that it held "for the purpose of ... influencing" a federal election unconstitutionally vague in Buckley not because issue advocacy (as opposed to express advocacy) can never be limited, but rather because the limitations on advocacy imposed by that phrase were unconstitutionally vague. Id. at 688. "Electioneering communication," in contrast, could be regulated because it describes only a well-defined subset of issue advocacy. Id. ("In narrowly reading the FECA provisions in Buckley to avoid problems of vagueness and overbreadth, we nowhere suggested that a statute that was neither vague nor overbroad would be required to toe the same express advocacy line."). Another provision upheld in McConnell against a vagueness challenge was similarly specifically defined. Id. at 675 n. 64; 2 U.S.C. § 431(20)(A)(iii) (limits on contributions to fund a "public communication that refers to a clearly identified candidate for Federal office (regardless of whether a candidate for State or local office is also mentioned or identified) and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate)," 2 U.S.C. § 431(20)(A)(iii), not unconstitutionally vague because "[t]he words `promote,' `oppose,' `attack,' and `support' clearly set forth the confines within which potential party speakers must act in order to avoid triggering the provision," McConnell, 124 S.Ct. at 675).
 
 
 [8]
 For example, the central link on the Secretary of State website is entitled "Visit the Secretary's Desk," a section that includes a picture of the incumbent on each pageVermont Secretary of State's Website, at http://www.sec.state.vt.us/secdesk/index.html. This section also houses her "Biography," which includes the following passage:
 As Secretary of State, Markowitz has enhanced the office's services to Vermont's businesses, banks and professionals. She has made customer service a priority and created a state of the art web site to serve the business community. Markowitz has also protected consumers of professional services by reducing the backlog of professional licensing complaints and by starting a public information campaign to inform consumers of their rights to competent professional services. Markowitz has also promoted civics education in Vermont's schools and has encouraged Vermonters to be active participants in democracy by volunteering in town government and by voting.
 Id. at http://www.sec.state.vt.us/secdesk/marko.html.
 The Vermont Attorney General's Office has a similar website. The first page houses a photograph of the incumbent, whose biography page reads as follows:
 Welcome to the Home Page for Vermont Attorney General William H. Sorrell. The Attorney General is the chief law enforcement officer in the state. He is charged with representing the state in all matters in which the state is a party or has an interest. The office of the Attorney General is dedicated to the protection of the health and safety of all Vermonters
 A native and resident of Burlington, Vermont, Attorney General William H. Sorrell graduated from the University of Notre Dame (AB, magna cum laude, 1970) and Cornell Law School (JD, 1974). Bill served as Chittenden County Deputy State's Attorney from 1975-1977; Chittenden County State's Attorney, 1977-78 and 1989-1992; engaged in private law practice at McNeil, Murray & Sorrell, 1978-1989; and served as Vermont's Secretary of Administration, 1992-1997. As State's Attorney, he personally successfully prosecuted several significant matters, including the first case allowing the admissibility of DNA evidence in a Vermont State Court and a ten-year-old homicide in which the victim's body had never been found.
 Governor Howard Dean appointed General Sorrell to fill the unexpired term of now Vermont Chief Justice Jeffrey Amestoy, commencing May 1, 1997. He has enjoyed strong voter support in standing for election in November 1998, 2000 and 2002. His current term of office will expire in January 2005.
 Bill is on the board of the American Legacy Foundation; has served on the Judicial Nominating Board; as president of United Cerebral Palsy of Vermont; secretary of the Vermont Coalition of the Handicapped; and on the board of the Winooski Valley Park District. Bill has recently been elected the President-Elect of the National Association of Attorneys General (NAAG) and will assume the Presidency of that organization for a one-year term beginning in June of 2004. He is chair of the NAAG Tobacco Committee and co-chair of its Consumer Protection Committee. In June of 2003, Bill was selected by his peers from around the country to receive NAAG's Kelley-Wyman Award, given annually to the "Outstanding Attorney General" who has done the most to further the goals of the nation's attorneys general.
 Office of the Vermont Attorney General, at http://www.atg.state.vt.us/display.php?smod=70.
 
 
 [9]
 The pertinent provision reads:
 "Candidate" means an individual who has taken affirmative action to become a candidate for state, county, local or legislative office in a primary, special, general or local election. An affirmative action shall include one or more of the following:
 (A) accepting contributions or making expenditures totalling $500.00 or more; or
 (B) filing the requisite petition for nomination under this title or being nominated by primary or caucus; or
 (C) announcing that he seeks an elected position as a state, county or local officer or a position as representative or senator in the general assembly.
 Vt. Stat. Ann. tit. 17, § 2801(1).
 
 
 [10]
 My colleagues assert that the word "candidate" is not vague because candidates know when they are candidates, and because "the notion that candidates do not know when they are candidates is belied by the specificity of the provision itself." Maj. Op. at 136 n.26. The issue, however, is not one of notice but one of enforcement. The question is not whether a candidate knows when he or she is a candidate, but what acts, or in the words of Act 64, "affirmative action[s]," will be deemed by Vermont authorities to trigger expenditure limits for purposes of the statute. Resolution of this question on a case-by-case basis ultimately rests within the discretion of some body external to the statute, whether it be the courts or the Secretary of State
 
 
 [11]
 The pertinent provision reads:
 "Contribution" means a payment, distribution, advance, deposit, loan or gift of money or anything of value, paid or promised to be paid to a person for the purpose of influencing an election, advocating a position on a public question, or supporting or opposing one or more candidates in any election, but shall not include services provided without compensation by individuals volunteering their time on behalf of a candidate, political committee or political party. For purposes of this chapter, "contribution" shall not include a personal loan from a lending institution.
 Vt. Stat. Ann. tit. 17, § 2801(2).
 
 
 [12]
 The pertinent provision reads:
 For the purposes of this section, a "related campaign expenditure made on the candidate's behalf" means any expenditure intended to promote the election of a specific candidate or group of candidates, or the defeat of an opposing candidate or group of candidates, if intentionally facilitated by, solicited by or approved by the candidate or the candidate's political committee.
 Vt. Stat. Ann. tit. 17, § 2809(c).
 
 
 [13]
 Section 2809(b) reads in full:
 A related campaign expenditure made on a candidate's behalf shall be considered an expenditure by the candidate on whose behalf it was made. However, if the expenditure did not exceed $50.00, the expenditure shall not be considered an expenditure by the candidate on whose behalf it was made.
 Vt. Stat. Ann. tit. 17, § 2809(b).
 
 
 [14]
 Section 2809(d) reads in full:
 An expenditure made by a political party or by a political committee that recruits or endorses candidates, that primarily benefits six or fewer candidates who are associated with the political party or political committee making the expenditure, is presumed to be a related expenditure made on behalf of those candidates. An expenditure made by a political party or by a political committee that recruits or endorses candidates, that substantially benefits more than six candidates and facilitates party or political committee functions, voter turnout, platform promotion or organizational capacity shall not be presumed to be a related expenditure made on a candidate's behalf. In addition, an expenditure shall not be considered a "related campaign expenditure made on the candidate's behalf" if all of the following apply:
 (1) The expenditures were made in connection with a campaign event whose purpose was to provide a group of voters with the opportunity to meet the candidate personally.
 (2) The expenditures were made only for refreshments and related supplies that were consumed at that event.
 (3) The amount of the expenditures for the event was less than $100.00.
 Vt. Stat. Ann. tit. 17, § 2809(d).
 
 
 [15]
 There is an exemption for certain expenses relating to "meet the candidate" events in Section 2809(d)See supra notes 12, 14. Because Section 2809(d) relates generally to activities of political parties and committees and the exemption for meet the candidate events begins with the words "In addition," the exemption may well have been intended to apply only to party or committee-sponsored events. The Secretary of State has indicated that the Attorney General believes it to apply to all such events, however sponsored. See 1999 Memorandum, supra. The Secretary of State's position is unclear. In any event, the Secretary of State has opined that, even with the exemption, Act 64 unduly discourages such events because their costs involve non-exempted expenses. See id.
 
 
 [16]
 Another common form of grassroots activity is the contribution of time and expert services by local professionals to candidates. Here, as is so often the case, Act 64 is ambiguous, but the provision of such services may well be deemed a contribution and related expenditure of some considerable size, particularly if the professional is in a firm that normally restricts the moonlighting of professional services. Indeed, to exempt professionals would be precisely counter to the purpose of reducing the influence of special interests—e.g., clients of lawyers or the lawyers themselves—and the well-to-do.
 
 
 [17]
 For example, the 1974 Federal Election Campaign Act, the subject of the challenge inBuckley, set the limits on expenditures for House of Representative candidates in general elections at $70,000. See 424 U.S. at 55, 96 S.Ct. 612. Adjusted for inflation, this limit was below the amount spent by every successful challenger to a House incumbent in the 1972 election. See Joint Appendix at 269-318, Buckley (Nos. 75-436 and 75-437). Nevertheless, the $70,000 limit was far above the average expenditure by House candidates in 1972, $39,884. See id. at 447.
 
 
 [18]
 When Howard Dean, the Vermont governor whose rallying cry for Act 64 is quoted in the opening paragraph of my colleagues' opinion, ran for the Democratic nomination for President, he rejected public financing so that he could spend unlimited amounts. He made that decision at a time when all of his Democratic opponents were abiding by spending limits—i.e. no "arms race." Although exact numbers are not available, Dean's rivals estimated that he spent as much as $6 million in the neighboring state of New Hampshire. Mike Madden, Democrats Scrambling For Cash As Well As Votes, Gannett News Service, Jan. 31, 2004.
 
 
 [19]
 For example, in the 2000 election, the Democratic Party madecash contributions— not including related expenditures—in the amount of $28,000 to Elizabeth Ready for her campaign for Auditor of Accounts. See Campaign Finance Report of Elizabeth Ready, Dec. 18, 2000. Under Act 64, cash contributions and related expenditures could not have exceeded $400.
 
 
 [20]
 A low level of judicial scrutiny necessarily leaves legislators with discretion to alter campaign finance regulations to affect upcoming elections. We have seen an example of this in New Jersey, where a campaign finance law was deliberately changed in an (unsuccessful) attempt to bolster the candidacy of a new entrant into the race for GovernorSee David M. Halbfinger, Substitute Candidate, on Short Notice, Stakes Claim in Race for New Jersey Governor, N.Y. Times, Apr. 27, 2001, at B5; David M. Halbfinger, New Jersey Legislature Votes To Delay Primaries 3 Weeks, N.Y. Times, Apr. 24, 2001, at B5. In Vermont, Governor Dean sought to use money reserved for the public financing of campaigns—a key part of Act 64—to pay general state expenditures. See State May Tap Campaign Finance Fund to Ease Budget Crunch, Associated Press, Dec. 5, 2001.
 
 
 [21]
 Some may doubt that Act 64 was intended to apply to media editorializing because they deem such editorializing to be constitutionally protected. However, paid advertisements have the same protection as editorials,see Sullivan, 376 U.S. at 266, 84 S.Ct. 710 (holding that "statements [that] would otherwise be constitutionally protected ... do not forfeit that protection because they were published in the form of a paid advertisement"), and if government may constitutionally limit paid advertisements, as Act 64 does, government may limit unpaid endorsements. I, of course, believe that government cannot limit either.
 The reason many campaign finance laws exempt the media is, therefore, not constitutional scruple, but the desire of proponents of regulation for media exposure and support. Such support might not be forthcoming if the media realized the extent to which the theory of such laws is a dagger easily aimed at freedom of the press.
 
 
 [22]
 My colleagues note that one purpose of Act 64's expenditure limits was to reduce the use of short commercials by candidates but, in light of their disposition of this matter, do not reach the issue of whether this concern is sufficiently compelling to justify the legislation. In that regard, I note two things. First, that interest is not compelling. Indeed, the use of law to force candidates to select one medium of advocacy rather than another is an unconstitutional purpose and an additional ground for striking expenditure limits downSee Meyer, 486 U.S. at 424, 108 S.Ct. 1886 ("The First Amendment protects [individuals'] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing."). Second, Act 64 has increased reliance on the media. See 2001 Memorandum, supra; David Gram, Dems Needle Each Other on Spending in Treasurer's Race, Associated Press, May 29, 2002.
 
 
 [23]
 My colleagues cite a Sixth Circuit concurrence for the proposition thatBuckley was "`decided on a slender factual record,'" Maj. Op. at 109 (citing Kruse v. City of Cincinnati, 142 F.3d 907, 919 (6th Cir.1998) (Cohn, J., concurring)). To this they add citations to a treatise, a law review article, and a student note for the proposition that Buckley was decided without a "factual" record. The authors of these works could not have been familiar with the actual record before the Court in Buckley, which contained over 700 pages of statistical and testimonial data and findings of fact, as described below. Those materials are a matter of public record, and the Buckley briefs and oral arguments can be found in a published, two-volume work. 1976 Landmark Briefs and Arguments of the Supreme Court of the United States: Buckley v. Valeo (Phillip B. Kurland and Gerhard Casper, eds. 1977) (hereinafter "Landmark Briefs").
 Buckley involved a major piece of legislation passed after extensive congressional hearings in which critics of the private financing of elections supported their case with massive submissions of evidence. Legislative History of Federal Election Campaign Act Amendments of 1974, The Federal Election Commission (1977). The Supreme Court's decision indicated familiarity with this body of evidence. See, e.g., Buckley, 424 U.S. at 20 nn. 20-21, 96 S.Ct. 612 (giving election-related statistics); id. at 22 n. 23, 96 S.Ct. 612 (same); id. at 26 n. 27, 96 S.Ct. 612 (same). Other materials before the Supreme Court in Buckley include, inter alia, a Joint Appendix of 762 pages, which compiled findings of fact and statistical findings agreed to by the parties, Joint Appendix at 4-698, Buckley (Nos. 75-436 and 75-437), and the district court's findings of fact, id. at 699-753.
 The agreed upon findings of fact included data from opinion polls on public perceptions of politicians, political participation, expenditure limits, and cynicism about government, id. at 160-89, 207-53, detailed catalogs of specific contributions by labor unions, PACs, and business organizations to individual candidates, id. at 55-146, data on expenditures in presidential elections from 1912 to 1968 indicating increasing spending and an increasing cost per vote, id. at 50-51, the cost of postage and newspaper advertising, id. at 29-32, advantages of incumbents over challengers, id. at 16-24, statistics indicating declining voter participation, id. at 9, evidence that candidates generally focused on wealthy donors but that candidates who limited their expenditures had been successful in the past, id. at 256-59, and evidence that elected officials give preferential access to large contributors, id. at 256-57.
 The agreed upon statistical findings included data on and analysis of contributions to, expenditures by, and election results for, all congressional candidates and political committees that filed reports in the 1972 and 1974 elections, id. at 270-440, 571-72, 619-78, votes received by challengers versus incumbents in the 1974 House races, id. at 679-96, evidence of specific individuals and groups donating money to congressional candidates on committees relevant to their businesses, id. at 462-64, 467-72, statistics on independent expenditures, id. at 472-73, data on individuals who contributed large sums to 1972 congressional elections and the Committee to Reelect the President, id. at 479-564, a detailed analysis of the 1972 elections which discussed, among other things, the costs of raising money from large versus small donors and the relationship of expenditures to success in elections, id. at 571-586, and a ten volume study by Common Cause entitled 1972 Congressional Campaign Finances, id. at 698.
 The Buckley district court's findings of fact were based on the testimony and affidavits of fifteen individuals, and basically summarized that testimony. Id. at 699. These findings included opinions on the importance of seed money to challengers, id. at 703, 714, the ways in which expenditure limits favor incumbents over challengers and third party candidates, id. at 727-33, 713-19, indices of success other than winning or losing, id. at 712, and the ability to run a successful campaign with little money, id.
 In Buckley, therefore, the Court had before it extensive hard data regarding contributions to, and expenditures by, candidates for federal offices, as well as a multitude of reflections and opinions on the role of money in campaigns by persons familiar with American electoral politics. Moreover, the defense in Buckley included not only the government but also various groups, including Common Cause and the League of Women Voters, who were allowed to intervene as full parties and were represented by the Washington law firm, Wilmer, Cutler, and Pickering and by Archibald Cox of the Harvard Law School, a former Solicitor General of the United States.
 
 
 [24]
 See Buckley v. Valeo, 519 F.2d 821, 838 (D.C.Cir.1975). The Court of Appeals found that:
 In practice ... candidates were compelled to allot to fund raising increasing and extreme amounts of time and energy. Senator Hollings testified that survival required candidates for national office to "set down a policy where they won't go see people other than those who can give money." Joseph Cole, finance chairman for the Democratic National Committee, testified from his experience in some four or five Presidential campaigns, how dog-tired candidates must arise early in pursuit of large contributions, and continue "all day long and all night long." "[How] much time do you think a Presidential candidate spends on fund raising? ... at least 70 percent of his time, and I think all of his waking hours. It is really demeaning, demeaning to go through it."
 Id. (footnotes omitted).
 
 
 [25]
 See Landmark Briefs: 2 Buckley v. Valeo (Brief for the Attorney General as Appellee and for the United States as Amicus Curiae). The relevant section of the brief stated:
 Fund raising consumes candidate time that otherwise would be devoted to campaigning.
 The court of appeals found support for the statute in the fact that in order to raise large amounts of money to support a campaign, "candidates [are] compelled to allot to fund raising increasing and extreme amounts of time and energy." A past finance chairman of the Democratic National Committee testified that a presidential candidate is required to spend 70 percent of his time in pursuit of funds.
 There is, of course, another side to this problem. If the idea is that expenditure limits relieve the pressure of raising funds, thereby giving the candidate more time to engage in speaking, there may be effective alternative means of accomplishing this end. For example, public financing of election campaigns, quite independent of restrictions upon contributions and expenditures, will provide some relief. A restriction on contributions will increase this effect even without an accompanying restriction on expenditures; once candidates are precluded from drawing upon wealthy donors who command personal attention, campaign fund raising may turn more to direct mail efforts that are sparing of the candidate's time.
 Id. at 434-35 (internal citations and footnotes omitted).
 
 
 [26]
 See Landmark Briefs: 2 Buckley v. Valeo (Brief for Appellee Center for Public Financing of Elections, Common Cause, League of Voters, et al.). The brief stated:
 Th[e] rising thirst for money has forced candidates to divert time and energy to fund-raising activities and away from other activities, such as addressing the substantive issues, that do not fill campaign coffers. Joseph Cole, who was National Finance Chairman of the Democratic National Committee, vividly recounted the effects of the pressure to raise money on candidates in a passage quoted by the court of appeals:
 ". . . I have been close to four or five Presidential campaigns .... I have sat next to the Presidential candidate, who was tired, who was weary and concerned with the issues and not able to handle them, not able to prepare, not able to think about them because he has to go downstairs at 7 in the morning to shake hands with a guy from whom he may get a large contribution."
 "It goes on all day long and all night long, and I was asked at the Senate hearings how much time do you think a Presidential candidate spends on fundraising? And I said at least 70 percent of his time, and I think all of his time, and I think all of his waking hours. It is really demeaning, demeaning to go through it."
 Id. at 97, 96 S.Ct. 612 (footnotes omitted); see also Landmark Briefs: 2 Buckley v. Valeo, (Brief of Senators Hugh Scott and Edward M. Kennedy as Amici Curiae) ("The pressure upon candidates to raise money from large contributors had become so great as to leave them little time for ordinary citizens.") (footnote omitted).
 
 
 [27]
 See Buckley v. Valeo, 424 U.S. at 91, 96 S.Ct. 612 ("In this case, Congress was legislating for the `general welfare' . . . to free candidates from the rigors of fundraisers"); id. at 96, 96 S.Ct. 612 ("In addition, the limits on contributions necessarily increase the burden of fundraising, and Congress properly regarded public financing as an appropriate means of relieving major-party Presidential candidates from the rigors of soliciting private contributions."); S. Rep. 93-689, 5 (cited in above quotations from Buckley, and justifying public financing because "[m]odern campaigns are increasingly expensive and the necessary fundraising is a great drain on the time and energies of the candidates"); see also Buckley, 424 U.S. at 258-59, 96 S.Ct. 612 (White, J., concurring in part and dissenting from the Court's view that the expenditure limits were unconstitutional) ("In another major innovation, aimed at insulating candidates from the time consuming and entangling task of raising huge sums of money, provision was made for public financing of political campaigns for federal office.").
 
 
 [28]
 For example, the Court of Appeals inBuckley stated:
 Looming large in the perception of the public and Congressmen was the revelation concerning the extensive contributions by dairy organizations to Nixon fund raisers, in order to gain a meeting with White House officials on price supports. The industry pledged $2,000,000 to the 1972 campaign, a pledge known to various White House officials, with President Nixon informed directly by Charles Colson in September 1970, as acknowledged by the 1974 White House paper .... On March 23, 1971, after a meeting with dairy organization representatives, President Nixon decided to overrule the decision of the Secretary of Agriculture and to increase price supports. In the meetings and calls that immediately followed the internal White House discussion and preceded the public announcement two days later, culminating in a meeting held by Herbert Kalmbach at the direction of John Ehrlichman, the dairymen were informed of the likelihood of an imminent increase and of the desire that they reaffirm their $2 million pledge. 519 F.2d at 840 n. 36.
 
 
 [29]
 My colleagues suggest in a footnote citing toMcConnell, see Maj. Op. at 117, n.12, that speech may be suppressed based solely on anecdotal evidence, and that reliance on a couple of untested and untestable anecdotes from Act 64's supporters is sufficient. However, McConnell—which dealt with contributions, not expenditures—does not stand for any such proposition. McConnell explained specifically how "[t]he evidence connects soft money to manipulations of the legislative calendar, leading to Congress' failure to enact, among other things, generic drug legislation, tort reform, and tobacco legislation." 124 S.Ct. at 664 (citing among other sources the declaration of former Senator Alan Simpson that "Donations from the tobacco industry to Republicans scuttled tobacco legislation, just as contributions from the trial lawyers to Democrats stopped tort reform"). McConnell also noted that
 The evidence in the record shows that candidates and donors alike have in fact exploited the soft-money loophole, the former to increase their prospects of election and the latter to create debt on the part of officeholders, with the national parties serving as willing intermediaries.... federal officeholders have commonly asked donors to make soft-money donations to national and state committees "solely in order to assist federal campaigns," including the officeholder's own. Parties kept tallies of the amounts of soft money raised by each officeholder, and "the amount of money a Member of Congress raise[d] for the national political committees often affect[ed] the amount the committees g[a]ve to assist the Member's campaign." Donors often asked that their contributions be credited to particular candidates, and the parties obliged, irrespective of whether the funds were hard or soft. National party committees often teamed with individual candidates' campaign committees to create joint fundraising committees, which enabled the candidates to take advantage of the party's higher contribution limits while still allowing donors to give to their preferred candidate. Even when not participating directly in the fundraising, federal officeholders were well aware of the identities of the donors: National party committees would distribute lists of potential or actual donors, or donors themselves would report their generosity to officeholders.
 For their part, lobbyists, CEOs, and wealthy individuals alike all have candidly admitted donating substantial sums of soft money to national committees not on ideological grounds, but for the express purpose of securing influence over federal officials.
 Id. at 662-63 (quoting and citing statements by politicians, CEOs and lobbyists).
 To support their argument that anecdotal evidence may, by itself, serve to repress speech, my colleagues parse McConnell's statement that "The record in this case is replete with similar examples of national party committees peddling access to federal candidates and officeholders in exchange for large soft-money donations." Id. at 664, see Maj. Op. at 117 n.12. In fact, this statement does not reference a record "replete" with anecdotal evidence, as my colleagues seem to believe, but introduces a factual discussion:
 So pervasive is this practice that the six national party committees actually furnish their own menus of opportunities for access to would-be soft-money donors, with increased prices reflecting an increased level of access. For example, the DCCC offers a range of donor options, starting with the $10,000-per-year Business Forum program, and going up to the $100,000-per-year National Finance Board program. The latter entitles the donor to bimonthly conference calls with the Democratic House leadership and chair of the DCCC, complimentary invitations to all DCCC fundraising events, two private dinners with the Democratic House leadership and ranking members, and two retreats with the Democratic House leader and DCCC chair in Telluride, Colorado, and Hyannisport, Massachusetts. Similarly, "the RNC's donor programs offer greater access to federal office holders as the donations grow larger, with the highest level and most personal access offered to the largest soft money donors."
 Id. at 665 (noting parenthetically "records indicating that DNC offered meetings with President in return for large donations").
 
 
 [30]
 In the last mayoral election in New York City, a candidate claimed to be eligible for public financing in a primary race, but his application was denied in a debatable rulingSee Mirta Ojito, Badillo Campaign Denied Matching Funds, N.Y. Times, Sept. 8, 2001, at B6; Mirta Ojito, Badillo Appeals Ruling on Campaign Fund Match, N.Y. Times, July 25, 2001, at B4. A Campaign Finance Board later overturned that ruling but only after the primary election was over. See A Bit Late for Race, Badillo Gets Funds, N.Y. Times, Apr. 12, 2002, at B3.
 
 
 [31]
 In a footnote responding to this dissent, my colleagues concede that "[o]f course, the ultimate issue for the District Court on remand is whether there exists a less restrictive type or degree of regulation that would serve Vermont's compelling anti-corruption and time-protection interests; it is not merely whether the legislatureconsidered such an alternative." Maj. Op. at 136 n.25 (emphasis in original). Unfortunately, the text of their opinion continues to direct the district court on remand to consider only what was "considered" by the legislature. See id. at 135 ("On remand, the District Court ought consider,... (1) what alternatives were considered by the legislature, including both alternative types of regulations and alternative amounts for the limits; (2) why these alternatives were rejected; (3) whether and how these alternatives would impinge less on First Amendment rights; and (4) whether the alternatives would be as effective as the mandatory spending limits in advancing the time-protection and anti-corruption interests.") Were I to eliminate my criticism of their text, their footnote would become superfluous and similarly removed, leaving the text of their opinion stating the incorrect standard.
 
 
 [32]
 Even where proponents do report spending for mileage, the numbers are rounded-off and therefore appear to be estimatesSee, e.g., Campaign Finance Report of Anthony Pollina, Sept. 25, 2002 (reporting in kind contribution of mileage by self of $2720); see also Campaign Finance Reports of Deborah Markowitz, Sept. 25, Oct. 25, and Dec. 16, 2002 (reporting in kind contributions of "postage, travel, phone") by Paul Markowitz of $525, $460, and $120, respectively. These round numbers are not divisible by 31¢ — the per mile cost of gas assigned by the Vermont Secretary of State; see 2001 Memorandum, supra.